**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **Jason J. Kilborn,** | ) | |
| Plaintiff, | ) | |
| **v.** | ) | |
| **Michael Amiridis, Caryn A. Bills,** | ) | **No** |
| **Julie M. Spanbauer, Donald Kamm,** and | ) | |
| **Ashley Davidson,** | ) | **Plaintiff Demands Trial by Jury** |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Jason J. Kilborn brings this action under 42 USC § 1983 and the First, Fifth, and Fourteenth Amendments to the United States Constitution and other laws against Defendants **Michael Amiridis, Caryn A. Bills, Julie M. Spanbauer, Donald Kamm,** and **Ashley Davidson,** in both their official and personal capacities, for injunctive, declaratory, compensatory, and punitive relief, and alleges as follows:

## JURISDICTION AND VENUE

1. This action arises under the First, Fifth, and Fourteenth Amendments to the United States Constitution and is brought pursuant 42 U.S.C. §§ 1983 and 1988.

2. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367.

3. Venue is proper under 28 U.S.C. § 1391 because the events giving rise to the claims occurred in the Northern District of Illinois.

**PARTIES**

4. Plaintiff, Jason J. Kilborn, resides in this district and is a tenured full Professor of Law at the UIC School of Law.

5. Defendants are all employees of the University of Illinois, a public university organized and existing under the laws of the State of Illinois. with multiple campuses, including the one relevant here in Chicago,  The University is governed by its Board of Trustees, which delegates authority and responsibilities to others, including the individual Defendants in this case. All acts taken by Defendants herein were taken pursuant to color of law.

6. Defendant Michael Amiridis is the Chancellor of UIC.

7. Defendant Caryn A. Bills is Associate Chancellor, Office for Access and Equity, at UIC.

8. Defendant Julie M. Spanbauer is Interim Dean of the UIC School of Law.

9. Defendant Donald Kamm is Director of the Office for Access and Equity at UIC.

10. Defendant Ashley Davidson was from May, 2020 to June, 2021 a Title IX & Equity Compliance Specialist in the Office for Access and Equity at UIC.

**FACTS**

11. This case arises from a single final examination question propounded by Plaintiff to his students, to which one or two student protested, which led to a purported investigation by the  UIC Office for Access and Equity ("OAE") into (i) the exam question, (ii) remarks by Plaintiff to two individual students

2

related to the protest over that exam question, and (iii) an unrelated series of in-class remarks by Plaintiff in a single class session two semesters earlier.

12.   In December, 2020, Plaintiff included on the final exam for his Civil Procedure II course a hypothetical employment discrimination scenario in which a woman sued because she suspected she had been fired on the basis of her race and gender.   One question asked students to analyze a piece of evidence, an account from a former manager that the manager had "quit her job at Employer after she attended a meeting in which other managers expressed their anger at Plaintiff, calling her a 'n____' and 'b____' (profane expressions for African Americans and women) and vowed to get rid of her." The question appeared exactly like this, with respectfully expurgated references to the racial and gender slurs.

13.   This same question had appeared on Plaintiff's exam in exactly this way for the previous ten years, administered to at least a dozen classes that included numerous Black and other non-white students. No one had ever suggested the question was objectionable.

14.   On December 21, 2020, the law school dean summoned Plaintiff to an electronic meeting (due to COVID restrictions, all meetings at this time were held by remote, electronic means). At this meeting, the dean revealed that she had been told Plaintiff had "used a racial slur" on his exam, upsetting some students. Plaintiff explained that he had not, in fact, "used" the word, but had simply included the respectfully expurgated reference in the context

3

of an employment discrimination litigation hypothetical.

15. Plaintiff spontaneously offered to send a note of regret to his class if those oblique references had caused anyone any distress. The dean agreed, and Plaintiff sent such a message to his class.

16. On January 12, 2021, the law school dean summoned Plaintiff to another electronic meeting, at which she summarily announced that Plaintiff was being placed on "indefinite administrative leave." All of Plaintiff's classes were cancelled for the entire semester, he was forbidden from coming onto campus or from engaging in any university activity, including remote electronic activities related to Plaintiff's university administrative duties, and he was prohibited from having even informal meetings of any kind with colleagues, staff, students, or even alumni of the school.

