IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JASON J. KILBORN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-00475 |
| | ) | |
| MICHAEL AMIRIDIS, CARYN A. BILLS, | ) | Judge John Z. Lee |
| JULIE M. SPANBAUER, DONALD KAMM, | ) | Magistrate Judge Sheila M. Finnegan |
| and ASHLEY DAVIDSON, | ) | |
| | ) | JURY DEMANDED |
| Defendants. | ) | |

## AMENDED COMPLAINT

Plaintiff Jason J. Kilborn brings this action under 42 USC § 1983 and the First, Fifth, and Fourteenth Amendments to the United States Constitution and other laws against Defendants Michael Amiridis, Caryn A. Bills, Julie M. Spanbauer, Donald Kamm, and Ashley Davidson, in both their official and personal capacities, for injunctive, declaratory, compensatory, and punitive relief, and alleges as follows:

### INTRODUCTION

1.      In its zeal to protect students from speech that made them feel uncomfortable, the University of Illinois Chicago ("UIC") has violated a school of law faculty member's rights to freedom of speech, academic freedom, and due process. It has also defamed him and subjected him to extreme emotional distress during a period of already heightened emotional trauma in the midst of the isolation and anxiety of the COVID-19 pandemic.

2.      Writing in the Chronicle of Higher Education on recent responses by law school administrators to politically criticized speech, a Northwestern University law professor declared about Professor Kilborn's case, "What you are seeing at UIC is much worse. It's positively

malevolent — there's just no excuse for it. … We are going into punitive damages territory here, where you have outrageous intentional infliction of emotional distress. There's no excuse for it — it's just insane." Len Gurkin, "The Review," Chronicle of Higher Education, Nov. 29, 2021, https://www.chronicle.com/newsletter/chronicle-review/2021-11-29 (interviewing Professor Andrew Koppelman).

3.     This observation is especially apt in the wake of the U.S. Supreme Court's judgment just last year in *Mahanoy Area School District v. B.L.,* 594 U.S. __ (2021), where the Court reaffirmed that public schools have a duty to defend freedom of speech, including politically unpopular speech, and are prohibited from punishing that speech.  UIC has ignored this mandate, subordinated freedom of speech (and many other essential freedoms) to other interests, and punished its faculty based on claims that isolated snippets of law school class-related speech constitute "harassment" of law students.

## JURISDICTION AND VENUE

4.     This action arises under the First, Fifth, and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. §§ 1983 and 1988.

5.     The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. This Court has supplemental jurisdiction over the common law claims under 28 U.S.C § 1367.

6.     Venue is proper under 28 U.S.C. § 1391 because the events giving rise to the claims occurred in the Northern District of Illinois.

## PARTIES

7.     Plaintiff, Jason J. Kilborn, resides in this district and is a tenured full Professor of Law at the UIC School of Law.

8.     Defendants are all employees of the University of Illinois, a public university organized and existing under the laws of the State of Illinois, with multiple campuses, including

the one relevant here in Chicago. The University is governed by its Board of Trustees, which delegates authority and responsibilities to others, including the individual Defendants in this case. All acts by Defendants herein were taken under color of law.

9.     Defendant Michael Amiridis is the Chancellor of UIC.

10.     Defendant Caryn A. Bills is Associate Chancellor, Office for Access and Equity, at UIC.

11.     Defendant Julie M. Spanbauer is Interim Dean of the UIC School of Law.

12.     Defendant Donald Kamm is Director of the Office for Access and Equity at UIC.

13.     Defendant Ashley Davidson was from May 2020 to June 2021 a Title IX & Equity Compliance Specialist in the Office for Access and Equity at UIC.

## FACTS

14.     This case arises from a single final examination question propounded by Plaintiff to his students, to which one or two students protested, which led to a purported investigation by the UIC Office for Access and Equity ("OAE") into (i) the exam question, (ii) remarks by Plaintiff to two individual students related to the protest over that exam question, and (iii) an unrelated series of in-class remarks by Plaintiff in a single class session two semesters earlier.

