

May 28, 2021

JASON KILBORN
Sent electronically to jkilborn@uic.edu

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2020105601

Dear Jason,

Please see attached finding letter.

Sincerely,



Donald Kamm
Director - OAE and Title IX Coordinator

CC:    Caryn Bills, Associate Chancellor, Office for Access and Equity
        Ashley Davidson, Title IX and Equity Compliance Specialist, Office for Access and Equity
        Darby Dickerson, Dean, UIC John Marshall Law School

Office for Access and Equity
809 S. Marshfield Ave., Room 717 (MC 602)
Chicago, IL 60612

Phone (312) 996-8670
E-mail oae@uic.edu
Web oae.uic.edu

EXHIBIT "A"



May 28, 2021

Jason Kilborn
Via Email Only at jkilborn@uic.edu

Dear Professor Kilborn:

The Office for Access and Equity (OAE) has concluded the investigation into Anthony Jackson's and other non-White students' allegations of race-based discrimination and harassment against you.

OAE received and reviewed reports that you have engaged in discriminatory conduct and have created a racially hostile environment for Mr. Jackson and other non-White law students between January 2020 and January 2021, particularly during your Civil Procedure II ("Civ Pro II") course. The allegations brought to our attention include:

Discrimination

- Two JMLS community members allege you discriminated against Mr. Jackson by dropping him from the Spring 2020 Civ Pro II course and refused to re-add the student to the course based on his race.

- Four JMLS community members allege you imposed a discriminatory in-person participation grade bump policy during the Fall 2020 semester that precluded Black students who could not attend live classes due to COVID restrictions and precautions from receiving the extra points.

Harassment

Six students and one faculty member reported that you engaged in race-based harassment of students between January 2020 and January 2021 as follows:

- During a January 23, 2020 lecture in the Civ Pro II course, you allegedly: (1) referred to racial minorities as "cockroaches" and denounced racial minorities' participation in civil rights claims as part of discussion of modern day extortion theory; and (2) referred to media stories that expose the negative behavior of White men as "lynching,"

- During other Civ Pro II class sessions during the Spring 2020 semester, you allegedly: (1) engaged in racially biased conduct toward non-White students when discussing topics about Black, Latinx, or Middle Eastern culture; and (2) diminished or dismissed the perspectives of an African female student because of her races as a Black woman and based on her accent.

- In a December 2020 exam in the Civ Pro II course, you included a question regarding the work product doctrine that used the abbreviated epithets "N_____"

and "B\_\_\_\_\_" that students (particularly non-White students) reported had a negative impact on an intense emotional level during the exam.

- After learning of a December 24, 2020 letter (referred to as the Black Law Students Association letter or "BLSA Letter") signed by various students that raised concerns about the exam question, you allegedly: (1) emailed a student who had signed the BLSA Letter indicating that you were "disappointed" in her for signing the letter and that she should not "bite the hand that feeds her"; and (2) on January 7, 2021, during a video conversation with another student who had signed the BLSA Letter, made a threatening statement about how the Dean knew you would have become "homicidal" if you had read the BLSA Letter.

During the investigation, OAE interviewed you, Mr. Jackson, and other anonymous JMLS community members. OAE also obtained and reviewed additional relevant documentation, including recordings of class sessions during the Spring 2020 semester. Based on such information, the factual circumstances surrounding these allegations were reviewed to determine whether, by a preponderance of the evidence, the alleged conduct violated Policy 1100-004, Nondiscrimination Statement ("Policy") for the University of Illinois Chicago, which seeks to protect members of the University community from, among other things, race-based discrimination or harassment. The Policy is broader than applicable law, which means that discriminatory or harassing conduct may violate the Policy even where the conduct does not rise to the level of a violation of law. Thus, the University seeks to prevent and address situations where conduct by any member of the University community, because of issues of race, unreasonably interferes with a student's participation in an academic program.

