IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JASON J. KILBORN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-00475 |
| | ) | |
| MICHAEL AMIRIDIS, CARYN A. BILLS, | ) | Hon. John Z. Lee |
| JULIE M. SPANBAUER, DONALD KAMM, | ) | Magistrate Judge Sheila M. Finnegan |
| and ASHLEY DAVIDSON, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

Paul K. Vickrey (vickrey@vvnlaw.com)
Patrick F. Solon (solon@vvnlaw.com)
Dylan M. Brown (brown@vvnlaw.com)
VITALE, VICKREY, NIRO, SOLON &
GASEY LLP
311 S. Wacker Dr., Suite 2470
Chicago, IL 60606
(312) 236-0733
Fax: (312) 236-3137

*Attorneys for Plaintiff, Jason J. Kilborn*

## **TABLE OF CONTENTS**

**Page**

I.    THE ELEVENTH AMENDMENT PERMITS "OFFICIAL CAPACITY" PROSPECTIVE RELIEF UNDER SECTION 1983 .......................................................... 2

    A.    Prospective Relief for an Ongoing Violation of Federal Law ............................... 3

    B.    The State-Law Claims Are Not Official-Capacity Claims .................................... 8

II.    ILLINOIS SOVEREIGN IMMUNITY DOES NOT APPLY ........................................... 8

III.    PLAINTIFF HAS ADEQUATELY PLED HIS CONSTITUTIONAL CLAIMS .......... 10

    A.    Plaintiff Has Adequately Described the Involvement of Each Defendant .......... 10

    B.    Plaintiff Has Stated a Claim for Violation of the First Amendment.................... 12

        1.    Kilborn's Speech as a Public University Law Professor is Protected ...... 12

        2.    Kilborn's Speech Was a Matter of Public Concern ................................. 14

        3.    Compelled Speech ................................................................................... 15

    C.    Plaintiff Has Adequately Pled a Procedural Due Process Violation.................... 15

IV.    PLAINTIFF HAS ADEQUATELY PLED CLAIMS FOR DEFAMATION *PER SE* AND FALSE LIGHT...................................... 16

    A.    The Defamatory Statements................................................................................. 16

    B.    Plaintiff Has Adequately Alleged Defendants' Participation in Creating and Publishing the Defamatory Statements .......................................................... 18

    C.    Defendants' Statements are Not Substantially True ............................................ 19

    D.    Plaintiff Has Adequately Pled Malice for the False Light Claim ........................ 21

V.    PLAINTIFF HAS ADEQUATELY PLED A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ............................. 22

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Adams v. Trustees of Univ. N. Carolina–Wilmington*,
  640 F. 3d 550 (4th Cir. 2011) ................................................... 13

*Aguilar v. Roland Corp. U.S.*,
  2021 U.S. Dist. LEXIS 102541 (N.D. Ill. June 1, 2021) ....................................... 24

*Austin v. Univ. of Florida Bd. of Trustees*,
  2022 WL 195612, 2022 U.S. Dist. LEXIS 11733 (N.D. Fla. Jan. 21, 2022) ........................... 7

*Balder v. Meeder*,
  2021 WL 1172243, 2021 U.S. Dist. LEXIS *13 (N.D. Ill. Mar. 29, 2021) ............................ 4

*Battle v. Alderden*,
  2015 U.S. Dist. LEXIS 164797 (N.D. Ill. Dec. 9, 2015) ......................................... 16

*Benning v. Board of Regents of Regency Univ.*,
  928 F. 2d 775 (7th Cir. 1991) .................................................. 10

*Bogosian v. Board of Educ., Comm. Unit School Dist. 200*,
  134 F. Supp. 2d 952 (N.D. Ill. 2001) ........................................... 21

*Brown v. Chicago Bd. Of Educ.*,
  824 F. 3d 713 (7th Cir. 2016) ................................................. 13

*Bryant v. Gardner*,
  587 F. Supp. 951 (N.D. Ill. 2008) .............................................. 14

*Buchanan v. Alexander*,
  919 F. 3d 847 (5th Cir. 2019) ................................................. 13

*Chavez v. Ill. State of Police*,
  251 F. 3d 612 (7th Cir. 2001) ................................................. 11

*Davis v. Bd. of Educ. of Waukegan County Sch. Dist. No. 60*,
  2020 U.S. Dist. LEXIS 63836 (N.D. Ill. April 13, 2020) ......................................... 19

*Demers v. Austin*,
  746 F. 3d 402 (9th Cir. 2014) ................................................. 13

*Doe v. Harpercollins Publrs.*,
  2018 U.S. Dist. LEXIS 36586 (N.D. Ill. Mar. 6, 2018) .................................... 22, 25

*Doe v. Purdue Univ.*,
　2019 U.S. Dist. LEXIS 49926 (N.D. Ind. Mar. 25, 2019) ........................................................4

*Elliott v. Hinds*,
　786 F. 2d 298 (7th Cir. 1986) ........................................................................................3, 4

*Entertainment Software Ass'n v. Blagojevich*,
　469 F. 3d 641 (7th Cir. 2006) ...........................................................................................5

*Entm't Software Ass'n v. Blagojevich*,
　404 F. Supp. 2d 1051 (N.D. Ill. 2005), *aff'd*, 463 F. 3d 641 (7th Cir. 2006) .........................15

*Garcetti v. Ceballos*,
　547 U.S. 410 (2006)..........................................................................................12, 13, 14

*Geinosky v. City of Chi.*,
　675 F. 3d 743 (7th Cir. 2012) .........................................................................................11

*Goka v. Bobbitt*,
　625 F. Supp. 319 (N.D. Ill. 1985) (state) .....................................................................2, 8, 10

*Green v. Mansour*,
　474 U.S. 64 (1985)..........................................................................................3, 4, 7

*Grutter v. Bollinger*,
　539 U.S. 306 (2003)..........................................................................................12

*Harden v. Board of Tr. of E. Ill. Univ.*,
　2013 U.S. Dist. LEXIS 170252 (C.D. Ill. Dec. 2, 2013) ........................................................8

*Hardy v. Jefferson Comm. College*,
　260 F. 3d 671 (6th Cir. 2001) .....................................................................................13, 14

*Hatcher v. Bd of Trs. of S. Ill. Univ.*,
　829 F. 3d 531 (7th Cir. 2016) .........................................................................................13

*Head v. Chicago Sch. Reform Bd. Of Trustees*,
　225 F. 3d 794 (7th Cir. 2000) .........................................................................................16

*Hecker v. Deere & Co.*,
　556 F. 3d 575 (7th Cir. 2009) .........................................................................................11

*Hiers v. Bd. of Regents of Univ. of N. Texas Sys.*,
　2022 U.S. Dist. LEXIS 43617 (E.D. Tex. Mar. 11, 2022)........................................................7

*Indiana Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs. Admin.*,
　603 F. 3d 365 (7th Cir. 2010) .....................................................................................2, 3

*Jackson v. City of Joliet*,
  2020 WL 5800733 (N.D. Ill. Sept. 29, 2020) .......................................................22

*Jackson v. Illinois Dep't of Com. & Econ. Opp.*,
  2019 WL 293377, 2019 U.S. Dist. LEXIS 10588 (C.D. Ill. Jan. 23, 2019) ...........................10

*Jackson v. Wright*,
  2022 WL 179277, 2022 U.S. Dist. LEXIS 8684 (E.D. Tex. Jan. 18, 2022).......................7, 23

*Judicial Watch, Inc. v. King*,
  2014 WL 12755049, 2014 U.S. Dist. LEXIS 65302 (S.D. Ind. May 13, 2014).......................7

*Keyishian v Board of Regents of Univ. of State of NY*,
  385 U.S. 589 (1967)..................................................................................12

*Littler v. Wallace*,
  2019 U.S. Dist. LEXIS 96570 (N.D. Ind. June 10, 2019) .......................................7

*Mahanoy Area School District v. B.L.*,
  141 S. Ct. 2038 (U.S. 23 June 2021) ..........................................................12

