EXHIBIT A

EXHIBIT A



# UIC Law matter

 **today.uic.edu**/uic-law-matter

UIC News staff

Dear UIC community,

Over the last few weeks, there has been interest and concern expressed by internal constituencies, external groups and media regarding the discrimination and harassment complaint filed against a UIC Law professor and the subsequent investigation by the University's Office for Access and Equity (OAE).

We believe it is important to share with you the facts of this matter to ensure accurate information is broadly accessible and to address questions that have been raised by the partial release of complaints, the OAE internal investigation report, Freedom of Information Act (FOIA) by the media, and subsequent administrative measures.

A step-by-step summary of the filed complaints, the process that investigators followed, the findings reported, and the administrative measures taken to address the findings is provided below. This summary also includes key excerpts of the OAE report along with UIC's relevant policies and procedures. Finally, the full 24-page investigation report is available for review.

UIC remains unequivocally committed to fostering an environment conducive to learning and free of any form of harassment or discrimination. UIC also strongly supports and defends faculty rights of academic freedom, a critical component to preserving the intellectual integrity of our University. These are not antithetical principles, nor can they be. Our faculty prove daily that both principles can be honored. The key is not what ideas are presented or tested; it's simply great consideration for how it's done in a respectful manner for all involved. The use of words that disparage individuals based on identity or background is not necessary for academic freedom to flourish and is inconsistent with our commitment to create an inclusive and conducive learning environment. These actions are not acceptable in our educational settings from any member of the campus community.

We understand the negative impact of this matter on our community. The following measures are being taken: the professor is required to complete an intercultural competency training program before he returns to teaching, which should have been mandated instead of just

strongly recommended earlier. In addition, the audio recordings of his classes will be monitored and reviewed and there will be oversight of his interactions and communications with students.

The University and the UIC Law administration are committed to working with the law school's faculty, students and staff to improve the environment, as indicated in the response to the students' concerns written by the Interim Dean and the Provost. Yesterday, we met again with the Student Bar Association, Black Law Student Association and other student leaders to continue the conversation.

We are also looking forward to discussions with the Faculty Senate and other representative bodies of shared governance on measures we can take to clarify and improve our existing policies and procedures so that similar situations can be avoided in the future. We remain committed to the necessary work to move us forward.

Sincerely,

Michael Amiridis
Chancellor

Javier Reyes
Provost & Vice Chancellor for Academic Affairs

Julie Spanbauer
Interim School of Law Dean

---

**ALLEGATIONS**
Between mid-December 2020 and late-January 2021, multiple students and one faculty member raised concerns of discrimination and harassment by UIC Law School Professor Jason Kilborn to the University's Office for Access and Equity (OAE). One student chose to be a complainant and pursue a formal OAE investigation under the University Nondiscrimination Policy Statement (Policy). The other students and faculty member were considered witnesses and remained anonymous due to their concerns about safety and retaliation. OAE acts independent of the University, College or Department administration to assure a fair process for all parties.

The complainants and witnesses in this case alleged:

> Racial discrimination on two accounts: (1) Dropping and refusing to re-add a student to a course based on race; and (2) Imposing an in-person participation grade bump policy that precluded Black students who could not attend in-person classes from receiving extra points due to COVID restrictions and precautions.

Racial harassment on four accounts: (1) Referring to racial minorities as "cockroaches" and denouncing racial minorities' participation in civil rights claims and metaphorically referring to media stories that expose negative behavior of white men as "lynchings" in a January 2020 class* (2) Engaging in racially biased conduct with students of color when discussing cultural topics pertaining to race or language in the same January 2020 class and other classes during Spring 2020; (3) Using redacted references to a racial slur and a profane expression to describe women in the December 2, 2020 final exam; and (4) Reportedly stating in a one-on-one Zoom meeting with a student that the Law School Dean knew that he "is extremely emotional and if he read the letter, his head would explode and he would become homicidal" if the Black Law Student Association (BLSA) demand letter criticizing his behavior were to be shared with him by UIC Law administration.**

—

*OAE's review of the class recording substantiates that: (1) When discussing media attention to situations in which corporations lose cases (but not when they win) and a particular case involving a racial minority plaintiff, Professor Kilborn stated: "Then all the cockroaches come out of the walls."; and (2) In reference to a bank executive, Professor Kilborn said, "I'm not subjecting my corporate bottom line to that public lynching; I didn't mean to use that word, I'm sorry, that's not the right word to use."*

**Professor Kilborn recalled saying, "I suspect she's [the Dean's] afraid if I saw terrible things said about me in that letter, I would become homicidal."*

## INVESTIGATION

The OAE full investigation of discrimination and harassment concluded in May 2021. The investigation determined that Professor Kilborn:

- Did not violate the discriminatory aspect of the Policy.
- Did violate the harassment aspect of the same Policy. This conclusion was not based on a single incident, but on his conduct considered in cumulative fashion and in context.

The conduct included: (1) Using the word "cockroaches," which was not directed to Black students, but in context, could have been perceived as directed towards racial minority plaintiffs; (2) Using the term "lynching," although apologizing immediately for it; (3) Using African American Vernacular English when referring to lyrics of an African American rapper; (4) Using racially charged language (the redacted terms "'n____' and 'b____'…") in an exam question;*** and (5) Responding to concerns about the exam with insensitive, chastising, and arguably threatening comments in January 2021, including using the term "homicidal" during a four-hour Zoom meeting with a student.