17. Not until two-and-a-half days later, on Friday afternoon, January 14, 2021, did the OAE reveal to Plaintiff that the summary suspension was based on a conversation he had with a student several days earlier regarding the exam question about which some objections had been raised.

18. A Black male colleague of Plaintiff 's had suggested that Plaintiff speak with a member of the Black Law Students Association about the exam controversy.  The student, who had not been in Plaintiff's class, arranged a remote electronic conversation at 5:00 p.m. on Thursday, January 7, 2021.

19. Plaintiff participated in that conversation which was generally cordial and constructive, and at one point about an hour into the conversation, the

student asked why the law school dean had not shown Plaintiff a student petition criticizing his exam question. Plaintiff responded, using the same common metaphorical expression he had used in a similar conversation with his dean days earlier, that perhaps she had not shared the petition with him because she feared that if Plaintiff saw the hateful things said about him in that petition, he might "become homicidal." The conversation continued with no indication that the student felt in any way distressed or threatened. Plaintiff allowed the conversation to extend over 4 hours, until 9:00 p.m.

20. It was reported to Plaintiff that on the following Monday, January 11, 2021, several students met (electronically) with the law school dean and other UIC administrators during which meeting the student with whom Plaintiff had spoken misreported that Plaintiff had exclaimed that he "was feeling homicidal" or "would become homicidal." .

21. The law school dean, along with other defendants, invoked UIC's Violence Prevention Plan to convene a Behavioral Threat Assessment Team ("BTAT") to assess this purported "threat" of imminent physical violence. Without communicating with Plaintiff or any other person with firsthand knowledge, the BTAT authorized the law school dean to take the most extreme measures.

22. When he met with OAE, Plaintiff openly admitted the "become homicidal" comment; at which time Defendant Bills revealed to Plaintiff that this comment was the basis for his summary and previously unexplained "indefinite administrative leave."

5

23. To be cleared of this "indefinite administrative leave," Plaintiff was required to meet physically with university health officials, submit to drug testing, and sit for several hours of examination with a nurse, a social worker, and a doctor. Plaintiff was released to unrestricted duty (though his classes remained cancelled) a few days later.

24. On January 6, 2021, the Black Law Student Association issued a tweet, inviting its followers to complain if they "were affected by Plaintiff past or present." At some point thereafter, several unidentified students reportedly approached OAE.

25. On February 17, 2021, OAE notified Plaintiff that it had commenced an investigation into "allegations of race based discrimination and harassment" in that Plaintiff had allegedly "created a racially hostile environment for … non-white students between January, 2020 and January, 2021, particularly during your Civil Procedure II course."

26. OAE's notification of investigation indicated a list of allegations from unidentified sources, offering virtually no detail or context.

27. Plaintiff objected that expecting him to respond to such vague allegations from unknown sources, violated his right to due process, but he attempted as best he could to respond in writing and at an electronic "investigative interview" on February 26, 2021.

28. Three months later, on May 28, 2021, with no further attempt at clarification with or an opportunity for Plaintiff to respond, OAE delivered its

6

"findings letter." A copy of that letter is attached hereto as Exhibit "A" and incorporated by reference as though fully set forth herein.

29. After concluding that allegations of racial discrimination had not been substantiated, OAE concluded that Plaintiff had nonetheless violated the harassment aspect of UIC policy because his final exam question and his "responses to criticism of the final exam question" had "interfered with Black students' participation in the University's academic program and therefore constituted harassing conduct that violates the Policy."

30. OAE never explained how Plaintiff had purportedly violated this policy, as the cited policy reads in its material entirety: "The University of Illinois System will not engage in … harassment against any person …." UIC's Nondiscrimination Policy Statement 1100-004. Neither the Statement nor any other public source defines or provides any other guidance as to the meaning of "harassment" for purposes of this policy.