15.     In December 2020, Plaintiff included on the final exam for his Civil Procedure II course a hypothetical employment discrimination scenario in which a woman sued because she suspected she had been fired on the basis of her race and gender.   One question asked students to analyze a piece of evidence, an account from a former manager that the manager had "quit her job at Employer after she attended a meeting in which other managers expressed their anger at Plaintiff, calling her a 'n_____' and 'b____' (profane expressions for African Americans and women) and vowed to get rid of her." The question appeared exactly like this, with respectfully expurgated references to the racial and gender slurs.

- 3 -

16.     This same question had appeared on Plaintiff's exam in exactly this way for the previous ten years, administered to at least a dozen classes that included numerous Black and other non-white students. No one had ever suggested the question was objectionable.

17.     On December 21, 2020, the law school dean summoned Plaintiff to an electronic meeting (due to COVID restrictions, all meetings at this time were held by remote, electronic means). At this meeting, the dean revealed that she had been told Plaintiff had "used a racial slur" on his exam, upsetting some students. Plaintiff explained that he had not, in fact, "used" the word, but had simply included the respectfully expurgated reference in the context of an employment discrimination litigation hypothetical.

18.     Plaintiff spontaneously offered to send a note of regret to his class if those oblique references had caused anyone any distress. The dean agreed, and Plaintiff sent such a message to his class.

19.     A Black male colleague of Plaintiff's had suggested that Plaintiff speak with a member of the Black Law Students Association ("BLSA") about the exam controversy. The student, who had not been in Plaintiff's class, arranged a remote electronic conversation at 5:00 p.m. on Thursday, January 7, 2021.

20.     Plaintiff participated in that conversation, which was generally cordial and constructive, and at one point about an hour into the conversation, the student asked why the law school dean had not shown Plaintiff a student petition criticizing his exam question. Plaintiff responded, using the same common metaphorical expression he had used in a similar conversation with his dean days earlier, that perhaps she had not shared the petition with him because she feared that if Plaintiff saw the hateful things said about him in that petition, he might "become homicidal." Plaintiff clearly used that phrase in jest, and the conversation continued with no indication that the

student felt in any way distressed or threatened. Plaintiff allowed the conversation to extend over 4 hours, until 9:00 p.m.

21.    It was reported to Plaintiff that on the following Monday, January 11, 2021, several students met (electronically) with the law school dean and other UIC administrators, during which meeting the student with whom Plaintiff had spoken misreported that Plaintiff had exclaimed that he "was feeling homicidal" or "would become homicidal."

22.    The law school dean, along with other Defendants, invoked UIC's Violence Prevention Plan to convene a Behavioral Threat Assessment Team ("BTAT") to assess this purported "threat" of imminent physical violence. Without communicating with Plaintiff or any other person with firsthand knowledge, the BTAT authorized the law school dean to take the most extreme measures.

23.    The very next morning, at 6:39 am on January 12, 2021, the law school dean summoned Plaintiff to yet another electronic meeting at 8:15 am.  This was the first morning of Plaintiff's classes for the spring semester, during which no classes or other university activities were being held on campus due to COVID restrictions, neither students nor faculty were coming onto campus for the foreseeable future, and none of the BLSA students was required to come into contact with Plaintiff for any reason.

24.    The dean summarily announced that Plaintiff was being placed on "indefinite administrative leave," all of Plaintiff's classes were cancelled for the entire semester, and Plaintiff was forbidden from coming onto campus or from engaging in any university activity, including remote electronic activities related to his duties as chair of the law school's Academic Affairs Committee and UIC's university-wide elected Promotion and Tenure Committee.  Indeed, Plaintiff was prohibited from having informal meetings of any kind with colleagues, staff, students, or even alumni of the school.  He was required to seek prior approval for fulfilling his commitments to

speak at external conferences.  Finally, Plaintiff was "requested to not discuss" these events with anyone associated with the university, and he was removed from the distribution lists for email communications with faculty and staff.

25.     Plaintiff immediately asked what the basis could possibly be for such a rash action. He was told only that the basis was "additional complaints and concerns brought forth by students regarding possible violations of University policies, including the nondiscrimination statement," and that UIC's Office for Access and Equity ("OAE") would explain more "in a few days."  The entire electronic meeting lasted little more than one minute.