After a thorough review of all documentation and information provided to our office, OAE does not substantiate that you engaged in discriminatory conduct when you dropped Mr. Jackson from the Spring 2020 Civ Pro II Course or when you imposed a participation grade bump policy for the Fall 2020 course. Instead, the evidence substantiated that your efforts either (i) sought to address attendance issues in ways that were even-handedly applied to students of different races or (ii) sought to encourage student participation during class sessions in ways that did not have a disparate impact on students based on race.

However, the evidence reviewed does substantiate that your conduct, considered cumulatively and particularly with respect to the manner of your responses to criticism of the final exam question, was sufficiently substantial and repeated that it interfered with Black students' participation in the University's academic program and therefore constituted harassing conduct that violates the Policy. In particular, it is substantiated that:

(1) you made multiple, inappropriate, racially-charged comments over the course of one hour during the January 23, 2020 class. This includes your making references to "cockroaches" and "lynching"; your using African-American Vernacular English ("AAVE") accent when referencing a Black artist's lyrics; and, when confronted by a Black student during the class because the student viewed

these comments as overgeneralizing references to minorities, you referenced your own "implicit bias" as some type of justification;

(2) you used an exam question during the Spring 2020 semester and the December 2020 semester that included explicit (abbreviated) reference to a racial epithet;[1]

(3) when you learned that student groups had lodged written objections to the exam question in late December 2020, you responded in early January expressing anger and displeasure with students' objections in a manner that created retaliation concerns for Black students with a January 4, 2021 email that verbally chastised a student for signing the BLSA Letter that you referred to as a "horrible, horrible letter," an "attack letter," that was "vicious" and "cruel," and that led you to feel and to write that your "hand of help had been bitten off," and

(4) likewise, in comments during a January 7, 2021 Zoom meeting to another student who had signed the BLSA Letter, you referred to students expressing dissent as "enemies," twice stated that the student in that meeting was accusing you of being a "liar," articulated your desire to go after people who "come at me," and discussed the concept that you might become "homicidal" because of the BLSA Letter.

During this investigation, you acknowledged much of this conduct, including referencing "lynching" during class (which you said you apologized for immediately), using the exam question at issue, sending the January 4, 2021 email, and referencing the term "homicidal" during the January 7, 2021 Zoom meeting with a Black student. You disputed other aspects of these allegations, including not emailing anyone about "biting the hand that feeds you." You also claimed that your "homicidal" comment was made as a joke; did not seek to articulate your own state of mind but, rather, that of the Dean; and could not reasonably be viewed as threatening. Such explanations were considered but viewed as unpersuasive for various reasons. Because the January 4 email and January 7 Zoom meeting were addressing the BLSA Letter's criticism of your racially-charged exam question (to signatories of that letter), your comments expressing anger, dissatisfaction, and disappointment related to issues of race and created fear and intimidation that were reasonably interpreted as such. And, while each such communication involved one student at the time of the particular email or Zoom meeting, the focus of such comments was upon a broader group of people – those who had signed the BLSA Letter. This became known by and affected a group of Black students who learned about them. Your reactions to minority students' expressions of extreme disappointment in the exam question demonstrated racial insensitivity and even hostility to those voicing concerns about a racially-charged topic.

---

[1] OAE notes that, although students raised concerns that the abbreviated reference to the N-word in an exam question was not relevant to the issue (the work product doctrine), OAE's analysis does not hinge in any way on whether there may, or may not have been, legitimate pedagogical reasons for referencing the epithet in abbreviated fashion in the exam question.

OAE notes that you candidly expressed regret for any distress your exam question may have caused students and, as verified by a recording of the January 23, 2020 class session, apologized for using the word "lynching" in class. Our review substantiated that your conduct, however, when considered in cumulative fashion, affected many Black students and substantially interfered with their participation in the University's academic program. Many students found the racially-charged January 23, 2020 classroom session offensive, were also distraught by what was viewed as a racially insensitive exam question in December of 2020, and were then fearful of arguably retaliatory and threatening language in January 2021. This amplified the racial tensions from your prior conduct. Even hinting at physical violence in jest toward a student in reaction to written or spoken criticism is completely unacceptable; referencing the potential to become "homicidal" in response to communications criticizing your conduct on racial topics created race-related fear of physical safety or retaliation. Such fear was amplified by the timing of these developments in December 2020 and January 2021, when racial tensions in broader American society were uniquely prevalent. Significantly, you made the "homicidal" comment on January 7, only one day after violence at the United States Capitol Building, at a time when concerns over public safety were heightened nationwide.