*Matal v. Tam*,
  137 S. Ct. 1744 (2017).............................................................................5

*Meriwether v. Hartop*,
  992 F. 3d 492 (6th Cir. 2021) ..........................................................7, 13, 14

*Murphy v. Smith*,
  844 F. 3d 653 (7th Cir. 2016) .......................................................1, 8, 9, 10

*Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Calif.*,
  475 U.S. 1 (1985)....................................................................................15

*Peirick v. Dudek*,
  2020 U.S. Dist. LEXIS 211438 (N.D. Ill. Nov. 12, 2020)....................................10

*Pennhurst St. Sch. & Hosp. v. Halderman*,
  465 U.S. 89 (1984)....................................................................................8

*Puppala v. Will County Comm. Health Ctr.*,
  2010 WL 3893847 (N.D. Ill. Sept. 30, 2010) .................................................13

*Salaita v. Kennedy*,
  118 F. Supp. 3d 1068 (N.D. Ill. 2015) .....................................................1, 3, 14

*Scheuer v. Rhodes*,
  416 U.S. 232 (1974) (federal) ......................................................................2

iv

*Snyder v. Phelps*,
    562 U.S. 443 (2011)........................................................................................6

*Speech First v. Cartwright*,
    2022 U.S. App. LEXIS 11864 (11th Cir. May 2, 2022)..........................5, 6, 7, 13

*Sullivan v. Bickler*,
    360 F. Supp. 3d 778 (N.D. Ill. 2019) ......................................................11

*Terry v. Burke*,
    589 F. Supp. 853 (N.D. Ill. 1984) ..........................................................8

*Tinker v. Des Moines Indep. Comm'ty Sch. Dist.*
    393 U.S. 503 (1969)..........................................................................12

*Towsend v. Vallas*,
    265 F. 3d 661 (7th Cir. 2001) ..............................................................16

*Turpin v. Koropchak*,
    567 F. 3d 880 (7th Cir. 2009) ..............................................................10

*Verizon Maryland Inc. v. Public Service Comm'n of Maryland*,
    535 U.S. 635 (2002)......................................................................2, 3, 7

*Whitlock v. Brueggeman*,
    682 F. 3d 567 (7th Cir. 2012) ..............................................................10

*Will v. Mich. Dep't of State Police*,
    491 U.S. 58 (1989)..............................................................................2

*Woods v. Cantrell*,
    29 F.4th 284 (5th Cir. 2022) ............................................................6, 15

*Ex Parte Young*,
    209 U.S. 123 (1908)................................................................1, 2, 3, 4, 5

## State Cases

*Bryson v. News Am. Publ'ns*,
    672 N.E. 2d 1207 (1996)....................................................................21

*Fritz v. Johnston*,
    807 N.E. 2d 461 (Ill. 2004)....................................................................9

*Gambino v. Boulevard Mortg. Corp.*,
    922 N.E. 2d 380 (1st Dist. 2009) ..........................................................19

*Gibson v. Philip Morris, Inc.*,
    685 N.E. 2d 638 (5th Dist. 1997)..........................................................22

*Graham v. Comm. Edison Co.*,
    742 N.E. 2d 858 (1st Dist. 2000) .........................................................23

*Healy v. Vaupel*,
    549 N.E. 2d 1240 (Ill. 1990) ..........................................................8, 9, 10

*Leetaru v. Board of Tr. of Univ. of Ill.*,
    32 N.E. 3d 583 (Ill. 2015) ..................................................................9

*Missner v. Clifford*,
    914 N.E. 2d 540 (2009) ...................................................................19

*Parker v. House O'Lite Corp.*,
    756 N.E. 2d 286 (1st Dist. 2001) .................................................19, 22

*Solaia Tech., LLC v. Specialty Publ'g Co.*,
    852 N.E. 2d 825 (Ill. 2006) ...............................................................17

*Van Horne v. Muller*,
    205 N.E. 2d 898 (Ill. 1998) .........................................................18, 19

## State Statutes

110 ILCS 305/1 .........................................................................................9

## INTRODUCTION

Plaintiff Kilborn's First Amended Complaint (Doc. 9, "FAC") includes no claim barred by the Eleventh Amendment. This is a classic *Ex Parte Young* injunction case, where Kilborn is suing Defendants in their official capacities under federal law to stop their ongoing enforcement of an unconstitutional 'antiharassment' speech policy. Defendants omit any discussion of *Salaita v. Kennedy*, 118 F. Supp. 3d 1068, 1089-93 (N.D. Ill. 2015), which rejected similar arguments in a professor's case against University of Illinois officials at the Champaign campus. Federal courts routinely hear injunction cases challenging university officials' policing of speech. The FAC's other claims are individual-capacity claims under federal and state law that do not implicate the Eleventh Amendment. And Illinois sovereign immunity does not bar the state-law claims under key Seventh Circuit precedent that Defendants fail to cite, *Murphy v. Smith,* 844 F. 3d 653, 658-59 (7th Cir. 2016).

Plaintiff Kilborn has stated two valid constitutional claims under 42 U.S.C. § 1983. The FAC alleges a First Amendment violation—restriction of law-school discourse about race discrimination and civil rights litigation that is clearly a matter of public concern—which Defendants' case law does not address. The FAC also alleges a due-process violation under the Fourteenth Amendment, where Defendants' arbitrary punishments of Kilborn include lost pay.

Turning to the Illinois common-law claims (Counts IV-VI), Defendants' false statements made Kilborn a racist (calling minorities "cockroaches" and "denouncing" their "participation in civil rights claims"), and a threat to his students' safety ("threatening," "threats did occur," guilty of "harassing conduct," "race-related fears of physical safety and intimidation"). These statements cannot be spun into "substantial truth," as shown by, among other evidence, the ABA Journal's summary of Defendants' "findings letter." As for the IIED claim, under Illinois law, a "sham investigation" in the employment context can constitute extreme and outrageous conduct.

1

Defendants' intentional distortion of the record and other misconduct transcend a sham investigation; those actions also constitute the requisite actual malice for the false light claim.

## ARGUMENT

### I. THE ELEVENTH AMENDMENT PERMITS "OFFICIAL CAPACITY" PROSPECTIVE RELIEF UNDER SECTION 1983

The FAC requests prospective injunctive and declaratory relief to bar further enforcement of an unconstitutional antiharassment policy and to stop Defendants' ongoing unconstitutional punishment of Kilborn. FAC p. 20. On Kilborn's federal claim under 42 U.S.C. § 1983, this Court can grant that relief against Defendants in their "official capacities." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989). Defendants' invocation of the Eleventh Amendment (Doc. 20, ECF p. 13) fails because Kilborn "asks a federal court to order state officials to modify their conduct to comply with federal law." *Indiana Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs. Admin.*, 603 F. 3d 365, 374 (7th Cir. 2010); *Verizon Maryland Inc. v. Public Service Comm'n of Maryland*, 535 U.S. 635, 645 (2002); *Ex Parte Young*, 209 U.S. 123, 159-60 (1908). Kilborn has not sued UIC. Kilborn does not seek other relief that implicates the Eleventh Amendment.

The Eleventh Amendment has no application to the FAC's "individual-capacity" claims, which Kilborn has brought under Section 1983 federal law (FAC Counts I, III) and Illinois tort law (FAC Counts IV, V, VI).[1] It has long been settled law that the Eleventh Amendment does not bar individual-capacity claims under federal or state law. *Scheuer v. Rhodes*, 416 U.S. 232, 237-38 (1974) (federal); *Goka v. Bobbitt*, 625 F. Supp. 319, 323 (N.D. Ill. 1985) (state).

---

[1] FAC Count II, referring to the University of Illinois Statutes, is *not* a separate claim for relief under Illinois law and is not a claim for breach of contract. These allegations provide additional support for Kilborn's contention that Defendants exceeded their powers under Illinois law. As argued in Section II below, that precludes their claim of Illinois sovereign immunity for the tort Counts IV, V, and VI.