Professor Kilborn's "homicidal" comment in January 2021 resulted in a separate immediate assessment, under UIC's Violence Prevention Plan process, initiated with the assistance of the Behavioral Threat Assessment Team (BTAT). At that point he was placed on temporary paid administrative leave, and remained on leave during the pendency of the assessment process. After the multi-step process, including a fitness for duty evaluation with University Health Service, with which Professor Kilborn cooperated, he was approved to return to work because there were no physical safety concerns.

—

*\*\*\*The exam question stated: "After she was fired from her job, Plaintiff sued Employer under federal civil rights law, claiming employment discrimination on the basis of her race and gender. [Discussion of other evidence omitted]. Employer also revealed that one of Plaintiff's former managers might have damaging information about the case, but no one at Employer knew where that former manager was, since she had abruptly quit her job at Employer several months ago and had not been heard from since. With nothing to go on but the manager's name, Employer's lawyer pieced together several scraps of information and concluded that this former manager must be located in a remote area of northern Wisconsin. Employer's lawyer spent $25,000 to hire a private investigator, who successfully located the former manager in northern Wisconsin.  Employer's lawyer traveled to meet the manager, who stated that she quit her job at Employer after she attended a meeting in which other managers expressed their anger at Plaintiff, calling her a "n____" and "b____" (profane expressions for African Americans and women) and vowed to get rid of her.*

*Later, Plaintiff's lawyer served [another discovery demand, omitted, and] an interrogatory demanding the identity and location of any person with any information related to the termination of Plaintiff's employment at Employer or potential discrimination against Plaintiff by Employer or any agent of Employer.*

*Can Employer identify the former manager but properly withhold her location, as this is the product of a significant amount of work and expense by Employer's attorney?"*

## OUTCOMES

Due to the timing of Professor Kilborn's temporary paid administrative leave because of the BTAT assessment of the "homicidal" comment, arrangements were made by the UIC Law administration for his spring 2021 classes to be taught by other instructors. He was not scheduled to teach during the summer or fall 2021 due to previously approved non-teaching academic activities.

After the completion of the multi-step evaluation and assessment, Professor Kilborn was fit to return to work, and he was taken off temporary leave status. It is not accurate that Professor Kilborn was "suspended" or later "reinstated."

As part of its report, OAE recommended that Professor Kilborn partake in a series of intercultural competency individual trainings and coaching sessions before he returns to teach. The report did not recommend revoking tenure or dismissal of Professor Kilborn.

In alignment with the OAE recommendation, UIC Law administration further strongly recommended that Professor Kilborn immediately participate in small group study sessions designed by the UIC Law School Faculty Committee for Diversity, Inclusion, Equity and Campus Climate. Due to the timing and pandemic circumstances, this opportunity was not fully made available to Professor Kilborn as intended. Therefore, the UIC Law administration is requiring that, before returning to the classroom, Professor Kilborn participate in an individualized training or coaching program. This program is meant to support his development and understanding regarding the importance of his position, including his voice and authority in the classroom, and how his words and actions impact others.

In addition, for the next four semesters after he is assigned to teach one or more classes, UIC Law administration is requiring that audio recordings of his classes be monitored and reviewed and there will be oversight of his interactions and communications with students, so that any potential deviations can be immediately addressed.

UIC Law administration did not enter into an agreement with Professor Kilborn regarding the above requirements and recommendations. He was informed in writing of the measures to be taken and he acknowledged receipt and understanding of them.

**POLICIES AND PROCEDURES REFERENCES**
***Office for Access and Equity***
*UIC's Office for Access and Equity (OAE) is an independent office within the University that is charged (among other duties and responsibilities) with assessing complaints of Policy violations. OAE meets with complainants and witnesses to gather factual background and conducts evaluations of such complaints. In appropriate cases, such as this one, OAE may perform a full independent investigation. OAE conducts its investigation independently of the University, College or Department administration to assure a fair process for all parties. At the conclusion of its investigative process, OAE makes a determination as to whether a Policy violation is substantiated by the greater weight of the evidence. It is not the role of University administration to judge or intervene in the OAE fact-finding and evidence-weighing process of individuals cases. OAE may make recommendations to address a Policy violation but decisions as to whether and how any such recommendations will be implemented is left to the unit or college where the respondent employee works.*

***The University Nondiscrimination Policy Statement***
*The commitment of the University of Illinois System to the most fundamental principles of academic freedom, equality of opportunity, and human dignity requires that decisions involving students and employees be based on individual merit and be free from invidious discrimination in all its forms.*

*The University of Illinois System will not engage in discrimination or harassment against any person because of race, color, religion, sex, national origin, ancestry, age, marital status, order of protection status, genetic information, disability, pregnancy, sexual orientation including gender identity, unfavorable discharge from the military or status as a protected veteran and will comply with all federal and state nondiscrimination, equal opportunity and affirmative action laws, orders and regulations. This nondiscrimination policy applies to admissions, employment, access to and treatment in the programs and activities of the University of Illinois System.*

*Complaint and grievance procedures provide employees and students with the means for the resolution of complaints that allege a violation of this Statement. Members of the public should direct their inquiries or complaints to the appropriate equal opportunity office.*

***Violence Prevention Plan***
*The Violence Prevention Plan provides a comprehensive framework for each phase of violence prevention and is designed to facilitate a timely, effective, efficient, and coordinated University response in dealing with issues related to violence that could affect the campus. It sets forth the responsibilities of campus administrative and operational units, and provides guidance to students, faculty and staff about how to recognize, address and report aberrant and threatening behavior. The University of Illinois Chicago (UIC) Violence Prevention Plan (VPP or "the Plan") is prepared in compliance with the Campus Security Enhancement Act of 2008 (110 ILCS 12/1 et seq.).*