31. Nonetheless, OAE purported to find a policy violation on two sets of facts: (1) the exam question from December 2020, along with Plaintiff's private remarks to two different students in January 2021 concerning the outcry over that exam question; and (2) comments made during a single session of a different Civil Procedure II course, which OAE for the first time assigned a specific date, January 23, 2020, two semesters earlier.

32. The details of OAE's findings remained unclear until six months later, when UIC released for the first time, a 24-page OAE "investigative report" dated

7

May 28, 2021, in response to a Freedom of Information Request to UIC from a newspaper reporter. Plaintiff received this investigation report, which had been prepared by Defendant Davidson, for the first time "as a courtesy" from UIC counsel's office on November 11, 2021.

33. The investigation report revealed substantial new information about OAE's analysis and findings which had never been submitted to Plaintiff and to which he never had an opportunity to respond. It made clear that OAE expressly did *not* find any evidence that Plaintiff had targeted non-white students "when discussing topics about Black, Latinx, or Middle Eastern culture," nor did he "diminish or dismiss the perspectives of an African female student because of her race as a Black woman and based on her accent."

34. As to other allegations, most of which had never been revealed to Plaintiff, the conclusions in the Report made by Defendant Davidson, were demonstrably false.

35. OAE's findings letter bases its conclusion of a policy violation in part on a very brief reference to "inappropriate, racially-charged comments" in Plaintiff's Civil Procedure II course 16 months earlier, on January 23, 2020. All of these conclusions were inaccurate.

A. OAE asserted that Plaintiff had referred to racial minorities as cockroaches, which statement was absolutely untrue. This is plainly revealed by reference to the recording of the relevant segment of the class discussion,

8

a true transcript of which is attached hereto as Exhibit "B."

B.  OAE criticized Plaintiff for referring to "lynching," but Plaintiff immediately retracted the remark and apologized to the class for that choice of words.

C.  OAE asserted that Plaintiff had used an "African American Vernacular English ("AAVE") accent when referencing a Black artist's lyrics," a matter to which Plaintiff was never given an opportunity to respond, which involved a single, topic appropriate quote of only a few words, and of which no complaint had been made by anyone.

D.  OAE accused Plaintiff of generalizing about minority participation in litigation and having admitted to having an "implicit bias" toward Black students.  These assertions had absolutely no basis in fact and were not presented to Plaintiff to give him an opportunity to respond.  An email exchange revealing the nature of this issue and the student's satisfied response is attached hereto as Exhibit "C."

36.  OAE's findings letter further purported to base its conclusion of a policy violation on the exam question discussed above, along with two communications about that exam question with individual students in January, 2021 that OAE asserted "demonstrated racial insensitivity and even hostility to those voicing concerns about a racially charged topic."  These assertions are false; OAE's contentions were never presented to Plaintiff, and they are unsupported by the facts.

9

A. OAE accused Plaintiff of expressing "anger and displeasure with students' objections in a manner that created retaliation concerns for Black students" by sending an email to a white former student on January 4, 2021. This finding was not presented to Plaintiff to give him an opportunity to respond, and it was a deliberate misrepresentation of the contents of Plaintiff's email, and the recipient's reaction, which he provided voluntarily on his own initiative to OAE. OAE deliberately excluded Plaintiff's statements in this email that were contrary to OAE's conclusions, such as that his "heart is absolutely broken by" the objections to his exam question and his expression of support for all students, including those expressing concern about the exam question. The full text of this email exchange with the white former student is attached hereto as Exhibit "D."

B. OAE asserted that the use of the single word "homicidal" in a four hour conversation at the invitation of another student on the evening of January 7, 2021, from Plaintiff's home computer "created fear and intimidation that were reasonably interpreted as such." These findings are false and belied by the facts.

37. On June 18, 2021, Plaintiff met with Defendant Spanbauer to discuss this hotly disputed case, which Plaintiff warned would lead to litigation if they could not agree on a compromise resolution. At this meeting, Plaintiff agreed that someone from the law school could review his class recordings (as all law school classes are recorded) and mention if any instance of potential "racial

10

harassment" presented itself, and he agreed to report to the dean before responding to any race-related student complaint.