26.     When he met with OAE on January 15, 2021, Plaintiff openly admitted the "become homicidal" comment and re-emphasized that it had been said in jest; at which time Defendant Bills revealed to Plaintiff that this comment was the basis for his summary and previously unexplained "indefinite administrative leave."

27.     In retrospect, it is fairly clear that the purported threat was a mere pretext, offering UIC officials cover for their politically motivated actions.  In an article published by Northwestern University law professor Andrew Koppelman in the Chronicle of Higher Education, Prof. Koppelman posits "It is hard to believe that [the dean] would have reacted the same way if Kilborn's exam had not already provoked controversy.  The complaints about the exam were apparently not sufficient to trigger the sanctions that might mollify the complaining students. The purported threat, however, offered that opportunity." Koppelman, A., "Is This Law Professor Really a Homicidal Threat?  The punitive overreactions of university administrators grow ever more demented," Chronicle of Higher Education, Jan. 19, 2021, https://www.chronicle.com/article/is-this-law-professor-really-a-homicidal-threat.

28.     To be cleared of this "indefinite administrative leave," Plaintiff was required to meet physically with university health officials, submit to drug testing, and sit for several hours of

examination with a nurse, a social worker, and a doctor. Plaintiff was released to unrestricted duty (though his classes remained cancelled) a few days later.

29.     On February 17, 2021, OAE notified Plaintiff that it had commenced an investigation into "allegations of race based discrimination and harassment" in that Plaintiff had allegedly "created a racially hostile environment for … non-white students between January 2020 and January 2021, particularly during your Civil Procedure II course."

30.     OAE's notice of investigation indicated a list of allegations from unidentified sources, offering virtually no detail or context.

31.     Plaintiff objected that expecting him to respond to such vague allegations from unknown sources violated his right to due process, but he attempted as best he could to respond in writing and at an electronic "investigative interview" on February 26, 2021.

32.     Three months later, on May 28, 2021, with no further attempt at clarification with or an opportunity for Plaintiff to respond, OAE delivered its 4-page "findings letter." (Exhibit A).

33.     After concluding that allegations of racial discrimination had not been substantiated, OAE concluded that Plaintiff had nonetheless violated the harassment aspect of UIC policy because his final exam question and his "responses to criticism of the final exam question" had "interfered with Black students' participation in the University's academic program and therefore constituted harassing conduct…."  This statement was false, as Plaintiff has never interfered with Black students' participation in the university's academic program.

34.     The findings letter reported the first – and most incendiary – allegation of harassment was that Plaintiff "referred to racial minorities as 'cockroaches' and denounced racial minorities' participation in civil rights claims as part of a discussion of modern-day extortion theory…."  The letter went on to find that the allegations referring to "cockroaches" had been "substantiated."

35.     The notion that Plaintiff had ever referred to racial minorities as "cockroaches" is demonstrably false, as is plainly revealed by the transcript of the recording of the relevant segment of the class discussion:

> The fact that other plaintiffs see that one other plaintiff lost isn't a disincentive. If it were, frivolous litigation would have ended long ago, because lots of plaintiffs have been pushed to the wall and lost. You don't hear about those stories in the media. You hear about idiot people winning $1 million verdict against Subway for having 11.5"-long sandwiches. That's what makes the press, right, that Subway lost. Not that they win against this ridiculously frivolous case. That wasn't in the media, only in the legal media, maybe, if you were paying attention. And that's the problem. If they win, no one hears about this. They only hear about it if they lose, and God forbid that, then all the cockroaches come out of the walls, they're thinking, right?

(Exhibit B). At no time, did Plaintiff ever denounce racial minorities' participation in civil rights claims.

36.     OAE's findings letter also:

(1)     criticized Plaintiff for referring to "lynching," a word which Plaintiff immediately retracted and apologized to the class for using ("I'm not subjecting my corporate bottom line to that public lynching; I'm sorry, that's not the right word to use.").