For these reasons, OAE has substantiated that conduct addressed herein (i) was perceived as offensive toward non-White people, (ii) was objectively offensive (particularly because of your overtly intimidating and threatening reactions to student-voiced criticism of your racially-charged comments and exam question), (iii) took an emotional toll on non-White students, faculty, and supporters of the non-White students who felt threatened, and (iv) interfered with non-White students' learning experiences at UIC JMLS. By a preponderance of the evidence, OAE has therefore substantiated conduct on your part that was harassing based on race and constitutes a violation of the Policy.

Please note that we expect compliance with OAE Policy 1100-003, Prohibition of Retaliation Following Claims of Unlawful Discrimination.

Sincerely,

Donald Kamm
OAE Director and Title IX Coordinator

cc: Caryn Bills, Associate Chancellor
    Ashley Davidson, Title IX and Equity Compliance Specialist
    Darby Dickerson, UIC JMLS Dean and Professor

True transcript of class recording, Civil Procedure II, January 23, 2020

The fact that other plaintiffs see that one other plaintiff lost isn't a disincentive. If it were, frivolous litigation would have ended long ago, because lots of plaintiffs have been pushed to the wall and lost. You don't hear about those stories in the media. You hear about idiot people winning $1 million verdict against Subway for having 11.5"-long sandwiches. That's what makes the press, right, that Subway lost. Not that they win against this ridiculously frivolous case. That wasn't in the media, only in the legal media, maybe, if you were paying attention. And that's the problem. If they win, no one hears about this. They only hear about it if they lose, and God forbid that, then all the cockroaches come out of the walls, they're thinking, right?

**EXHIBIT "B"**

# Kilborn, Jason J

| | |
|---|---|
| **From:** | ██████████ |
| **Sent:** | Thursday, January 23, 2020 3:33 PM |
| **To:** | Kilborn, Jason |
| **Subject:** | RE: Class 1.23.2020 |

Agreed.

The topic of inbedded biasness within the legal system alone is quite challenging to discuss, I would imagine, particularly in front of a classroom full of analytical thinkers. In my opinion, your practical and scholastic approach to instruction of Civil Procedure is well balanced.

I look forward to the semester.

Best,


On Jan 23, 2020 3:18 PM, "Kilborn, Jason" <jkilborn@jmls.edu> wrote:

> The love was quite welcome ... as was the respectful dissent. :-)
>
>
> I don't think we so much disagree with each other as were, perhaps, talking about slightly different things. I don't mean to be heard as saying that my description of how Citi likely would react, how Swanson and her lawyer might react, or the incidence of patently frivolous litigation is a factual, universally applicable assessment of that case or the world. Generalization is not necessarily negative; it's inevitable when we're talking about assessing an unknown situation, discounting future likelihood, and helping a corporate defendant to assess a litigation scenario. What I hope you understand is that my job is to prepare you to understand the litigation mindset of your clients (or opponents), many of whom are likely to be business people, who HAVE to base their assessments on statistical likelihoods (i.e., generalizations) and predictions about outcomes. My 25-ish years as a law clerk, lawyer, and now law professor have exposed me to enough of these kinds of scenarios that my perspective, while not universal, fairly confidently represents the "norm"; that is, the most likely situation. Might this case have been different—absolutely. But again, we always have to responsibly generalize when making future predictions, which is one reason why those predictions are so often inaccurate, but companies like Citi can't take the chance of being the headline grabbing normal casualty of a litigation system and society with lots of fairly consistent problems.
>
>
> Dissent away! And reminding me that it's not personal, and you're not attacking me or my view, just expressing an opposing viewpoint, is nice. I am sometimes a bit fragile, and standing in front of a room of smart people talking about tough issues makes one quite vulnerable.
>
>
> Cheers!
>
>
> **Jason Kilborn**
>
> **Professor of Law**