### A.    Prospective Relief for an Ongoing Violation of Federal Law

In this Section 1983 action, the *Ex Parte Young* doctrine permits Kilborn's suit against Defendants in their official capacities to obtain prospective injunctive and declaratory relief. *Ex Parte Young*, 209 U.S. at 159-60; *Verizon*, 535 U.S. at 645; *Salaita*, 118 F. Supp. 3d at 1090. Defendants' motion omits that this Court "need only conduct a 'straightforward inquiry' into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Indiana Prot. & Advocacy Servs.*, 603 F. 3d at 371 (quoting *Verizon*, 535 U.S. at 645). The FAC challenges an ongoing violation of federal law and seeks prospective relief, so the straightforward inquiry is easily satisfied. *Id.*

First, the FAC directly alleges Defendants' ongoing enforcement of the policy against Kilborn for his *past* speech. That episode is not complete, contrary to Defendants' argument (Doc. 20, ECF p. 14). While Kilborn complied with some mandated training, Defendants have *not* said whether they deem his effort to be an adequate "engagement and commitment to the goals of the program" or a "satisfactory completion of this program." FAC ¶ 50. For that reason, Kilborn's return to teaching depends on Defendants' whim and he is *not* sure to be teaching classes in the fall semester of 2022. FAC ¶ 51. Defendants previously reneged on a promise to put Kilborn back in the classroom, at the last moment without explanation. FAC ¶¶ 45, 47-49.

Because Defendants' punishment of Kilborn for his past speech is *not* over, this Court surely can restrain further punishments. In *Elliott v. Hinds*, 786 F. 2d 298 (7th Cir. 1986), a Section 1983 action under the First and Fourteenth Amendments, a prison pharmacist claimed that he was wrongly discharged and defamed in retaliation for exposing improper drug practices. *Elliott* reversed the district court's determination that injunctive relief was "retroactive" and thus unavailable against the state under *Green v. Mansour*, 474 U.S. 64 (1985). *Id.* at 301. Defendants

here make the same argument from *Green*. Doc. 20, ECF p. 14. The Seventh Circuit rejected these arguments, holding that the *Ex Parte Young* doctrine applied:

> The injunctive relief requested here, reinstatement and expungement of personnel records, is clearly prospective in effect and thus falls outside the prohibitions of the Eleventh Amendment. The goal of reinstatement and the removal of damaging information from the plaintiff['s] work record is not compensatory; rather, it is to compel the state official to cease her actions in violation of federal law and to comply with constitutional requirements. Elliott's alleged wrongful discharge is a continuing violation; as long as the state official keeps him out of his allegedly tenured position the official acts in what is claimed to be derogation of Elliott's constitutional rights.

*Elliott*, 786 F. 2d at 302. *See also Doe v. Purdue Univ.*, 2019 U.S. Dist. LEXIS 49926, *5 (N.D. Ind. Mar. 25, 2019) (expelled students could seek reinstatement and expungement of records). Defendants cite *Green*, but there the governing statute had been amended and it was "undisputed that respondent's calculations thereafter have conformed to federal law." 474 U.S. at 65. Defendants also cite *Balder v. Meeder*, 2021 WL 1172243, *4, 2021 U.S. Dist. LEXIS *13 (N.D. Ill. Mar. 29, 2021), where the plaintiffs challenging past retaliatory acts of workplace discipline were not challenging the ongoing enforcement of an institutional policy.

Here, Defendants assert Kilborn violated their unconstitutional policy and have not stopped their punishments, so injunctive and declaratory relief necessary to stop the punishments and bring Defendants into compliance with federal constitutional law is prospective. *Elliott*, 786 F. 2d at 302. That relief can include ordering Kilborn's return to the classroom, prohibiting further punishments, and correcting the false disciplinary record that Defendants now have on file.

Second, Kilborn can sue Defendants to stop unconstitutional enforcement of their policy against his *future* speech that is now being chilled. This is a classic *Ex Parte Young* case, where the threat of *future* enforcement of their policy is real and subject to the scrutiny of a federal court. The FAC allegations show Defendants' strong commitment to the vigorous enforcement of an unconstitutional policy against past and future speech. Kilborn cannot speak freely because he

remains subject to the policy as a tenured UIC professor. *Ex Parte Young* expressly permitted an injunction suit against a state official tasked with enforcement of an unconstitutional state statute. 209 U.S. at 159-161. Kilborn's suit is proper to establish that the policy is unconstitutional and obtain declaratory and injunctive relief prohibiting further enforcement.

The Eleventh Amendment is satisfied when the state official sued has "some connection with the enforcement of the act." *Id.* at 157. For example, *Entertainment Software Ass'n v. Blagojevich*, 469 F. 3d 641, 645 (7th Cir. 2006), applied *Ex Parte Young* to a suit against the Illinois Attorney General and affirmed a permanent injunction barring enforcement of a statute that violated First Amendment. Here, the positions of all five Defendants (in UIC's Office for Access and Equity and as heads of UIC and its law school) have the required connection with the enforcement of the unconstitutional policy, so all are proper defendants in a suit to enjoin its enforcement. FAC ¶¶ 10, 12-14, 29-32, 43-47.

Kilborn's right to seek injunctive relief also is firmly grounded in First Amendment law. Defendants' policy is a chilling threat to Kilborn's speech in the especially sensitive context of legal professional higher education. The policy is unconstitutionally vague, overbroad, and a content-based restriction on speech. The Eleventh Circuit recently ordered a preliminary injunction against enforcement of an almost identical antiharassment policy by Florida university officials. *Speech First v. Cartwright*, 2022 U.S. App. LEXIS 11864, *40 (11th Cir. May 2, 2022). There, as here, the challenged antiharassment policy is "staggeringly broad, and any number of statements— some of which are undoubtedly protected by the First Amendment—could qualify for prohibition under its sweeping standards." *Id.* at *33; *see also id.* at *34-*36 (discussing the unconstitutionally impermissible content-based nature of the policy). Defendants here have ignored the repeated and recent Supreme Court reminders of the "bedrock First Amendment principle" that "[s]peech may not be banned on the ground that it expresses ideas that offend." *Matal v. Tam*, 137 S. Ct. 1744,

1751 (2017) (quoted in *Cartwright*, U.S. App. LEXIS 11864 at *35). The First Amendment "protect[s] even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v. Phelps*, 562 U.S. 443, 461 (2011).

Defendant Amiridis's statement to the UIC community (FAC ¶ 43) has created confusion and fear regarding the enforcement of the policy. In response to two respectfully expurgated slurs referenced in a law school employment discrimination hypothetical, Amiridis boldly announced: "The use of words that disparage individuals based on identity or background is not necessary .... These actions are not acceptable in our educational settings from any member of the campus community." FAC ¶ 43. While it always has been clear that such words *directed at* individuals or groups with the intent of disparaging them is unlawful, this is not what Kilborn did, and it is entirely unclear where the boundaries of Amiridis's proscriptions lie.

Kilborn remains subject to Defendants' further enforcement of the vague, unpredictable, and unconstitutional policy, exacerbated by Amiridis's vague and overbroad statement. Kilborn has never been told what he should have done differently, despite asking many times. Kilborn now has no way of reasonably predicting what statement (in his classes, service, or scholarship) might be regarded as undefined "harassment" of members of the broad range of social identity groups catalogued in the policy. Kilborn now fears covering several key cases in future Civil Procedure courses. There are cases including references to racial slurs, such as the recently decided *Woods v. Cantrell*, 29 F.4th 284, 285 (5th Cir. 2022), which included *exactly* the same abbreviated slur in the employment discrimination context that started the Defendants' actions against Kilborn: "Woods's complaint specifically alleges that in the presence of other employees, Woods's supervisor ... directly called him a 'Lazy Monkey A__ N____.'" Other cases cast Black people and members of many other social identity groups in a light that some might regard as unfavorable in some vague respect. Kilborn also fears speaking with students and even voicing opinions in

6

faculty meetings, not knowing what utterance might be misrepresented as "harassment," as defined arbitrarily, retrospectively, and with no advance warning by Defendants. The chilling effect of Defendants' policy is undeniable, and the threat of prosecution is ever present.