38. Plaintiff strenuously objected to any required participation in sensitivity training on Plaintiff's supposed "white privilege" and engagement with diverse students. He asserted that such training was both unwarranted and unconstructive, as multiple studies had recently demonstrated.

39. On July 2, 2021, Defendant Spanbauer delivered her final resolution. She accepted Plaintiff's proposed compromise on sensitivity training, agreeing that such training might be mandated only if four semesters of review of class recordings revealed that Plaintiff had failed to maintain a non-harassing classroom environment. Plaintiff accepted this resolution to avoid a lawsuit. A copy of that letter is attached hereto as Exhibit "E" and incorporated by reference as though fully set forth herein.

40. Reneging on this agreed settlement arrangement, Defendant Spanbauer subsequently imposed two surprise punishments on Plaintiff emanating from OAE's findings.

41. First, despite Plaintiff's glowing and exceptional performance review, and without warning of any kind, Defendant Spanbauer informed Plaintiff on September 6, 2021, that he was "ineligible" for an announced across-the-board 2% "merit raise." The sole basis for this punishment was OAE's finding of a policy violation. Defendant Spanbauer claimed—for the first time, and contrary to Plaintiff's glowing performance evaluation—that he had failed to

meet "General Teaching Expectations" requiring all faculty to "act in a collegial manner toward each other, and act with appropriate dignity and respect toward … students."

42. Plaintiff's counsel sent a demand letter to the school on September 16, 2021, which Defendant has acknowledged, but to which it has never responded. A copy of that letter is attached hereto as Exhibit "F" and incorporated by reference as though fully set forth herein.

43. Then, on November 12, 2021, at 4:15 pm,, Defendant Spanbauer notified Plaintiff that he would be required to undergo the very sensitivity training that she had promised not to impose in her letter of July 2. Indeed, though she asserted that more information about scheduling the training would be forthcoming, she insisted that this training be completed within less than one month, before December 10, over the Thanksgiving holiday, in a period during which Plaintiff was scheduled for surgery. A copy of that letter is attached hereto as Exhibit "G" and incorporated by reference as though fully set forth herein.

44. Disregarding their own arbitrary deadline, Defendants delayed for more than a month while purporting to decide what sort of training mandate to impose on Plaintiff.

45. On December 17, 2021, Plaintiff was finally informed that he was to be summarily suspended from teaching for the entire Spring, 2022 semester—again with no hearing or prior notice. His Bankruptcy class was

12

cancelled, and his Secured Transactions class was reassigned to another professor with no experience teaching the course.

46. At that time, Defendants declared that Plaintiff would be subjected to an 8-week diversity course—20 hours of course work, required "self-reflection" papers for each of 5 modules, plus weekly 90-minute sessions with a trainer followed by three more weeks of vaguely described supplemental meetings with this trainer. The trainer would provide "feedback regarding Professor Kilborn's engagement and commitment to the goals of the program." Only upon satisfactory completion of this program would Plaintiff be allowed to return to class in Fall, 2022.

## COUNT I

### Violation of the First and Fourteenth Amendments

47. The University of Illinois is a public institution, bound by the First Amendment via the Fourteenth Amendment, as well as related state law, which prohibits the punishment, prohibition, and/or compulsion of speech.

48. Indeed, the University of Illinois System's Guiding Principles at the very beginning explicitly ensure an "unyielding allegiance to freedom of speech – even controversial, contentious, and unpopular speech" and pledge that "protected speech cannot be prohibited or punished."

49. Defendants have purported to punish Plaintiff for speech that expresses "anger, dissatisfaction, and disappointment related to issues of race" or that "demonstrate[s] racial insensitivity and even hostility to those voicing

concerns about a racially-charged topic." This is a plainly unlawful, content-based restriction on speech.