(2)     asserted that Plaintiff had used an "African American Vernacular English ("AAVE") accent when referencing a Black artist's lyrics," a matter to which Plaintiff was never given an opportunity to respond, which involved a single, topic-appropriate quote of only a few words, and of which no complaint had been made by anyone. (Plaintiff had repeated a line from a song in which Jay-Z describes an abusive pretextual racial profile stop; in explaining to the young Black man why he stopped him, the police officer says, "You was doin' 55 in a 54."); and

(3)     accused Plaintiff of generalizing about minority participation in litigation and having admitted to having an "implicit bias" toward Black students. These assertions had absolutely no basis in fact and were not presented to Plaintiff to give him an opportunity to respond. An email exchange revealing the nature of this issue and the student's satisfied response is attached as Exhibit C.

37.     OAE's findings letter further purported to base its declaration that Plaintiff had engaged in "harassment" on the exam question discussed above, and the statement that Plaintiff had engaged in "overtly intimidating and threatening reaction" is false. As purported support for that statement, OAE accused Plaintiff of expressing "anger and displeasure with students'

- 8 -

objections in a manner that created retaliation concerns for Black students" by sending an email to a white former student on January 4, 2021. This finding was not presented to Plaintiff to give him an opportunity to respond, and it was a deliberate misrepresentation of the contents of Plaintiff's email, which he provided voluntarily on his own initiative to OAE, as well as the recipient's reaction. OAE deliberately excluded Plaintiff's statements in this email that were contrary to OAE's conclusions, such as that his "heart is absolutely broken by" the objections to his exam question, and his expression of support for all students, including those expressing concern about the exam question. The full text of this email exchange with the white former student is attached as Exhibit D.

38.     OAE also asserted that the use of the single word "homicidal" in a four-hour conversation at the invitation of another student on the evening of January 7, 2021, from Plaintiff's home computer "created fear and intimidation that were reasonably interpreted as such." Plaintiff used that word in jest, and it was clearly understood to be in jest ("I suspect she's [the Dean's] afraid if I saw terrible things said about me in that letter, I would become homicidal"), as the conversation continued for several hours after that word was used. Nonetheless, the OAE pointed to that conversation as "overtly intimidating and threatening" behavior because UIC had already used that conversation to invoke UIC's Violence Prevention Plan to have its Behavioral Threat Assessment Team assess Plaintiff.

39.     All Defendants participated in creating the findings letter; they then published it by, on information and belief, sending it to members of the BLSA and others. Indeed, the ABA Journal used the letter as the centerpiece of an article highly critical of Plaintiff: "Exam Question wasn't only offensive behavior of UIC law professor, according to internal investigation", Stephanie Francis Ward, December 7, 2021, ABA Journal. That article states:

A May 28 letter ([https://www.abajournal.com/files/UIC_Law_finding.pdf](https://www.abajournal.com/files/UIC_Law_finding.pdf)) from UIC's Office for Access and Equity details the various complaints. According to the letter, the agency found that **Kilborn's conduct** was "sufficiently substantial and repeated" enough to interfere with Black students' law school participation and **constituted harassment**.... **Allegations the office found to be substantiated include Kilborn** in a January 2020 lecture dismissing a Black student's view that his comments were overgeneralizing references to people of color, **referring to racial minorities as "cockroaches," and denouncing their participation in civil rights claims.**

(emphasis added).

40.     Not surprisingly, the false and incendiary claim that Plaintiff had described minorities as "cockroaches" sparked a wave of outrage over Plaintiff's purported use of "racial slurs." See e.g., https://abc7chicago.com/university-of-illinois-at-chicago-uic-law-professor-racial-slur/11200106/; https://chicago.cbslocal.com/2021/11/04/jesse-jackson-uic-professor-firing-racial-slurs/ and https://chicagocrusader.com/breaking-news/uic-black-law-student-association-wants-white-professor-fired/ (Headline: "UIC Black Law Student Association wants White professor fired for calling them 'cockroaches' and other racial slurs."). Protests and a press conference were held for the purpose of denouncing Plaintiff.

41.     A more careful observer, however, revealed Defendants' misdeeds in disseminating these devastating falsehoods about Plaintiff's conduct. Northwestern University law professor Andrew Koppelman reviewed the class recording and concluded insightfully, "Only those already committed to a predetermined finding that Kilborn had done something, anything, wrong could have issued judgments like these. … The overall impression is of an adjudicator who regards Kilborn's exoneration as unthinkable, who is struggling desperately to avoid that conclusion. … We are dealing here with administrators who seem to regard truth as an inconvenient obstacle and who appear not to mind convicting the innocent." Andrew Koppelman, "Yes, this is a witch-hunt: A university's Office for Access and Equity launches a full-scale persecution campaign,"

Chronicle of Higher Education, Nov. 17, 2021, https://www.chronicle.com/article/yes-this-is-a-witch-hunt.