EXHIBIT "C"

**UIC John Marshall Law School**

**The University of Illinois at Chicago**

**300 S. State St.**

**Chicago, IL 60604**

**+1 (312) 386-2860**

**jkilborn (at) uic.edu**

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Thursday, January 23, 2020 3:07 PM
**To:** Kilborn, Jason <jkilborn@jmls.edu>
**Subject:** Class 1.23.2020

Professor Kilborn,

Great discussion in class today. My intention was to "respectfully dissent" rather than say "I love you" before dissenting.

I was just showing my respect to you though I disagreed with that part of the discussion and I hope it did not come off as offensive.

Have a great weekend.

Best,

**From:** Kilborn, Jason J
**Sent:** Monday, January 4, 2021 9:01 PM
**To:** ▮
**Subject:** Re: Letter of Recommendation for SBA Position

Acknowledging pain did not and does not require attacking me very personally and cruelly. I also acknowledged and expressed regret for the pain that question caused. Two wrongs don't make a right.

I admire your support of your colleagues. I support them too. Making me into a villain is not a fair or effective pathway to healing and understanding.

Enough said. We'll all learn from this ...

**Jason Kilborn**
**Professor of Law**
**UIC John Marshall Law School**
**The University of Illinois at Chicago**
300 S. State St.
Chicago, IL 60604
+1 (312) 386-2860
jkilborn (at) uic.edu

On Jan 4, 2021, at 8:28 PM, ▮ wrote:

Professor,

I'm sorry that you feel like your helping hand has been bitten off. I didn't intend that in the slightest and I still very much value everything that you taught me as a professor, a lawyer, and a person.

However, as a white student, with the privileges that come with that, is believing People of Color when they say that actions or inactions have caused them pain or distress. This year that has been a constant source of stress for students and professors alike. This year also saw a racial reckoning on a global scale. If students, expressed concern, pain, or feelings of inhumanity, I can't ignore, negate, or deny those feelings. Rather, as an SBA member, and a JMLS student, I felt it was my place to stand in solidarity with those experiencing these feelings.

I'm not the gatekeeper of what is right or wrong, or offensive or not offensive. Students of color were detrimentally affected by this question; I cannot, in good faith, disregard that because of help that was extended to me for my own benefit.

As you mentioned, this question was on the exam that I took last semester. An issue was not raised during that time and that is part of the problem. That I was able to read that question without much thought, without the reawakening of trauma, is part of why I signed that letter. Because I am privileged enough to read

1

over that question, I want to stand in solidarity with those that weren't able to read that question without issue.

Again, I'm sorry that you feel betrayed, that wasn't my intention and it is heartbreaking to think that I caused anyone such pain. But when I say I stand in solidarity with students of color, especially as a member of the SBA, I cannot then ignore students expressing feelings of pain and trauma.

Best,
█

█

J.D. Candidate, 2021
█

The John Marshall Law School

---

**From:** Kilborn, Jason J <jkilborn@uic.edu>
**Sent:** Monday, January 4, 2021 7:48 PM
**To:** █
**Subject:** RE: Letter of Recommendation for SBA Position

Can't tell you how painful it was to see your name on BLSA's attack letter against me. That question and that very language were on the exam that you and your class took, yet no one in the years I've administered that question has ever said anything. I'm sure you know that I certainly did not intend to cause anyone distress and that I am especially sensitive to the issues raised in that horrible, horrible letter.

Such a shame to see all of my efforts to offer comfort and encouragement, as you acknowledge below, only to be now vilified in the most vicious, cruel, and uncompassionate way. I feel like my extended hand of help has been bitten off.

I'm not criticizing you, and it hurts that anyone would even dream that I would seek retribution against anyone about all of this—all of these people are and will always be welcome in my classes. But a few of the familiar names on that letter—with not one person ever, ever reaching out to me—is painful beyond description.