If a law professor is fearful of interference by administrators with no knowledge of the law, the legal profession, or legal education, and thus cannot feel free to discuss honestly the evolving landscape of cases involving race and other key social issues in the civil procedural context, a bedrock aspect of the First Amendment has been dangerously eroded. Several other courts have recognized this ongoing problem in very similar situations in just the past several months, as a rash of administrative interference based on challenged speech in university education has swept the country. *See, e.g., Speech First v. Cartwright*, *supra*; *Hiers v. Bd. of Regents of Univ. of N. Texas Sys.*, 2022 WL 748502, 2022 U.S. Dist. LEXIS 43617 (E.D. Tex. Mar. 11, 2022); *Austin v. Univ. of Florida Bd. of Trustees*, 2022 WL 195612, 2022 U.S. Dist. LEXIS 11733 (N.D. Fla. Jan. 21, 2022); J*ackson v. Wright*, 2022 WL 179277, 2022 U.S. Dist. LEXIS 8684 (E.D. Tex. Jan. 18, 2022); *Meriwether v. Hartop*, 992 F. 3d 492 (6th Cir. 2021).

Defendants cannot avoid judicial scrutiny of their unconstitutional policy that mirrors other policies denounced by courts around the country. This Court can grant declaratory and injunctive relief to stop Defendants from continuing to enforce their unconstitutional policy against Kilborn. *See Verizon*, 535 U.S. at 645 ("The prayer for injunctive relief — that state officials be restrained from enforcing an order in contravention of controlling federal law — clearly satisfies our 'straightforward inquiry.'"); *Littler v. Wallace*, 2019 U.S. Dist. LEXIS 96570, *3-*4 (N.D. Ind. June 10, 2019). In contrast, Defendants' other citations (Doc. 20, p. 15) do not support the invocation of the Eleventh Amendment. *Judicial Watch, Inc. v. King*, 2014 WL 12755049, 2014 U.S. Dist. LEXIS 65302, *3-*4 (S.D. Ind. May 13, 2014), had no ongoing violation of law because Indiana passed new legislation after the case was filed, as was the case in *Green*, 474 U.S. at 65.

In *Harden v. Board of Tr. of E. Ill. Univ.*, 2013 WL 6248500, *8, 2013 U.S. Dist. LEXIS 170252, *19 (C.D. Ill. Dec. 2, 2013), the plaintiff was seeking damages and a declaratory judgment for past discrimination. The declaratory judgment was not tied to an injunction or other prospective relief.

### B.     The State-Law Claims Are Not Official-Capacity Claims

The Eleventh Amendment does not apply to Kilborn's claims under Illinois state law because Kilborn is not suing Defendants in their official capacities, he does not seek damages against UIC, and he does not seek any injunctive relief under state law. Kilborn's state-law claims are the plain-vanilla torts presented in Counts IV, V, and VI, all of which give Kilborn a right to damages against Defendants in their individual capacities.

Given the nature of Kilborn's state-law claims, Defendants' citation of *Pennhurst St. Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) (Doc. 20, ECF p. 15) is not relevant. The Eleventh Amendment does not bar claims under state law against individual defendants, even if they work for a state. *Terry v. Burke*, 589 F. Supp. 853, 856 (N.D. Ill. 1984) (applying *Pennhurst*). As Defendants' cited cases make clear, "the key issue in determining whether the eleventh amendment is a bar to a particular lawsuit is whether the state is the real party in interest. If it is not, the eleventh amendment presents no bar to the suit, for it is not an action against the state." *Id.* at 855. Individual-capacity tort claims under Illinois law, against employees of Illinois entities, are permitted in federal court. *Id.* at 866; *Goka*, 625 F. Supp. at 323-24.

## II.    ILLINOIS SOVEREIGN IMMUNITY DOES NOT APPLY

Kilborn's state-law claims in this action are tort claims for damages against the individual Defendants that are not subject to exclusive jurisdiction in the Illinois Court of Claims. A federal court applies Illinois law on the issue of Illinois sovereign immunity. *Murphy v. Smith*, 844 F. 3d 653, 658 (7th Cir. 2016). *Murphy* applied the same three-part test relied on by Defendants (Doc. 20, ECF p. 17), from *Healy v. Vaupel*, 549 N.E. 2d 1240, 1247 (Ill. 1990). *Id.* at 658. *Murphy* also

applied subsequent Illinois precedents on sovereign immunity, including *Leetaru v. Board of Tr. of Univ. of Ill.*, 32 N.E. 3d 583 (Ill. 2015), and *Fritz v. Johnston*, 807 N.E. 2d 461 (Ill. 2004).

Defendants' motion ignores *Murphy* and fails to acknowledge, much less address, an "important exception" to Illinois immunity law that requires denial of their immunity claim:

> This case is governed by an important exception to sovereign immunity in suits against state officials or employees. If the plaintiff alleges that state officials or employees violated "statutory or constitutional law," "[s]overeign immunity affords no protection." *Healy*, 549 N.E. 2d at 1247. "This exception is premised on the principle that while legal official acts of state officers are regarded as acts of the State itself, illegal acts performed by the officers are not." *Leetaru*, 32 N.E. 3d at 596.

*Murphy*, 844 F. 3d at 658-59. Here, because Kilborn alleges that Defendants "acted 'in violation of statutory or constitutional law,' sovereign immunity does not bar his state-law claims." *Id.* at 660 (quoting *Fritz*, 807 N.E. 2d at 467; *Healy*, 549 N.E. 2d at 1247).

The gist of Defendants' argument is that they were 'just doing their jobs' as UIC officials. Doc. 20, ECF pp. 17-18. They assert that the FAC concedes this, as it says in places that "UIC" and its "Office for Access and Equity" took actions. Doc. 20, ECF p. 18. But these institutions can act only through individual agents, in this case the Defendants, who are not shielded by immunity from responsibility for their own tortious conduct. To enjoy immunity, Defendants would have to establish that they acted only within the proper scope of their *legal and official* authority, i.e., without violating any constitutional or statutory law.

The FAC alleges violations of both. First, it alleges that Defendants violated constitutional law under the First, Fifth, and Fourteenth Amendments by taking illegal actions against Kilborn as punishment for protected speech. FAC Counts I, III. Second, it also alleges that Defendants' same actions violated the University of Illinois Statutes promulgated under the University of Illinois Act. FAC Count II, ¶¶ 62-66. *See* 110 ILCS 305/1. Defendants concede that the University Statutes are by-laws having the force of administrative law. Doc. 20, ECF p. 25. The allegations

9

in Count II support the contention that Defendants exceeded their statutory powers under the Illinois Statutes. Defendants cannot claim Illinois sovereign immunity for actions that violated both statutory and constitutional law. Kilborn's state-law tort claims (FAC Counts IV, V, VI) are based on the same actions of Defendants that violated constitutional law and exceeded Defendants' authority under University of Illinois Statutes, so Defendants are not immune under Illinois law.

Defendants ignore the ample authorities denying immunity for state-law tort claims tied to constitutional violations by state officials, a common feature of Section 1983 actions. *See*, *e.g.*, *Murphy*, 844 F. 3d at 660 (Eighth Amendment and Illinois battery claims); *Goka*, 625 F. Supp. at 324 (same); *Whitlock v. Brueggeman*, 682 F. 3d 567, 589-90 (7th Cir. 2012) (Fifth Amendment due-process claims and state-law claims); *Peirick v. Dudek*, 2020 U.S. Dist. LEXIS 211438, *7 (N.D. Ill. Nov. 12, 2020) (Fourth Amendment and Illinois malicious prosecution claims).