50.     The sensitivity training which Defendants have imposed upon Plaintiff also violates the First Amendment, as it compels Plaintiff to express his "commitment to the goals of the program" in order to be released back to teaching, even if he disagrees with the content and purpose of this diversity training.

51.     Plaintiff's exam question and in-class discussions are plainly protected educational speech.

52.     The few remarks to two individual students were neither intended nor expected to reach beyond those two participants, and nothing said to either of them could reasonably be perceived as a "true threat" or "pervasive harassment." These statements are all protected speech.

53.     Nothing stated by Plaintiff to any of his students expressed any anger; rather, if anything, it expressed pain and heartbreak, and it nonetheless emphasized that Plaintiff has not criticized any of his students and continued to welcome all students, regardless of their race or background. .

54.     Nothing stated by Plaintiff can even remotely be construed as a "true threat."

55.     Punishing or otherwise sanctioning Plaintiff under color of state law on the basis of his speech, and compelling him to adopt speech with which he disagrees, violates the First and Fourteenth Amendments and UIC's own Guiding Principles.

14

## COUNT II

### Violation of University of Illinois Statutes

56. UIC is governed by the University of Illinois Statutes, as promulgated by authority of the Illinois General Assembly under the University of Illinois Act, 110 ILCS 305.

57. Article X, Section 2(a) of the Statutes pledges to "protect all members of the academic staff against influences, from within or without the University of Illinois System, which would restrict the member's exercise of these freedoms in the member's area of scholarly interest." It establishes that this freedom "includes the right to discuss and present scholarly opinions and conclusions both in and outside the classroom."

58. OAE's investigation report asserts "OAE does not address or make determinations regarding the extent that academic freedom principles may apply to the facts at issue in this investigation. Instead, OAE considers whether, based on the totality of the circumstances, racial discrimination or racial harassment occurred ....."

59. Since academic freedom protects Plaintiff's speech, that speech cannot lawfully be found to violate OAE's policy in a way that could lead to the punishments meted out to Plaintiff.

60. Plaintiff has the right to advance his pedagogical goals as he sees fit within the confines of state and federal anti-discrimination law. Nothing he did or said violates any law; therefore, neither OAE or any of the defendants can

lawfully arrogate to themselves the power to declare that Plaintiff cannot teach his course as he sees fit.

61. OAE's report indicates that its investigation and its conclusions disregarded and consequently violated Plaintiff's rights to academic freedom, as has the action of defendants in taking punitive action against Plaintiff based upon that report.

## COUNT III

## Violation of the Fifth and Fourteenth Amendments

62. The process of investigating and sanctioning Plaintiff's speech here involved a series of violations of due process, equal protection, and lack of adequate or fair notice.

63. OAE's factual conclusions are clearly erroneous and demonstrate an intentional failure to provide Plaintiff with an opportunity to respond to the accusations it has made against him.

64. Prior to each of the two summary suspensions from teaching, Plaintiff was afforded no process of any kind.

65. These shortcomings constitute violations of Plaintiff's rights under the Fifth and Fourteenth Amendments to fair notice, due process, and equal protection.

66. The conclusion that Plaintiff violated UIC's Nondiscrimination Policy Statement 1100-004 is based upon a single operative word, "harassment," which is not defined in any way which has given Plaintiff no notice or

guidance on the content of this policy or the kind(s) of conduct it purports to proscribe.

67. The due process principle of clarity is especially demanding, and a more stringent vagueness test applies, when First Amendment freedoms are at stake, as in this case; any claim that Plaintiff has violated any nondiscrimination policy violates due process and is void for vagueness.

68. The finding by OAE that Plaintiff is guilty of "harassment" is based upon an assertion which is hidden from Plaintiff and is arbitrary and capricious and, as OAE admits, "is broader than applicable law." Such an admission runs afoul of both the federal and state protections of free speech, due process and equal protection.

69. Punishing Plaintiff for violation of a policy with no stated substance and no advance notice or guidance is an arbitrary and capricious abuse of authority. Such abuse undertaken under color of state law violates Plaintiff's constitutional rights to fair notice and due process.