42.     The details of OAE's findings remained unclear until six months later, when UIC released for the first time, a 24-page OAE "investigation report" dated May 28, 2021, in response to a Freedom of Information Request to UIC from a newspaper reporter. Plaintiff received this investigation report, drafted by Defendant Davidson, for the first time "as a courtesy" from UIC counsel's office on November 11, 2021.  UIC has posted the document on its website.

43.     The investigation report revealed substantial new information about OAE's analysis and findings which had never been submitted to Plaintiff and to which he never had an opportunity to respond. It made clear that OAE expressly did not find any evidence that Plaintiff had targeted non-white students "when discussing topics about Black, Latinx, or Middle Eastern culture," nor did he "diminish or dismiss the perspectives of an African female student because of her race as a Black woman and based on her accent."  However, the report included many of the same statements of the findings letter, along with additional false statements, including: "certain alleged statements [by Kilborn] and threats did occur"; Kilborn had created "race related fears of physical safety and retaliation"; and Kilborn was wrong to "suggest killing anyone as a reaction to written or spoken criticism."  In his November 30, 2021, cover letter releasing the report to the "UIC Community," Defendant Amiridis stated:  "The use of words that disparage individuals based on identity or background is not necessary for academic freedom to flourish and is inconsistent with our commitment to create an inclusive and conducive learning environment. These actions are not acceptable in our educational settings from any member of the campus community."  Plaintiff never disparaged anybody based on identity or background.

44.     On June 18, 2021, Plaintiff met with Defendant Spanbauer to discuss this hotly disputed case, which Plaintiff warned would lead to litigation if they could not agree on a

- 11 -

compromise resolution. At this meeting, Plaintiff agreed that someone from the law school could review his class recordings (as all law school classes are recorded) and mention if any instance of potential "racial harassment" presented itself, and he agreed to report to the dean before responding to any race-related student complaint.

45. On July 2, 2021, Defendant Spanbauer delivered her final resolution. She accepted Plaintiff's proposed compromise on sensitivity training, agreeing that such training might be mandated only if four semesters of review of class recordings revealed that Plaintiff had failed to maintain a non- harassing classroom environment. Plaintiff accepted this resolution to avoid a lawsuit. (Exhibit E).

46. Reneging on this agreed settlement arrangement, Defendant Spanbauer subsequently imposed two surprise punishments on Plaintiff emanating from OAE's findings. First, despite Plaintiff's glowing and exceptional performance review, and without warning of any kind, Defendant Spanbauer informed Plaintiff on September 6, 2021, that he was "ineligible" for an announced across-the-board 2% "merit raise." The sole basis for this punishment was OAE's finding of a policy violation. Defendant Spanbauer claimed—for the first time, and contrary to Plaintiff's glowing performance evaluation—that he had failed to meet "General Teaching Expectations" requiring all faculty to "act in a collegial manner toward each other, and act with appropriate dignity and respect toward … students."

47. Then, on Friday, November 12, 2021, at 4:15 pm, Defendant Spanbauer notified Plaintiff that he would be required to undergo the very sensitivity training that she had promised not to impose in her letter of July 2. (Exhibit F). Indeed, though she asserted that more information about scheduling the training would be forthcoming, she insisted that this training be completed within less than one month, before December 10, over the Thanksgiving holiday, in a period during which Plaintiff was scheduled for surgery.

48.     Disregarding their own arbitrary deadline, Defendants delayed for more than a month while purporting to decide what sort of training mandate to impose on Plaintiff.

49.     On December 17, 2021, Plaintiff was finally informed that he was to be summarily suspended from teaching for the entire Spring 2022 semester—again with no hearing or prior notice. His Bankruptcy class was cancelled, and his Secured Transactions class was reassigned to another professor with no experience teaching the course.