My heart is absolutely broken by all of this.

Jason Kilborn
**Professor of Law**
**UIC John Marshall Law School**
**The University of Illinois at Chicago**
**300 S. State St.**
**Chicago, IL 60604**
**+1 (312) 386-2860**
**jkilborn (at) uic.edu**
<image002.jpg>



2



**UIC John Marshall Law School**

July 2, 2021

Dear Professor Kilborn,

Thank you for meeting with Associate Dean for Faculty Affairs McMurtry-Chubb and me on June 18, 2021 to discuss the Law School's response to the May 28, 2021 letter from the Office for Access and Equity (OAE) conveying the results of its investigation to you. The conclusions reached by OAE indicate a need on the Law School's part to pursue the following course of action, which involves both (a) requirements intended to address OAE's substantiation of conduct constituting a violation of Policy 1100-004, Nondiscrimination Statement ("Policy") of the University of Illinois Chicago ("Policy") and (b) recommendations intended to address the matters about which OAE did not substantiate Policy violations but that I would like to address, going forward, in a collaborative, collegial manner.

**A.** <u>**Requirements:**</u>

1. For the next 4 semesters that you are assigned to teach one or more classes at the Law School, if a student complains to you about a class session or an interaction with you and alleges racial or ethnic harassment or similar conduct, you should immediately report that matter to the Dean or Dean's designee before you respond to the student, individually, or to the class as a whole. This process is intended to provide the Law School and University with the opportunity to work with you to help you prepare an appropriate response and/or develop other steps to resolve the situation in a collaborative fashion. At the end of these 4 semesters, the Dean will determine whether this process should be extended, and if so, for how long.

2. For the next 4 semesters that you are assigned to teach one or more classes at the Law School, your class sessions will be audio-recorded and the Law School will also exercise oversight by reviewing these audio recordings to help foster a non-discriminatory, non-harassing classroom environment. The Dean will assign one or more appropriate faculty members to perform this oversight. The Dean or Dean's designee will address any matters of concern that are observed in any such class session recordings with you as soon as is practicable. At the end of these 4 semesters, the Dean will determine whether this oversight should continue, and if so, for how long.

Office of the Dean
UIC John Marshall Law School
300 S. State Street (MC 300)
Chicago, IL 60604

Phone 312.386.2828
Fax 312.427.5134
Email law-dean@uic.edu
Web jmls.uic.edu

EXHIBIT "E"

3.  At the conclusion of the second semester in which you are assigned to teach one or more classes at the Law School, if the Dean concludes that by virtue of your actions and conduct, you have not effectively maintained a non-discriminatory, non-harassing classroom environment, you will complete a training program designed and administered by Vantage Solutions LLC. The goal of the training will be to ensure that you appreciate the importance of your position including your voice and authority in the classroom and when assessing students, and how your words and actions impact others. You will be deemed to have completed the training program when Vantage Solutions provides a written report to the Law School indicating that you have (1) engaged constructively in action planning and identified what you will do differently in class, on assessments, and when otherwise interacting with students orally and in writing; and (2) developed the skills and tools to engage effectively with a diverse group of students on sensitive topics.

**B.      Recommendations:**

In addition to the three requirements above, during our meeting on June 18, 2021, we discussed the following recommendations for collaborating and interacting to avert future issues:

1.  I strongly encourage you to submit any written assessment that will include content involving issues of race or ethnicity ("assessment" meaning a graded examination, quiz, or written assignment) to the Dean, the Dean's designee, or one of your trusted colleagues and engage in a consultation about the proposed assessment before you administer the assessment to students. While I appreciate that you have voluntarily committed not to use the specific hypothetical that was reviewed during the OAE investigation, this proposed consultation process could offer insight about whether other content is pedagogically appropriate and wise to use going forward. I hope that you will take advantage of this offer to interact and collaborate—and do so as far in advance as possible before you plan to use the assessment. Please know that, if you do consult with the Dean or Dean's designee, the review would be for the limited purpose of identifying any issues or potential issues related to race or ethnicity. If consulted, the Dean or Dean's designee will communicate any concerns to you, and I would hope you would seek to address the concerns before the assessment is due or administered. As a faculty member, you would retain discretion about the content of the written assessments.