Defendants' cited immunity cases involve claims against state officials that did not involve a constitutional or statutory violation. *Healy*, *supra*, involved claims of negligence causing personal injuries. Likewise, *Benning v. Board of Regents of Regency Univ.*, 928 F. 2d 775 (7th Cir. 1991), involved claims of negligence causing a lab explosion. *Turpin v. Koropchak*, 567 F. 3d 880 (7th Cir. 2009), involved a demand for specific performance and claims of tortious interference with a prospective employer. *Murphy*, 844 F. 3d at 658-59, cites those distinguishable cases. In *Jackson v. Illinois Dep't of Com. & Econ. Opp.*, 2019 WL 293377, 2019 U.S. Dist. LEXIS 10588 (C.D. Ill. Jan. 23, 2019), the court did not address *Murphy* or the important exception to immunity.

## III. PLAINTIFF HAS ADEQUATELY PLED HIS CONSTITUTIONAL CLAIMS

### A. Plaintiff Has Adequately Described the Involvement of Each Defendant

Plaintiff's references to "Defendants" are appropriate because each Defendant participated in the misconduct described in the FAC. Defendant Amiridis is the Chancellor, responsible for all administrative policy at the university, including the OAE and the policy at issue here. The

allegations concerning the conduct of the OAE also implicate Defendants Davidson, Kamm, and Bills (FAC, ¶¶10, 12, 13), because each of these people participated in the violations directly or they directly and improperly supervised the conduct at issue. The FAC alleges: "All Defendants participated in creating the findings letters…." (FAC, ¶39). The letter itself, and its accompanying transmittal letter (FAC, Ex. A), explicitly show the involvement of Defendants Kamm, Bills and Davidson, all of whom were part of the OAE, in the underlying "investigation."

Defendant Amiridis also authored and sent the email blast along with the investigation report to the entire "UIC Community." (FAC, ¶43). While Plaintiff inadvertently did not attach that letter to the Amended Complaint, the letter itself (Ex. A, which is still posted on UIC's website) was co-authored by Defendant Spanbauer. "[O]n a motion to dismiss, the Court may consider 'documents attached to the Complaint, documents that are critical to the complaint and are referred to in it, and information that is subject to proper judicial notice.'" *Sullivan v. Bickler*, 360 F. Supp. 3d 778, 781, n.1 (N.D. Ill. 2019) (quoting *Geinosky v. City of Chi.*, 675 F. 3d 743, 745 n. 1 (7th Cir. 2012). See also *Hecker v. Deere & Co.,* 556 F. 3d 575, 582-83 (7th Cir. 2009) (affirming of a "liberal standard" in noticing material outside of the complaint).[2]

Defendants Amidiris and Spanbauer's email blast (Ex. A) shows that, at a minimum, they endorsed or condoned the actions of Davidson, Kamm, and Bills acting for the OAE. That alone meets the standard for supervisory liability in a Section 1983 action. *Chavez v. Ill. State of Police*, 251 F. 3d 612, 651 (7th Cir. 2001) ("The Supervisors must know about the conduct and facilitate it, approve it, [or] condone it ...."). Defendant Spanbauer also is identified as meting out additional punishment in late 2021. (FAC, ¶¶46-50). The FAC's reference to "other Defendants" in the BTAT's evaluation of Kilborn as a "threat" (FAC, ¶¶22, 28) also implicates Defendants Bills and

---

[2] Plaintiff intends to seek leave to correct his Amended Complaint to attach that letter (Ex. A).

Kamm, who are two of the "core members" of the BTAT, according to UIC's public website. (*https://oae.uic.edu/btat-e*).

### B. Plaintiff Has Stated a Claim for Violation of the First Amendment

Defendants' reliance on *Garcetti v. Ceballos*, 547 U.S. 410 (2006) is misplaced. Justice Souter's dissent in that case signaled his concern about its possible extension to the university setting: "I have to hope that today's majority does not mean to imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write 'pursuant to official duties.'" 547 U.S. at 438. The majority expressly reassured that "we need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.* at 425. This is just such a case, involving a public university law professor's speech related to teaching about race discrimination, civil rights litigation, and appropriate approaches to dispute resolution in this fraught context. Defendants have ignored all of the recent case law on this issue and rely instead on cases involving elementary school teachers or non-educational speech.

### 1. Kilborn's Speech as a Public University Law Professor is Protected

A long line of Supreme Court jurisprudence has strongly suggested "a special niche in our constitutional tradition" for higher education speech. *See, e.g., Grutter v. Bollinger,* 539 U.S. 306, 329 (2003); *Tinker v. Des Moines Indep. Comm'ty Sch. Dist.* 393 U.S. 503, 509 (1969); *Keyishian v Board of Regents of Univ. of State of NY*, 385 U.S. 589, 603 (1967) ("Our Nation is deeply committed to safeguarding academic freedom…. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom."). The Supreme Court recently reconfirmed its commitment to First Amendment protections and resistance to administrative restrictions on speech in the secondary school context. *Mahanoy Area School District v. B.L.*, 141 S. Ct. 2038 (U.S. 23 June 2021) (striking down a

"substantial disruption" standard for restricting speech, similar to the "substantially interferes" standard applied by UIC in this case).

Consequently, since *Garcetti*, **every** Court of Appeals opinion addressing this question has declined to apply any lesser protection to public university professors' right to free speech in their educational "public duties." *Speech First, supra,* 2022 U.S. App. LEXIS 11864 at *38 n. 6; *Meriwether, supra,* 992 F. 3d at 504-06; *Buchanan v. Alexander*, 919 F. 3d 847, 852-53 (5th Cir. 2019); *Demers v. Austin*, 746 F. 3d 402, 411-12 (9th Cir. 2014) (concluding "'*Garcetti* does not—indeed, consistent with the First Amendment, cannot—apply to teaching ... performed 'pursuant to the official duties' of a teacher and professor.'"); *Adams v. Trustees of Univ. N. Carolina–Wilmington*, 640 F. 3d 550, 561-64 (4th Cir. 2011). Speech strikingly similar to that presented in this case has been protected under the First Amendment in no uncertain terms. *Hardy v. Jefferson Comm. College*, 260 F. 3d 671, 683 (6th Cir. 2001) (protecting discussion including gender and racial slurs, concluding "Given this court's in depth analysis of the protections available to one using the 'N' word in an academic context, reasonable school officials should have known that such speech ... is protected by the First Amendment.").

Defendants fail to acknowledge any of these authorities and rely instead upon inapposite cases. Like *Garcetti* itself, *Puppala v. Will County Comm. Health Ctr.,* 2010 WL 3893847 (N.D. Ill. Sept. 30, 2010), had no connection to education, and *Hatcher* v. *Bd of Trs. of S. Ill. Univ.*, 829 F. 3d 531, 538-39 (7th Cir. 2016) involved speech wholly unrelated to teaching. *Brown v. Chicago Bd. Of Educ.*, 824 F. 3d 713 (7th Cir. 2016), involved a teacher at an elementary school, where speech is widely accepted to be subject to greater control by public officials. There, the Seventh Circuit specifically distinguished *Demers v. Austin, supra*, as involving "speech in a university setting, not a primary or secondary school," explaining, "academic freedom in a university is 'a special concern of the First Amendment.'" *Brown*, 824 F. 3d at 716. Both of these distinguishing

limitations distinguish *Bryant v. Gardner*, 587 F. Supp. 951 (N.D. Ill. 2008) (high school teacher/coach's complaint about open gym cancellation, basketball spending, resource allocation).

### 2. Kilborn's Speech Was a Matter of Public Concern

Rather than *Garcetti*, the so-called *Pickering-Connick* framework applies a balancing test in evaluating a public university employer's restriction of a professor-employee's job-related speech, as illustrated in the many cases cited above. *See, e.g., Meriwether*, *supra,* 992 F. 3d at 507 *et seq.*; *Salaita, supra*, 118 F. Supp. 3d at 1083. The first prong of that test (carried over from *Garcetti*), is whether the public university professor was speaking "on a matter of public concern."