70. The allegations presented to Plaintiff were so vague as to be impossible to respond to, no specific time period was identified, and no specific facts giving rise to many of the allegations were offered. Plaintiff was given no opportunity to advance any reasonable defense because he was not given any specific dates or fact scenario to which he was to respond until OAE's conclusions were released, long after punishment had been imposed on Plaintiff. OAE never confronted Plaintiff with its purported evidence or

allowed him to present an explanation or defense.

71. The conclusions OAE drew from its review of the documentary evidence are so clearly erroneous and biased as to constitute due process violations themselves.

72. Defendant Davidson frequently ignored aspects of this evidence that plainly contradicted her foregone conclusion, and she misrepresented other facts.

73. OAE's clearly erroneous and biased investigation and fact findings, undertaken under color of state law and without notice to Plaintiff violate his rights to due process.

74. As a result of the foregoing actions against him, Plaintiff has suffered humiliation, indignity and mental agony, and his professional reputation has been egregiously damaged, and he has been required to retain counsel to assist him in defending his constitutional rights which have been egregiously violated by Defendants.

**COUNT IV**

**Violation of the Illinois Violence Prevention Plan**

75. The actions taken against Plaintiff by Defendants was a gross violation of UIC's Violence Prevention Plan, in the following respects:

A. Defendants failed to make a fact-based assessment and case specific evidence-based solution built upon communication, as required by Paragraph 3.2 of the plan, in that it refused to communicate with Plaintiff at all before barring him from campus,

18

B.  Defendants failed to apply "common-sense behavioral thresholds" before taking action against Plaintiff, as required by Paragraph 4.2 of the Plan.

C.  Defendants failed to identify and weigh mitigating factors as required by Paragraph 5.2.3, of the Plan before taking action against Plaintiff.

D.  Defendants failed to consider how the decisions, actions and delivery of threat management requirements may impact the life of the person against whom action is taken, as required by paragraph 5.4 of the Plan.

76.  As a result of Defendants' violation of the provisions of the Violence Prevention Plan, Plaintiff was forced to come physically to campus, exposing himself to COVID and undergo two days of invasive drug testing and several hours of mental examination, none of which was appropriate or called for by the provisions of the Plan which were ignored by defendants.

77.  These actions turned Plaintiff's life upside down and caused him severe emotional damage due to this summary and unexplained banishment from having any contact with others at UIC.

**WHEREFORE**, Plaintiff Jason J. Kilborn respectfully requests that this Court enter judgment in his favor and against Defendants and provide the following relief:

A. Issue a preliminary injunction preventing Defendants from enforcing the mandated 8-week sensitivity training program, which is suggested to begin on January 22, 2022;

B. Enter a declaratory judgment that Defendants' punishment and

compulsion of Plaintiff's speech violates the First, Fifth, and Fourteenth Amendments as well as the University of Illinois Statutes, along with an order of specific performance requiring Defendants to abide by their contractual obligations of freedom of speech and academic freedom to Plaintiff under the University of Illinois Statutes;

C. Issue a permanent injunction barring Defendants from enforcing the anti-discrimination policy in a way that violates faculty and student rights under the First, Fifth, and Fourteenth Amendments and the University of Illinois Statutes;

D. Award to Plaintiff compensatory and punitive damages against Defendants for their violations of his rights and consequent harm inflicted upon his person and property in an amount of not less than One Hundred Thousand Dollars ($100,000).

E. Award to Plaintiff his reasonable costs and expenses of this action, including attorney's fees, in accordance with 42 U.S.C. §1988 and all other applicable laws; and

F. Award to Plaintiff all other and further relief to which the Court finds Plaintiff is entitled.

Respectfully submitted,

/s/ Wayne B. Giampietro

Of Counsel:
POLTROCK & GIAMPIETRO
123 W. Madison St., Suite 1300
Chicago, IL 60602
(312) 236-0606

Attorney I.D. 0947776
wgiampietro@giampietrolaw.com

*Counsel for Plaintiff Jason J. Kilborn*