50.     At that time, Defendants declared that Plaintiff would be subjected to an 8-week diversity course—20 hours of course work and required "self-reflection" papers for each of 5 modules, plus weekly 90-minute sessions with a trainer, followed by three more weeks of vaguely described supplemental meetings with this trainer. The trainer would provide "feedback regarding Professor Kilborn's engagement and commitment to the goals of the program." Only upon satisfactory completion of this program would Plaintiff be allowed to return to class in Fall 2022.

51.     Plaintiff has since complied with this mandated "training." Ironically, the very first set of supplemental readings selected and assigned by Defendants contains the exact same "usage" of a racial slur that sparked this entire dispute. In one such reading Defendants required Plaintiff to study, presumably as an exemplar of appropriate discourse on these sensitive topics, the author refers to White people being called "n_____ lover." Harro, B., "The cycle of socialization," in Readings for Diversity and Social Justice (M. Adams et al., eds., 4th ed. 2018) (p. 49). After Plaintiff invoked the same usage ("n_____") in his exam, Defendants repeatedly condemned him for "explicit (abbreviated) reference to a racial epithet."

## COUNT I
### Violation of the First and Fourteenth Amendments

52.     Plaintiff restates paragraphs 1 through 51 as fully set forth in Count I.

53. The University of Illinois is a public institution, bound by the First Amendment via the Fourteenth Amendment, as well as related state law, which prohibits the punishment, prohibition, and/or compulsion of speech.

54. Indeed, the University of Illinois System's Guiding Principles at the very beginning explicitly ensure an "unyielding allegiance to freedom of speech – even controversial, contentious, and unpopular speech" and pledge that "protected speech cannot be prohibited or punished."

55. Defendants have purported to punish Plaintiff for speech that expresses "anger, dissatisfaction, and disappointment related to issues of race" or that "demonstrate[s] racial insensitivity and even hostility to those voicing concerns about a racially-charged topic." This is a plainly unlawful, content-based restriction on speech.

56. The sensitivity training which Defendants have imposed upon Plaintiff also violates the First Amendment, as it compels Plaintiff to express his "commitment to the goals of the program" in order to be released back to teaching, even if he disagrees with the content and purpose of this diversity training.

57. Plaintiff's exam question and in-class discussions are plainly protected educational speech.

58. The few remarks to two individual students were neither intended nor expected to reach beyond those two participants, and nothing said to either of them could reasonably be perceived as a "true threat" or "pervasive harassment." These statements are all protected speech.

59. Nothing stated by Plaintiff to any of his students expressed any anger; rather, if anything, it expressed pain and heartbreak, and it nonetheless emphasized that Plaintiff has not criticized any of his students and continued to welcome all students, regardless of their race or background.

60.     Punishing or otherwise sanctioning Plaintiff under color of state law on the basis of his speech, and compelling him to adopt speech with which he disagrees, violates the First and Fourteenth Amendments and UIC's own Guiding Principles.

## COUNT II
### Violation of University of Illinois Statutes

61.     Plaintiff restates paragraphs 1 through 60 as fully set forth in Count II.

62.     UIC is governed by the University of Illinois Statutes, as promulgated by authority of the Illinois General Assembly under the University of Illinois Act, 110 ILCS 305/.

63.     Article X, Section 2(a) of the Statutes pledges to "protect all members of the academic staff against influences, from within or without the University of Illinois System, which would restrict the member's exercise of these freedoms in the member's area of scholarly interest." It establishes that this freedom "includes the right to discuss and present scholarly opinions and conclusions both in and outside the classroom."

64.     OAE's investigation report asserts "OAE does not address or make determinations regarding the extent that academic freedom principles may apply to the facts at issue in this investigation. Instead, OAE considers whether, based on the totality of the circumstances, racial discrimination or racial harassment occurred ….."

65.     Since academic freedom protects Plaintiff's speech, that speech cannot lawfully be found to violate OAE's policy in a way that could lead to the punishments meted out to Plaintiff.

66.     Plaintiff has the right to advance his pedagogical goals as he sees fit within the confines of state and federal anti-discrimination law. Nothing he did or said violates any law; therefore, neither OAE or any of the defendants can lawfully arrogate to themselves the power to declare that Plaintiff cannot teach his course as he sees fit.