2.   I strongly encourage you to use this same approach and communicate with the Dean or Dean's designee before (a) using grade bumps or communicating with students about grade bumps in your syllabus language or other student communications or (b)



determining that a student is not entitled to continue with your course. This process would be intended to avert future issues and address potential process or communication issues that concern diversity, equity, or inclusion in the highly charged contexts of student grading and continuation. I hope that you will take advantage of this offer to interact and collaborate and do so as far in advance as possible before the time you would hope to use the grade bump policy or initiate the dismissal in question. Please know that, if you do consult with the Dean or Dean's designee, the consultation would be for the limited purpose of identifying any issues or potential issues related to diversity, equity, or inclusion. If consulted, the Dean or Dean's designee will communicate any concerns to you, and I would hope you would seek to address such concerns before any grade bump policy or dismissal is implemented. As a faculty member, you would retain discretion about such issues.

3. Finally, I strongly encourage you to begin immediate participation in the small-group study sessions designed by the Law School Faculty Committee for Diversity, Inclusion, and Campus Climate. The Committee assigned you to a group; you may join the group at any point. All faculty have access to the Box folder with reading and viewing materials.

Sincerely,

*Julie Spanbauer*

_____
Interim Dean Julie Spanbauer


I acknowledge that I received a copy of this letter and understand the requirements and recommendations herein.

_____
Professor signature

2 July 2021
_____
Date


**UNIVERSITY OF ILLINOIS CHICAGO**

School of Law
**Via email to jkilborn@uic.edu**

November 11, 2021

Dear Professor Kilborn:

I am writing in reference to my letter to you of July 2, 2021, that set forth certain requirements applicable during the next 4 semesters that you are assigned to teach one or more classes at the Law School, as well as recommended actions that I strongly encouraged you to take for collaborating and interacting with students to avert future issues. One such recommendation was that you begin immediate participation in the small-group study sessions designed by the Law School Faculty Committee for Diversity, Equity, Inclusion, and Law School Campus Climate to provide training and practice for faculty in initiating, mediating, and maintaining classroom conversations that address racism in the U.S. legal system.

I very recently learned that you have been unable to participate in this Law School training because the group you were assigned to has not regularly met. In light of the fact that this training opportunity was not fully made available to you as expected (through no fault of your own), you are now preparing to return to the classroom this spring without training in the critical topics covered by the small-group sessions. Meanwhile, the situation at the Law School remains fraught and it is important to minimize the possibility of further incidents and disruption to the educational experience of our students. I have considered this matter and must now require that you participate in an individualized training or coaching program of the type described in Section A.1 of my letter of July 2, 2021 before the start of the spring 2022 semester. You will be required to successfully complete this individualized training no later than December 10, 2021 before returning to the classroom to teach your spring 2022 assigned classes. I will be in touch in the coming days with more detailed information as to the specific training program and its requirements.

Please understand that this training is not a punishment or a sanction for past conduct. Rather, it is intended to afford you an opportunity for having better success in the future as a member of the faculty in our Law School, which has a very diverse student body. It is intended to help assure that the learning environment that your students experience is a positive one.

All of the requirements and recommendations in my letter of July 2, 2021, remain in place except as modified by this letter; and, so long as you adhere to those requirements and act in good faith upon my prior recommendations, as well as following the above requirement, you will be deemed to be in compliance with your obligations for this matter.

Sincerely,

*Julie Spanbauer*

Julie Spanbauer, Interim Dean

Office of the Dean  
School of Law  
300 S. State Street (MC 300)  
Chicago, IL 60604

Phone 312.386.2828  
Fax 312.427.5134  
Email law-dean@uic.edu  
Web law.uic.edu

EXHIBIT "F"