"[A] teacher's in-class speech about 'race, gender, and power conflicts' addresses matter of public concern." *Meriwether*, *supra,* 992 F. 3d at 508 (quoting *Hardy*, 260 F. 3d at 679). This is clearly the context that the FAC describes. Kilborn's use of "n___" and "b___" in his Civil Procedure exam question was neither random nor gratuitous. A significant theme in that class was Kilborn's engagement of his students in dialogue about discrimination in the context of civil rights litigation. Indeed, most of Defendants' other purported bases for their improper conclusion that Kilborn violated UIC's nondiscrimination policy came from other instances of in-class conversation about racial discrimination in the litigation context: "refer[ing] to racial minorities as 'cockroaches' and denounc[ing] racial minorities' participation in civil rights claims," using "African American Vernacular English" in describing racial profiling of Black males in traffic stops, "generalizing about minority participation in litigation" and referring to "implicit bias" in assessing the litigation position of a corporate board accused of racial discrimination. (FAC ¶¶ 35-36, FAC Exs. A, C). While Defendants mischaracterize and falsify these statements attributed to Kilborn (see FAC ¶¶ 35-36), the constant theme is the discussion of actual or perceived racial discrimination in the litigation context, a matter of public concern of the highest order. Discussion of occurrences of racial slurs in the workplace, cited in abbreviated from in the context of legal

14

analysis of civil procedure, are quite clearly by their very nature "matters of public concern." *See Woods, supra,* 2022 U.S. App. LEXIS 7803 at *3.

### 3. Compelled Speech

In addition to stating a claim for being punished for protected speech, in Count I, Plaintiff has also stated a claim for compelled speech. "Compelled speech 'penalizes the expression of particular points of view and forces speakers to alter their speech to conform with an agenda that they do not set.'" *Entm't Software Ass'n v. Blagojevich*, 404 F. Supp. 2d 1051, 1082 (N.D. Ill. 2005), *aff'd*, 463 F. 3d 641 (7th Cir. 2006) (quoting *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n of Calif.*, 475 U.S. 1, 9 (1985)). Here, Kilborn was compelled to express his "commitment to the goals of the [diversity sensitivity] program". (FAC, ¶¶ 50, 56). Defendants quibble about the nature of these goals and the way Kilborn was required to express his commitment to them, but Defendants have refused to reveal whether he has satisfactorily complied with their mandate in order to be reinstated in the classroom (FAC ¶ 50). Kilborn was compelled to undertake the course and actively engage in discussion of themes with which he adamantly disagreed, he was forced to participate and acknowledge that his behavior merited corrective "training," and he now fears further persecution on the basis that he failed to say what Defendant demanded to hear. The precise nature and extent of Defendants' compulsion of Kilborn's speech remains fluid due to Defendants' own furtive behavior.

### C. Plaintiff Has Adequately Pled a Procedural Due Process Violation

Defendants' sole challenge to the Due Process claim (FAC Count III) is that Kilborn's suspension with pay does not represent a cognizable injury to a property interest. However, Defendants ignore the fact that, as punishment for his purported policy violation, Kilborn was denied an across-the-board salary adjustment of 2% that was given to *every single other* member of the law faculty. (FAC ¶ 46). That 2% raise, combined with the university's contribution to

retirement savings over the remainder of Kilborn's career, amounts to a significant sum. In *Head v. Chicago Sch. Reform Bd. Of Trustees,* 225 F. 3d 794, 803 (7th Cir. 2000), the Seventh Circuit held that a difference in salary or benefit qualifies as an actionable deprivation of property:

> The Board suggests that because Head received the same salary and benefits after his removal that he did when he was principal, he, at most, suffered a de minimis deprivation of property. The Board's suggestion is flawed, however. To begin with, the relevant question is whether Head received all the salary and benefits he would have received if he had remained Pope Elementary's principal. Head opposed the Board's summary judgment motion on the ground that he did not receive all he would have been due. If he is right, he suffered an injury that is plainly more than de minimis. See *Swick*, 11 F. 3d at 86-88 (pecuniary losses qualify as actionable deprivations of property).

Here, Kilborn's loss was in his compensation as a law professor, not extracurricular pay (*Towsend v. Vallas*, 265 F. 3d 661, 676 (7th Cir. 2001)) or secondary employment (*Battle v. Alderden*, 2015 U.S. Dist. LEXIS 164797 (N.D. Ill. Dec. 9, 2015)). Hence, he has stated an actionable deprivation of property.

## IV. PLAINTIFF HAS ADEQUATELY PLED CLAIMS FOR DEFAMATION *PER SE* AND FALSE LIGHT

### A. The Defamatory Statements

To begin with, the Amended Complaint makes clear that the defamatory statements "***include*** statements that (1) Plaintiff was guilty of race-based "harassment" of students; (2) Plaintiff had 'overtly intimidat[ed] and threaten[ed]' students (and similarly, 'threats did occur') and (3) had 'used' racial slurs and referred to minorities as 'cockroaches.'" (FAC, ¶ 84; emphasis added). Other defamatory statements are identified in the Amended Complaint:

- Plaintiff's actions had "***interfered with Black students' participation in the University's academic program*** and therefore ***constituted harassing conduct***…." (FAC, ¶ 33; emphasis added).

- Defendants referenced an allegation that Plaintiff "referred to racial minorities as 'cockroaches' and ***denounced racial minorities' participation in civil rights claims*** as part of a discussion of modern-day extortion theory…." Defendants went on to report that the allegations referring to "***cockroaches***" and other "***in appropriate racially-charged comments***" had been "***substantiated***." (FAC, ¶ 34;

Ex. A to FAC; emphasis added).

- Plaintiff had made an "overtly and *threatening reaction*" to a student, and expressed "anger and displeasure with students' objections in a manner that *created retaliation concerns for Black students*" by sending an email to a white former student on January 4, 2021. (FAC, ¶ 37; emphasis added).

- Plaintiff had created "*fear and intimidation* that were reasonably interpreted as such, and "*race related fears of physical safety and retaliation.*" (*Id.,* emphasis added).

On November 30, 2021, Defendants Amiridis and Spanbauer sent a letter to the entire "UIC Community" (students, faculty and staff) along with a link to the investigation report, which also contains defamatory statements. (FAC, ¶ 43, Ex. A). In that letter, Defendants Amiridis and Spanbauer reiterated the false messages that Kilborn had engaged in professional misconduct requiring training and monitoring in order to prevent further "deviations." (Ex. A at 1-2; 5). They also attempted to buttress the purported bases for the conclusion that Kilborn had engaged in race-based "harassment." Addressing the "lead" basis, they attempted to justify the incendiary, earlier "finding" that Kilborn had called minorities "cockroaches" by first stating the allegation: "referring to racial minorities as 'cockroaches' and denouncing racial minorities' participation in civil rights…." (Ex. A at 3). They then stated in a footnote:

> OAE's review of the class recording substantiates that: (1) When discussing media attention to situations in which corporations lose cases (but not when they win) and *a particular case involving a racial minority plaintiff,* Professor Kilborn stated: "Then all the cockroaches come out of the walls."

(Ex. A at 3; emphasis added). This statement is false; the actual transcript showed that the case about which Kilborn was speaking of did not "involve a racial minority plaintiff." (FAC, ¶ 35).[3]

---

[3] Defendants have not contested the allegation that their statements constitute defamation *per se.* In Illinois, a statement is defamatory *per se* if it (1) indicates that the plaintiff is unable to perform or lacks integrity in performing his employment duties, or (2) attributes to the plaintiff a lack of ability or otherwise harms him in his profession. *Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E. 2d 825, 839 (Ill. 2006) (also listing additional bases). Here, Defendants' statements fall within both of these *per se* categories.