67.     OAE's report indicates that its investigation and its conclusions disregarded and consequently violated Plaintiff's rights to academic freedom, as has the action of Defendants in taking punitive action against Plaintiff based upon that report.

### COUNT III
### Violation of the Fifth and Fourteenth Amendments

68.     Plaintiff restates paragraphs 1 through 67 as fully set forth in Count III.

69.     The process of investigating and sanctioning Plaintiff's speech here involved a series of violations of due process, equal protection, and lack of adequate or fair notice.

70.     OAE's factual conclusions are clearly erroneous and demonstrate an intentional failure to provide Plaintiff with an opportunity to respond to the accusations it has made against him.

71.     Prior to each of the two summary suspensions from teaching, Plaintiff was afforded no process of any kind.

72.     These shortcomings constitute violations of Plaintiff's rights under the Fifth and Fourteenth Amendments to fair notice, due process, and equal protection.

73.     The conclusion that Plaintiff violated UIC's Nondiscrimination Policy Statement 1100-004 is based upon a single operative word, "harassment," which is not defined in any way, giving Plaintiff no notice or guidance on the content of this policy or the kind(s) of conduct it purports to proscribe.

74.     The due process principle of clarity is especially demanding, and a more stringent vagueness test applies, when First Amendment freedoms are at stake, as in this case; any claim that Plaintiff has violated any nondiscrimination policy violates due process and is void for vagueness.

75.     The finding by OAE that Plaintiff is guilty of "harassment" is based upon an assertion which is hidden from Plaintiff and is arbitrary and capricious and, as OAE admits, "is broader than applicable law." Such an admission runs afoul of both the federal and state protections of free speech, due process and equal protection.

76.     Punishing Plaintiff for violation of a policy with no stated substance and no advance notice or guidance is an arbitrary and capricious abuse of authority. Such abuse undertaken under color of state law violates Plaintiff's constitutional rights to fair notice and due process.

77.     The allegations presented to Plaintiff were so vague as to be impossible to respond to, no specific time period was identified, and no specific facts giving rise to many of the allegations were offered. Plaintiff was given no opportunity to advance any reasonable defense because he was not given any specific dates or fact scenario to which he was to respond until OAE's conclusions were released. OAE never confronted Plaintiff with its purported evidence or allowed him to present an explanation or defense.

78.     The conclusions OAE drew from its review of the documentary evidence are so clearly erroneous and biased as to constitute due process violations themselves.

79.     Defendant Davidson frequently ignored aspects of this evidence that plainly contradicted her foregone conclusion, and she misrepresented other facts.

80.     OAE's clearly erroneous and biased investigation and fact findings, undertaken under color of state law and without notice to Plaintiff, violate his rights to due process.

81.     As a result of the foregoing actions against him, Plaintiff has suffered humiliation, indignity and mental agony, his professional reputation has been egregiously damaged, and he has been required to retain counsel to assist him in defending his constitutional rights which have been egregiously violated by Defendants.

**COUNT IV**
**Defamation**

82.    Plaintiff restates paragraphs 1 through 81 as fully set forth in Count IV.

83.    As described above, Defendants have made numerous false statements in writing about Plaintiff that were disseminated broadly by Defendants.  Defendants knew these statements were false or, if they believed they were true, lacked reasonable grounds for that belief in light of the facts described above.  Defendants' actions caused Plaintiff severe emotional and reputational damage.

84.    The false statements include statements that (1) Plaintiff was guilty of race-based "harassment" of students; (2) Plaintiff had "overtly intimidat[ed] and threaten[ed]" students (and similarly, "threats did occur") and (3) had "used" racial slurs and referred to minorities as "cockroaches."

85.    These statements harmed Plaintiff in his profession and damaged his professional reputation and thus constitute defamation *per se*.  Indeed, it is all but impossible to imagine that, despite his substantial accomplishments and exemplary academic record, Plaintiff could ever be considered for another position in his profession in light of Defendants' statements.