### B.  Plaintiff Has Adequately Alleged Defendants' Participation in Creating and Publishing the Defamatory Statements

Contrary to Defendants' argument, the Amended Complaint adequately alleges Defendants' participation in creating and publishing the defamatory statements. As for the "findings letter," Plaintiff alleged: "All Defendants participated in creating the findings letter; they then published it by, or information and belief, sending it to members of the BLSA and others." (FAC, ¶ 39). The letter itself, and its accompanying transmittal letter (both attached to the Amended Complaint as Exhibit A), explicitly show the involvement of Defendants Kamm, Bills and Davidson, all of whom were part of the OAE.

The allegation "on information and belief" about Defendants' publication of the findings letter is certainly reasonable in light of the fact that third parties received copies of it.  Indeed, the ABA Journal published a copy of the findings letter online in its article, ***"Exam question wasn't only offensive behavior of UIC law professor, according to internal investigation."*** (FAC, ¶ 39).[4]

The investigation report was also the work of the OAE (and hence Defendants Bills, Kamm and Davidson) (FAC, ¶ 42; FAC, Ex. A at 1); that report also contained defamatory statements. (FAC, ¶ 43). Defendant Amidiris published the investigation report itself to the entire "UIC Community" (FAC, ¶ 43), with a letter which was co-authored by Defendant Spanbauer.  (Ex. A).

Under *Van Horne v. Muller*, 205 N.E. 2d 898, 903 (Ill. 1998), "all persons who ***cause or participate*** in the publication of libelous or slanderous matters are responsible for such publication." (emphasis added).  There, the Illinois Supreme Court established that more than one person may be liable for defamation based on their participation in the publication:

> ***Count II sets forth sufficient facts to support a cause of action against Blanco for***

---

[4] The ABA advertises a membership of 350,000.  The article is posted on the ABA Journal Website and is accessible to the public at large. *https://www.abajournal.com/web/article/exam-question-wasnt-only-offensive-behavior-of-uic-law-professor-according-to-internal-investigation/*

> ***her participation in the publication of the allegedly false statements about plaintiff.*** … Blanco made several statements affirming Muller's version of the encounter, agreeing with his description of plaintiff's conduct, and even going so far as to confirm that it was not a prearranged "stunt." ***In addition, in her newscasts, Blanco repeatedly reiterated Muller's statements about his encounter with plaintiff.***

*Id.* at 308 (emphasis added); *see also Gambino v. Boulevard Mortg. Corp.*, 922 N.E. 2d 380, 419 (1st Dist. 2009) (relying on *Van Horne*, finding element of "publication" was met against defendants in context of slander of title where defendants "participated in the acts ***leading to*** the recording of all the legal documents which slandered plaintiffs' title to the subject properties.").

Plaintiff has adequately alleged Defendants' involvement in the creation and publication of the defamatory statements. To be sure, discovery will reveal the Defendants' individual roles with greater precision. Moreover, the issue of whether a person "participated" in a publication is reserved for the jury. *See Missner v. Clifford,* 914 N.E. 2d 540, 552 (2009).[5]

### C.     Defendants' Statements are Not Substantially True

"When determining the 'gist' or 'sting' of allegedly defamatory material, a trial court must 'look at the highlight of the article, the pertinent angle of it, and not to items of secondary importance which are inoffensive details, immaterial to the truth of the defamatory statement.'" *Parker v. House O'Lite Corp.*, 756 N.E. 2d 286, 296 (1st Dist. 2001). Here, the "gist" of the findings letter was false: that Kilborn had engaged in repeated misconduct constituting race-based harassment, including calling racial minorities "cockroaches" and denouncing their participation in civil rights claims. That very gist was captured by the ABA Journal's own article about the

---

[5] Defendants' one-sentence suggestion that no defamation occurred because the investigation report was first "released to a journalist in response to a FOIA request" (Doc. 20, p. 20) is meritless. *E.g.*, *Davis v. Bd. of Educ. of Waukegan County Sch. Dist. No. 60*, 2020 U.S. Dist. LEXIS 63836 at *19 (N.D. Ill. April 13, 2020) (Judge Bucklo denied motion to dismiss false light claim, rejecting argument that "the Board memo was provided to a newspaper in response to a FOIA request…."). In any event, Defendants Amiridis and Spanbauer published the investigation report to the entire "UIC Community" with their November 30, 2021 letter (Ex. A) and the journalist never publicly disclosed the investigation report.

findings letter, beginning with the ominous title: "**Exam question wasn't only offensive behavior of UIC law professor, according to internal investigation**":

> A May 28 letter (https://www.abajournal.com/files/UIC_Law_finding.pdf) from UIC's [OAE] details the various complaints. According to the letter, the agency found that *Kilborn's conduct was "sufficiently substantial and repeated"* enough to interfere with Black students' law school participation and *constituted harassment.... Allegations the office found to be substantiated include Kilborn* in a January 2020 lecture dismissing a Black student's view that his comments were overgeneralizing references to people of color, referring to *racial minorities as "cockroaches," and denouncing their participation in civil rights claims.*

(FAC, ¶ 39, emphasis added). Contrary to Defendants' argument, the ABA Journal's description is an accurate (even verbatim) reading of the most serious charges which Defendants falsely classified as "substantiated." Specifically, the findings letter describes the accusations as:

> During a January 23, 2020 lecture in the Civ Pro II course, you allegedly: (1) referred to racial minorities as "cockroaches" and denounced racial minorities' participation in civil rights claims as part of discussion of modern day extortion theory; and (2) referred to media stories that expose the negative behavior of White men as "lynching,"

(FAC, Ex. A at 1). Defendants went on to state that those accusations were "substantiated":

> In particular, it is substantiated that: (1) you made multiple, inappropriate, racially-charged comments over the course of one hour during the January 23, 2020 class. This includes your making references to "cockroaches" and "lynching"….

(*Id.* at 2). These key charges were false. The verbatim transcript unequivocally shows that Kilborn never referred to racial minorities as "cockroaches"; nor did his statement in any way "denounce racial minorities participation in civil rights claims." (FAC, ¶ 35). Nor did Kilborn's use of the word "lynching" (for which he immediately apologized) "refer to media stories that expose the negative behavior of White men"; his actual statement was "I'm not subjecting my corporate bottom line to that public lynching; I'm sorry, that's the wrong word to use." (FAC, ¶ 36(1)).

Defendants also falsely tacked on a statement clearly made in jest ('homicidal" – the context of which is detailed in FAC, ¶ 20) and a legitimate exam question which Kilborn had given

repeatedly over ten years (FAC, ¶ 16) to arrive at their conclusion that Kilborn had engaged in "harass[ment] based on race." They also deliberately mischaracterized Kilborn's email to a white student expressing support for all students – even those objecting to his exam question – claiming that he had expressed "anger" and created "retaliation concerns for black students." (FAC, ¶ 37).

Defendants then parlayed their own false narrative into false statements in the findings letter and the investigation report that Kilborn had engaged in dangerous conduct ("threats", "threatening reaction", "intimidation", "disparage") supposedly creating "race related fears of physical safety and retaliation", and "fear and intimidation." In their email blast circulating the investigation report to the entire "UIC Community," Defendants Amiridis and Spanbauer confirmed that Kilborn had engaged in professional misconduct and had "disparaged" people based on race; they also continued to misrepresent the supposed evidence.

In any event, "whether a statement is substantially true or false is a question for the jury." *Bogosian v. Board of Educ., Comm. Unit School Dist. 200*, 134 F. Supp. 2d 952, 957 (N.D. Ill. 2001). Accord, *Bryson v. News Am. Publ'ns*, 672 N.E. 2d 1207, 1220 (1996).

### D. Plaintiff Has Adequately Pled Malice for the False Light Claim

The Amended Complaint alleges facts establishing actual malice. Defendants' OAE "investigation" was an effort to stigmatize Kilborn and legitimize criticism of him for his use of an appropriately worded hypothetical in an exam. They then deliberately spun innocuous events into something far more sinister and racially charged by falsifying the "evidence":

● Defendants morphed the "cockroaches" statement about a class action suit against Subway over 11.5"-long sandwiches into a slur against "minorities" and a "denounc[iation]" of racial minorities' participation in civil rights claims."