**COUNT V**
**False Light**

86.    Plaintiff restates paragraphs 1 through 85 as fully set forth in Count V.

87.    As described above, Defendants have made numerous false statements in writing about Plaintiff that were disseminated to third parties by Defendants.  Defendants acted with actual malice and reckless disregard for obvious evidence of the falsity of these statements in light of the facts described above.  These statements were highly offensive to a reasonable person and severely prejudiced Plaintiff in his profession, as attributing race-based discrimination, threats and harassment to a public university professor is among the very worst things that one might say about

such a person.  Defendants published these statements to the public.  Defendants' actions caused Plaintiff severe emotional damage.

**COUNT VI**
**Intentional Infliction of Emotional Distress**

88.     Plaintiff restates paragraphs 1 through 87 as fully set forth in Count VI.

89.     The abrupt cancellation of Plaintiff's Spring 2021 and Spring 2022 classes and banning him from contact with students and colleagues in the middle of the isolation and emotional trauma of the COVID pandemic, with no explanation for several days, and forcing him to come to campus, expose himself to COVID, and submit to drug testing and several hours of medical examination over two days, constitutes intentional infliction of emotional distress.

90.     Defendants also publicly attributed inflammatory race-based comments to Plaintiff and knowingly allowed others to attribute extreme and inflammatory race-based comments to Plaintiff in the public domain.

91.     Defendants' actions were extreme and outrageous beyond all bounds of decency. They violated every protective aspect of UIC's Violence Prevention Plan designed to assuage the dangers of the very extreme emotional distress caused to Plaintiff in this case.  And attributing race-based discrimination and harassment to a public university professor is among the very worst things that one might say to destroy that person's reputation in the community and future career prospects.  As the result of Defendants' actions, Plaintiff has been transformed from a respected and well-liked professor into a racist and violent pariah.

92.     Defendants knew or consciously disregarded the probability of causing extreme emotional distress to Plaintiff through their Violence Prevention Plan violations and dissemination of false statements.  Defendants' actions actually and proximately caused Plaintiff to suffer

extreme emotional distress over an extended period of time, distress which has resulted in depressive episodes and other conditions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jason J. Kilborn respectfully requests that this Court enter judgment in his favor and against Defendants and provide the following relief:

A.    Enter a declaratory judgment that Defendants' punishment and compulsion of Plaintiff's speech violates the First, Fifth, and Fourteenth Amendments as well as the University of Illinois Statutes, along with an order of specific performance requiring Defendants to abide by their contractual obligations of freedom of speech and academic freedom to Plaintiff under the University of Illinois Statutes;

B.    Issue a permanent injunction barring Defendants from enforcing the anti-discrimination policy in a way that violates faculty and student rights under the First, Fifth, and Fourteenth Amendments and the University of Illinois Statutes;

C.    Award to Plaintiff compensatory and punitive damages against Defendants for their violations of his rights and consequent harm inflicted upon him by reason of their actions in an amount of not less than One Hundred Thousand Dollars ($100,000).

D.    Award to Plaintiff his reasonable costs and expenses of this action, including attorney's fees, in accordance with 42 U.S.C. §1988 and all other applicable laws; and

E.    Award to Plaintiff all other and further relief to which the Court finds Plaintiff is entitled.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  February 17, 2022                      Respectfully submitted,

                                            /s/ Paul K. Vickrey

Paul K. Vickrey (vickrey@vvnlaw.com)
Patrick F. Solon (solon@vvnlaw.com)
Dylan M. Brown (brown@vvnlaw.com)
VITALE, VICKREY, NIRO, SOLON &
GASEY LLP
311 S. Wacker Dr., Suite 2470
Chicago, IL 60606
(312) 236-0733
Fax: (312) 236-3137

*Attorneys for Plaintiff, Jason J. Kilborn*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on February 17, 2022 the foregoing

AMENDED COMPLAINT

was served upon the following counsel who are currently non-CM/ECF participants via electronic transmission

John F. Kennedy (jkennedy@taftlaw.com)
Elizabeth E. Babbit (ebabbitt@taftlaw.com)
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker
Suite 2800
Chicago, IL 60601
(312) 527-4000
Fax: (312) 527-4011

*Attorneys for Defendants*

/s/ Paul K. Vickrey
*Attorney for Plaintiff, Jason J. Kilborn*