● Defendants morphed a heartfelt letter to a white former student and a single off-handed reference to the word "homicidal" (obviously said in gest in a cordial conversation that continued for several hours after the word was used (FAC, ¶38)) into another basis for concluding Kilborn had engaged in "race-based harassment."

21

● Defendants wove statements into their findings letter and investigation report that Kilborn had actually engaged in "threats" and "intimidation."

This was not a legitimate investigation, but an agenda-driven hit piece by Defendants. Defendants then gave their supposedly "confidential" findings letter to a member of BLSA, stoking a wave of outrage against Kilborn (including protests, a press conference, and demands for his termination), as they knew it would. (See FAC at ¶ 40). In their email blast circulating the investigation report to the entire "UIC Community," Defendants Amiridis and Spanbauer widely disseminated these and other false claims that Kilborn had engaged in misconduct and had "disparaged" people based on race; they also continued to misrepresent the supposed evidence.

These allegations of actual malice sufficiently support the false light claim; indeed, courts have repeatedly held that evidence of a reckless investigation alone renders malice a question for the jury. *Parker v. House O'Lite, supra,* 756 N.E. 2d at 301 ("A jury could find Larson…never conducted a careful investigation into the CCH Project before attributing criminal and reprehensible conduct to Parker in her two letters. That is, a jury could find she was reckless…."), *Gibson v. Philip Morris, Inc.*, 685 N.E. 2d 638, 645 (5th Dist. 1997) (qualified privilege defeated by actual malice where there "was an improper and incomplete investigation of the truth of the matter."). See also *Doe v. Harpercollins Publrs.*, LLC, 2018 U.S. Dist. LEXIS 36586 at **19-20 (N.D. Ill. Mar. 6, 2018) (malice adequately pled for false light claim: "Beyond reciting the element of malice, Plaintiff also alleges supporting details regarding specific false statements made by Kipnis and the fact that Kipnis deliberately omitted evidence that contradicted the narrative ....").

## V.   PLAINTIFF HAS ADEQUATELY PLED A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

"The Illinois Supreme Court has explained that conduct is of an extreme and outrageous character where recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Jackson v. City of Joliet*,

No. 19 C 7284, 2020 WL 5800733, at *5 (N.D. Ill. Sept. 29, 2020) (internal quotation marks and citation omitted). In *Jackson*, Judge Durkin pointed out that valid IIED claim in the employment context may be premised on a "'sham', or improperly motivated investigation":

> In the employment context, "courts have found extreme and outrageous behavior to exist . . . where the employer clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." Indeed, Illinois courts have held that a "sham" or improperly motivated investigation into, and discipline of, an employee's conduct can be "extreme and outrageous."

(*Id.* at **15-16; citations omitted). In *Jackson*, the court found that a sham investigation had been adequately pled and denied the motion to dismiss. *Id.* Likewise, in *Graham v. Comm. Edison Co.,* 742 N.E. 2d 858, 868 (1st Dist. 2000), the court reversed the dismissal of an IIED claim premised on a "sham investigation": "Graham also alleges that *the sham investigation* conducted by ComEd *served no legitimate purpose*, was retaliatory in nature and therefore *constitutes extreme and outrageous conduct. We agree."* (emphasis added).

Here, the Amended Complaint alleges conduct which transcended a sham investigation, beginning with treating Kilborn as an actual threat to the physical safety of the UIC Community:

> ● Defendants invoked UIC's Violence Prevention Plan to convene a Behavioral Threat Assessment Team ("BTAT") to assess this purported "threat" of imminent physical violence. Without communicating with Plaintiff or any other person with firsthand knowledge, the BTAT authorized the law school dean to take the most extreme measures. (FAC, ¶22).

> ● Kilborn was forbidden from communicating with colleagues, staff, students and even alumni of the school, and, over several days, had to submit to drug testing and evaluations by a nurse, a social worker and a doctor. (FAC, ¶¶24, 28).

This was not a legitimate exercise of an emergency protocol in response to a real threat, but a charade conducted in reckless disregard for Kilborn's reputation and psychological well-being: "the purported threat was a mere pretext, offering UIC officials cover for their politically motivated actions…. The complaints about the exam were apparently not sufficient to trigger the

23

sanctions that might mollify the complaining students.  The purported threat, however, offered that opportunity."  (FAC, ¶ 27, quoting third-party commentary published in *Chronicle of Higher Ed.*).  These actions "violated every aspect of UIC's Violence Prevention Plan."  (FAC, ¶ 91).

Consistent with that strategy, the OAE then launched its "investigation" into Kilborn for allegations of "race-based harassment" for allegedly "creat[ing] a racially hostile environment for…non-white students…." (FAC, ¶ 29).  That investigation was a "sham" in that the OAE deliberately misrepresented the evidence (some of which the OAE never gave Kilborn notice, much less an opportunity to respond, e.g., FAC, ¶ 37) in order to arrive at their foregone and false conclusion that Kilborn had engaged in race-based "harassing conduct" and "threats" and "intimidation."  They then released their supposedly "confidential" findings to a member of BLSA, resulting in protests, a press conference and media reports (some of them national) demonizing Kilborn.  (FAC, ¶¶ 39, 40).  In their email blast circulating the investigation report to the entire "UIC Community," Defendants Amiridis and Spanbauer: (1) confirmed that Kilborn had engaged in professional misconduct: (2) had "disparaged" people based on race; (3) continued to misrepresent the supposed evidence; and (4) published the defamatory statements in the report itself (e.g., "threats did occur", etc., FAC, ¶ 43).  They further humiliated Kilborn by emphasizing how Kilborn would be put under the magnifying glass ("monitored and reviewed") to prevent additional "deviations." Then, in December of 2021, Defendants abruptly suspended Kilborn for another semester, and mandated his participation in "diversity training," materials for which repeated the same expurgated racial slur that precipitated this entire ordeal.  (FAC, ¶¶ 49-51).

Defendants' sham investigation and other misconduct far transcend "typical on-the-job disagreements" in the employment context.  See *Aguilar v. Roland Corp. U.S.*, 2021 U.S. Dist. LEXIS 102541 at **9-10 (N.D. Ill. June 1, 2021) (finding adequately alleged IIED claim where actions against plaintiff went far beyond on-the-job disagreements and included coercion).  See

also *Doe v. Harpercollins, supra,* 2018 U.S. Dist. LEXIS 36586 at *31 (extreme and outrageous conduct met where "Kipnis documented a false and misleading account of Plaintiff's travail's taking facts out of context and falsely characterizing confidential investigation materials….").

As a result of these actions – all of which occurred during the heightened emotional trauma of the COVID pandemic (FAC, ¶ 89) -- Defendants broadcast falsehoods to tens of thousands of UIC faculty, staff, and students that transformed Kilborn "from a respected and well-liked professor into a racist and violent pariah….caus[ing] extreme emotional distress over an extended period of time, distress which has resulted in depressive episodes and other conditions." (FAC, ¶¶ 91, 92). At the pleading stage, these allegations suffice to meet the severe harm requirement. See *Doe v. Harpercollins, supra,* 2018 U.S. Dist. LEXIS 36586 at **30-31 (IIED harm element met where "Plaintiff alleges that no reasonable person 'could be expected to endure being made the focal point of a campaign by a professor at her own University ... to discredit the student herself in her own academic community and far beyond.'").

## CONCLUSION

For the reasons stated above, Plaintiff requests that Defendants' motion be denied.

Respectfully submitted,

_____/s/ Paul K. Vickrey_____
Paul K. Vickrey (vickrey@vvnlaw.com)
Patrick F. Solon (solon@vvnlaw.com)
Dylan M. Brown (brown@vvnlaw.com)
VITALE, VICKREY, NIRO, SOLON &
GASEY LLP
311 S. Wacker Dr., Suite 2470
Chicago, IL 60606
(312) 236-0733
Fax: (312) 236-3137

*Attorneys for Plaintiff, Jason J. Kilborn*