**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JASON J. KILBORN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 22 C 475 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| MICHAEL AMIRIDIS, CARYN A. BILLS, | ) | |
| JULIE M. SPANBAUER, DONALD KAMM, | ) | |
| AND ASHLEY DAVIDSON | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

University of Illinois Chicago ("UIC") School of Law professor Jason Kilborn, formerly

the subject of an investigation by UIC's Office of Access and Equity ("OAE"), brings this suit

against Defendants Michael Amiridis, Caryn Bills, Julie Spanbauer, Donald Kamm, and Ashley

Davidson, all UIC employees, in their official and individual capacities. Based on the

investigation and resulting punishments, Kilborn alleges violations of the First Amendment,

Fourteenth Amendment, and state law. As to his state law claims, Kilborn alleges defamation,

false light, and intentional infliction of emotional distress ("IIED"). Defendants move to dismiss

all claims and for sanctions under Rule 11.

Because Kilborn has not sufficiently pleaded that his speech involved matters of public

concern, the Court dismisses his First Amendment retaliation claim. The Court also dismisses

Kilborn's First Amendment compelled speech claim against Defendants in their official

capacities because he fails to adequately allege an ongoing violation of federal law. However,

Kilborn may proceed with his compelled speech claim against Defendants in their individual

capacities. Kilborn may also proceed with his due process claim on the basis that UIC's

Nondiscrimination Policy Statement (the "Nondiscrimination Policy") is unconstitutionally void. With respect to his state law claims, Kilborn may proceed with his defamation and false light claims predicated on only certain allegedly false statements, as explained in more detail below. The Court dismisses Kilborn's IIED claim because he fails to allege extreme and outrageous conduct by Defendants. Finally, the Court denies Defendants' motion for sanctions.

## BACKGROUND[1]

Kilborn teaches law as a tenured professor at UIC School of Law. In December of 2020, Kilborn gave his Civil Procedure II class a final exam, which included a hypothetical employment discrimination scenario that Kilborn had used on his exam for ten years. To describe the scenario, Kilborn wrote that an employee "quit her job at Employer after she attended a meeting in which other managers expressed their anger at Plaintiff, calling her a 'n____' and 'b____' (profane expressions for African Americans and women) and vowed to get rid of her." Doc. 9 ¶ 15. The exam question generated student criticism, including a petition circulated by the Black Law Students Association ("BLSA") (the "BLSA Petition").

On January 4, 2021, Kilborn emailed a former student expressing his sadness and pain as a result of the controversy; Kilborn saw the student's name on the BLSA "attack letter" against him and conveyed that it was "[s]uch a shame to see all of [his] efforts to offer comfort and encouragement . . . only to be now vilified in the most vicious, cruel, and uncompassionate way." Doc. 9-1 at 10. Kilborn explained that he felt "heart . . . broken." *Id.* A few days after sending the email, Kilborn met with a member of BLSA to discuss the controversy. About an hour into

---

[1] The Court takes the facts in the background section from Kilborn's Amended Complaint and exhibits attached thereto and presumes them to be true for the purpose of resolving Defendants' motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013). Although the Court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018), the Court may consider "documents that are central to the complaint and are referred to in it" in ruling on a motion to dismiss, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

the over four-hour conversation with the student, the student asked Kilborn why the law school dean did not show him the BLSA Petition. Kilborn responded, in jest, that she might not have shared the petition because she feared that if Kilborn saw what students said about him, he might "become homicidal." Doc. 9 ¶ 20. The conversation continued with no indication that the student felt distressed or threatened.

As a result of this conversation, Kilborn alleges that "the law school dean and other Defendants" invoked UIC's Violence Prevention Plan and convened a Behavioral Threat Assessment Team to assess the purported threat of physical violence. *Id.* ¶ 22. On January 12, 2021, the first day of Kilborn's classes for the spring semester, the dean told Kilborn that he must take an "indefinite administrative leave," cancelled his classes for the semester, forbade him from coming onto campus or engaging in UIC activities, and prohibited him from meeting with colleagues, students, or alumni. *Id.* ¶ 24. If Kilborn sought to speak at external conferences, he had to seek prior approval. Additionally, the dean asked that Kilborn "not discuss" the events with anyone associated with UIC. *Id.* When Kilborn asked for the reason behind these actions, the dean conveyed that students raised additional concerns regarding possible violations of UIC policies, including UIC's Nondiscrimination Policy. The dean informed Kilborn that OAE would explain more in the coming days.

On January 15, Kilborn met with OAE. Caryn Bills, OAE's Associate Chancellor, told him that his comment about becoming homicidal predicated his administrative leave. Kilborn admitted that he made the comment but emphasized that he said it in jest. To clear the administrative leave, Kilborn had to meet with UIC health officials and undergo drug testing and examination by a nurse, social worker, and doctor. A few days later, Kilborn was no longer on administrative leave and began unrestricted duty. His classes remained cancelled.

On February 17, 2021, OAE provided Kilborn with a notice of investigation related to allegations of race-based discrimination and harassment. They included a list of allegations from unidentified sources to which Kilborn attempted to respond in writing and at an interview, although he objected that he could not respond to the vague allegations. Three months later, on May 28, 2021, OAE provided a findings letter (the "Findings Letter") to Kilborn. The Findings Letter reflected that OAE did not substantiate the allegations of race-based discrimination against Kilborn. It did, however, conclude that Kilborn violated the Nondiscrimination Policy as it relates to harassment. OAE based its determination on a variety of purported statements and actions taken by Kilborn, including that he interfered with Black students' participation in UIC's programs; in the course of one class, made references to "cockroaches" and "lynching," used an "African American Vernacular English" ("AAVE") accent when referencing a Black artist's lyrics, and referenced having an "implicit bias" after a Black student confronted him during the class; used an exam question that included an explicit (abbreviated) reference to a racial epithet; expressed anger and displeasure when he learned students had objected to the exam question; and discussed the possibility that he might become "homicidal" as a result of BLSA's Petition, among other findings. Doc. 9-1 at 3–5. All Defendants participated in creating the Findings Letter, which Kilborn believes they published by sending to BLSA members and others. The entire Findings Letter eventually made its way into an ABA Journal article and other news sources picked up the story. Stories reported that Kilborn described minorities as "cockroaches" and used racial slurs. Protests and a press conference were held to "denounce" Kilborn. Doc. 9 ¶ 40.

A few weeks later, on June 18, Kilborn met with Julie Spanbauer, Interim Dean of UIC's law school, to discuss next steps for Kilborn resulting from the Findings Letter. Kilborn agreed

to allow someone from UIC to review his class recordings for instances of potential racial harassment, report if any instance of potential racial harassment arose, and speak with Spanbauer before responding to any race-based student complaint. Based on this conversation, Spanbauer provided Kilborn with a "final resolution." *Id.* ¶ 45. The resolution consisted of requirements and recommendations for Kilborn to meet. One requirement mandated that, if a review of his class recordings over four semesters revealed that Kilborn maintained a harassing classroom environment, Kilborn would have to undergo sensitivity training.

Kilborn alleges that Spanbauer "reneg[ed]" on their "agreed settlement arrangement," which Kilborn accepted "to avoid a lawsuit," when Kilborn did not receive an across-the-board 2% merit raise and Defendants required him to complete an eight-week diversity course. *Id.* ¶¶ 45–47. As part of the course, Kilborn had to meet with a trainer who would provide feedback regarding Kilborn's engagement with and commitment to the program. Kilborn could not teach his courses until he satisfactorily completed the program. He alleges that he "complied with" the training program but does not indicate whether he returned to the classroom. *Id.* ¶ 51.

In November, UIC released the investigation report upon which OAE based its Findings Letter. It did so in response to a Freedom of Information Request. Kilborn received the report, drafted by Ashley Davidson, a Title IX and Equity Compliance Specialist in OAE during the relevant time period, for the first time on November 11, 2021. On November 30, Michael Amiridis, the Chancellor of UIC, released the report to the UIC community along with a cover letter (together, the "UIC Community Letter"). The report included many of the same statements as the Findings Letter.

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits.  Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor.  *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016).  To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**ANALYSIS**

I.     **First Amendment Claims**

Kilborn brings two First Amendment claims—one alleging retaliation and the other compelled speech—against Defendants in their individual and official capacities.  Defendants move to dismiss both claims on the bases that Kilborn failed to adequately allege each Defendant's involvement sufficient for his individual capacity claims and that sovereign immunity protects them in their official capacities.  They also move to dismiss his claims on the merits.  The Court addresses each of Defendants' arguments where relevant.

A.     **Retaliation**

Kilborn alleges that Defendants unlawfully punished him for speech relating to race and workplace discrimination.  To establish a First Amendment retaliation claim, a public employee

must show that (1) the Constitution protects his speech, (2) his speech caused his employer to act, and (3) he suffered deprivation as a result. *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 792 (7th Cir. 2016). Defendants focus only on the first factor—whether the First Amendment protects Kilborn's speech—and so the Court does the same. The First Amendment protects a public employee's speech only where the employee speaks as a private citizen addressing matters of public concern. *Id*. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)).

Here, Defendants argue that as a public university professor speaking with students about an exam and writing an exam question, Kilborn did not speak as a private citizen. *See Garcetti*, 547 U.S. at 421–22 ("Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen."). Courts, however, have questioned *Garcetti*'s application to public university professors. *See id.* at 438 (Souter, J., dissenting) ("I have to hope that today's majority does not mean to imperil First Amendment protection of academic freedom in public colleges and universities, whose teachers necessarily speak and write 'pursuant to . . . official duties.'"); *Demers v. Austin*, 746 F.3d 402, 412 (9th Cir. 2014) ("*Garcetti* does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor."); *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550 (4th Cir. 2011) (declining to apply *Garcetti* to "speech related to scholarship or teaching").

7

The Seventh Circuit has not explicitly decided whether *Garcetti* applies to a professor's speech related to scholarship or teaching, *see Brown v. Chi. Bd. of Educ.*, 824 F.3d 713, 715 (7th Cir. 2016) ("The question remains whether the *Garcetti* rule applies in the same way to a case involving speech related to scholarship or teaching." (citation omitted) (internal quotation marks omitted)), but it has applied *Garcetti* to public university professors generally, *see Wozniak v. Adesida*, 932 F.3d 1008, 1010 (7th Cir. 2019) (applying *Garcetti* to hold that the First Amendment did not protect a professor who harassed and humiliated students for not giving him an award because the professor "acted in his capacity as a teacher," even though his speech "did not concern how he ran his classroom, graded exams, assisted students in conducting experiments or writing papers, or conduct[ed] his own research and scholarships"); *Renken v. Gregory*, 541 F.3d 769, 775 (7th Cir. 2008) (applying *Garcetti* to hold that the First Amendment did not protect a professor's speech relating to a university's use of funds). Here, drafting an exam question likely falls within the "core official duties" of a university professor, which "are a special concern of the First Amendment." *Demers*, 746 F.3d at 411 (citing *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967)) (concluding that "if applied to teaching and academic writing, *Garcetti* would directly conflict with the important First Amendment values previously articulated by the Supreme Court"). However, the Court need not decide this question today. Even if it agreed with Kilborn that *Garcetti* does not apply to the facts of this case, Kilborn's speech did not relate to matters of public concern, and so he cannot proceed with his First Amendment retaliation claim.

"Whether a statement rises to the level of public concern is a question of law, and in answering this question [courts] look to the 'content, form, and context' of the statement." *Kristofek*, 832 F.3d at 984 (quoting *Chaklos v. Stevens*, 560 F.3d 705, 712 (7th Cir. 2009)).

While content carries the most weight, "the broad subject matter is not determinative, and [courts] must instead focus on the particular content of the speech." *Kubiak v. City of Chicago*, 810 F.3d 476, 483 (7th Cir. 2016). When evaluating context, courts may consider the motive of the speaker. *Id.* at 484.

As alleged, neither Kilborn's word choice for his exam question nor his conversations with students after the exam involved matters of public concern.[2] Although issues relating to race and workplace discrimination constitute matters of public concern, *see, e.g.*, *Walker v. Bd. of Regents of Univ. of Wis. Sys.*, 300 F. Supp. 2d 836, 860 (W.D. Wis. 2004) ("[R]ace . . . discrimination [is a] matter[] of public concern." (citing *Connick v. Myers*, 461 U.S. 138 (1983)), "the broad subject matter" of speech "is not determinative," *Kubiak*, 810 F.3d at 483. Here, considering the specific content—an abbreviated racial epithet; context—an exam question; and motive—presumably to test students' knowledge about civil procedure, Kilborn has not sufficiently alleged that his speech implicated a matter of public concern. *See Kluge v. Brownsburg Cmty. Sch. Corp.*, 432 F. Supp. 3d 823, 839 (S.D. Ind. 2020) (professor's decision regarding the use of pronouns to address his students "did not involve a matter of public concern," even though "issues relating to the treatment of individuals based on their gender

---

[2] In his Amended Complaint, Kilborn alleges that Defendants based their decision to retaliate against him not only upon his exam question and the events following, but upon in-class conversations that allegedly occurred in January of 2020. He contends that these alleged conversations included (1) his reference to racial minorities as "cockroaches," (2) a reference to "lynching, (3) using an AAVE accent when referring to a Black artist's lyrics, and (4) generalizing about minority participation in litigation and admitting to having an "implicit bias" toward Black students. *See* Doc. 9 ¶¶ 34–37. Neither party addresses whether the First Amendment protects these statements. Although the Court could read Kilborn's Amended Complaint to attempt to state a claim based on them, *see id.* ¶ 57 ("Plaintiff's exam question and in-class discussions are plainly protected educational speech."), because Kilborn invokes the statements in his response brief but does not argue that they warrant First Amendment protection, the Court does not understand these statements to underlie Kilborn's First Amendment retaliation claim. Moreover, Kilborn denies making two of the statements. *Id.* ¶ 35 ("The notion that Plaintiff had ever referred to racial minorities as 'cockroaches' is demonstrably false[.]"); *id.* ¶ 36 (accusations that Kilborn generalized about minority participation in litigation and "admit[ed] to having an implicit bias toward Black students . . . . had absolutely no basis in fact"). To the extent the Court has misunderstood Kilborn's claims, he may replead.

identity are of great public importance," because the professor "was not conveying a message concerning such matters when he refused to call students by their [preferred] names"). Kilborn's argument in his response brief that a "significant theme" in his civil procedure class included his "engagement of his students in dialogue about discrimination in the context of civil rights litigation" does not cure his pleading deficiencies, even if the Court considers it. *See* Doc. 23 at 14; *see also Help At Home Inc. v. Med. Cap., L.L.C.*, 260 F.3d 748, 752–53 (7th Cir. 2001) (plaintiff "may add [facts] by affidavit or brief in order to defeat a motion to dismiss if the facts are consistent with the allegations of the complaint" (citation omitted) (internal quotation marks omitted)). While in-class dialogue about discrimination in a civil procedure course may implicate matters of public concern, Kilborn's exam question, as pleaded, did not. *See Lawlor v. Metro. Water Reclamation Dist. of Greater Chi.*, No. 17-CV-117, 2020 WL 1166223, at *5 (N.D. Ill. Mar. 11, 2020) (plaintiff's speech did not implicate matters of public concern where plaintiff referenced Martin Luther King Day in a negative light and used racial slurs toward his Black coworkers); *cf. Garcetti*, 547 U.S. at 419 (acknowledging, in analyzing public concern, "the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civil discussion"); *Afogho as next friends of A.A. v. Ill. Cent. Sch. Dist. 104 Bd. of Educ.*, 421 F. Supp. 3d 585, 595 (S.D. Ill. 2019) (finding speech plausibly related to public concern where employees raised, to the school board, the fact that racism posed a serious problem in their school district).

As for his discussions with and statements made to students after the exam, Kilborn failed to respond to Defendants' arguments that these statements did not implicate matters of public concern, effectively conceding the point. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). In any event,

Kilborn's comment (in jest) that he would "become homicidal" and his January 4th email remarking on the community's reaction to his exam do not implicate matters of public concern. *See Howell v. Millersville Univ. of Pa.*, 283 F. Supp. 3d 309, 337 (E.D. Pa. 2017) (explaining that "complaints based in self-interest [do not] implicate matters of public concern"), *aff'd*, 749 F. App'x 130 (3d Cir. 2018). Even if they did, the statements would not compel First Amendment protection because the content, context, and form of Kilborn's speech—private conversations regarding reactions to his exam question—evince their personal nature. *See Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 378 (7th Cir. 2009) (explaining that the First Amendment does not protect speech that relates to matters of public interest where it focuses "solely on the personal effect upon" an employee or the "only point of the speech was to further some purely private interest"); *Perkins v. O'Malley*, No. 94 C 7029, 1996 WL 316894, at *6 (N.D. Ill. June 10, 1996) (statement that included charges of racism and sexism did not implicate matters of public concern where, "considering the form, context, and especially the content," it sought to "express [the employee's] unhappiness about her evaluation . . . , not to bring to the public's attention a matter in which it could expected to take an interest"); *Howell*, 283 F. Supp. 3d at 337 (finding that "the content, form, and context of [employee's] speech characterize[d] it as a personal grievance" where he complained about department decisions to raise revenue for student activities and his treatment at the hands of his colleagues, and he expressed the opinions in faculty meetings and private emails). Because Kilborn has not established that his speech involved matters of public concern, the Court dismisses his First Amendment retaliation claim without prejudice.

### B.     Compelled Speech

The First Amendment "prohibits the government from telling people what they must say." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 61 (2006).  Kilborn alleges that Defendants violated the First Amendment by requiring him to undergo sensitivity training, which "compels [Kilborn] to express his commitment to the goals of the program in order to be released back to teaching, even if he disagrees with the content and purpose of this diversity training."  Doc. 9 ¶ 56.  Defendants assert that this conclusory allegation does not suffice to establish a compelled speech claim because Kilborn has not alleged the specifics of the purportedly compelled speech and because other allegations in his Amended Complaint contradict his claim.  As discussed *supra*, they also move to dismiss in their official capacities based on sovereign immunity, and in their individual capacities, based on Kilborn's purported failure to identify Defendants' individual involvement in the alleged violation.

The Eleventh Amendment protects Defendants in their official capacities from Kilborn's compelled speech claim.  The Eleventh Amendment bars suits against a State in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984).  "Illinois state universities are state agencies subject to Eleventh Amendment immunity."  *Harden v. Bd. of Trs. E. Ill. Univ.*, No. 12-CV-2199, 2013 WL 6248500, at *5 (C.D. Ill. Dec. 2, 2013) (citing *Cannon v. Univ. of Health Sci./Chi. Med. Sch.*, 710 F.2d 351, 357 (7th Cir. 1983)); *see also Mutter v. Madigan*, 17 F. Supp. 3d 752, 757–58 (N.D. Ill. 2014) ("[S]tate universities, as well as their governing bodies, are protected from suit under the Eleventh Amendment." (citing *Kaimowitz v. Bd. of Trs. of Univ. of Ill.*, 951 F.2d 765, 767 (7th Cir. 1991))), *aff'd as modified sub nom. Mutter v. Rodriguez*, 700 F. App'x 528 (7th Cir. 2017).  However, the "immunity is not absolute"; under the *Ex parte Young* doctrine, the Eleventh Amendment does not extend to claims to enjoin a state

officer in his or her official capacity from engaging in prospective action that will violate federal law. *Brown v. Budz*, 398 F.3d 904, 917–18 (7th Cir. 2005) (citation omitted). To determine whether Kilborn's Amended Complaint avoids the Eleventh Amendment bar, the Court must determine whether it "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 363 (2002) (citation omitted).

Kilborn seeks a declaratory judgment that "Defendants' . . . compulsion of [his] speech violates" the Constitution and UIC statutes. Doc. 9 at 20. Although this request purports to seek prospective relief, Kilborn has not sufficiently alleged an ongoing violation of federal law with respect to his compelled speech claim. Kilborn alleges that he has already "complied with th[e] mandatory training" program, which allegedly required that he express his commitment to the program's goals. *See id.* ¶¶ 50–51, 56. In his response brief, Kilborn contends that he had not, in fact, completed the training when he filed his Amended Complaint and that he still does not know whether he completed the training to Defendants' satisfaction. *See, e.g.*, Doc. 23 at 10 ("While Kilborn complied with some mandated training, Defendants have *not* said whether they deem his effort to be an adequate 'engagement and commitment to the goals of the program' or a 'satisfactory completion of this program.'") Although courts may consider additional facts from a party opposing a motion to dismiss, "the flexibility is not without limitations." *Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017) ("Materials or elaborations in appellants' brief opposing dismissal may be considered, so long as those materials or elaborations are consistent with the pleadings." (citation omitted) (internal quotation marks omitted)). Kilborn omitted these facts from his Amended Complaint and they are not consistent with the facts he did include (*i.e.*, that he complied with the training). Even if the Court

13

considered these additional facts, Kilborn adds in his response that the "precise nature and extent of Defendants' compulsion of [his] speech remains fluid due to Defendants' own furtive behavior." Doc. 23 at 22. This leads the Court to believe that, rather than complaining of an ongoing violation of law, Kilborn fears that Defendants will compel him to speak again in the future. Even assuming the veracity of these fears, they do not amount to an ongoing violation of federal law for which a plaintiff can seek injunctive relief. *See Lawlor v. Metro. Water Reclamation Dist. of Greater Chi.*, No. 17-CV-117, 2018 WL 1293227, at *3 (N.D. Ill. Mar. 13, 2018) ("To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical[.]" (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009))), *on reconsideration in part*, No. 17-CV-117, 2019 WL 1429621 (N.D. Ill. Mar. 30, 2019); *Jud. Watch, Inc. v. King*, No. 1:12-CV-800-WTL-TAB, 2014 WL 12755049, at *2 (S.D. Ind. May 13, 2014) (noting that "Plaintiffs point[ed] to no authority for the proposition that this Court may grant injunctive relief based upon the possibility that a state might violate its own law in the future and in doing so might violate federal law"); *see also Balder v. Meeder*, No. 19-CV-7928, 2021 WL 1172243, at *4 (N.D. Ill. Mar. 29, 2021) ("Although Plaintiffs seek prospective relief, they have not alleged an ongoing violation of federal law. Instead, their claims rest upon discrete retaliatory actions taken by Defendants.").[3] Therefore, Kilborn may not proceed against Defendants in their official capacities on his compelled speech claim.

With regard to Kilborn's claim against Defendants in their individual capacities, at this stage, Kilborn has sufficiently alleged their individual involvement as required to state a claim

---

[3] The Court reaches this conclusion without considering the emails Defendants reference in their motion to dismiss or the materials associated with Defendants' motion for sanctions, which exist outside the four corners of Kilborn's Amended Complaint and are not referenced in it. *See Jackson*, 888 F.3d at 263 (7th Cir. 2018) ("Generally, a district court cannot consider evidence outside the pleadings to decide a motion to dismiss without converting it into a motion for summary judgment.").

14

under 42 U.S.C. § 1983. *See Knight v. Wiseman*, 590 F.3d 458, 462–63 (7th Cir. 2009) ("[T]o recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." (citation omitted)). Kilborn alleges that Spanbauer initially agreed that sensitivity training "might be mandated only if four semesters of review of class recordings revealed that Plaintiff had failed to maintain a non-harassing classroom environment," and then "reneg[ed]" on the agreement and "imposed two surprise punishments," including notifying Kilborn "that he would be required to undergo the very sensitivity training that she had promised not to impose." Doc. 9 ¶¶ 45–47. As to Amiridis, the UIC Community Letter that he sent to the school notified readers that Kilborn "[was] required to complete an intercultural competency training program before he returns to teaching, which should have been mandated instead of just strongly recommended earlier." Doc. 23-1 at 3–4.[4] The allegations against Spanbauer and Amiridis demonstrate, at the very least, knowledge of and consent to the training program. *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) ("A defendant will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent." (citation omitted) (internal quotation marks omitted)). Kilborn also alleges that "Defendants" declared he must take a diversity course and that "Defendants" imposed the sensitivity training. Doc. 9 ¶¶ 50, 56. Although these allegations lack the specificity of his allegations against Spanbauer and Amiridis, given the remaining Defendants' roles at OAE and in creating the Findings Letters, the Court finds it plausible that they were involved in mandating the training. Kilborn's allegations suffice at this stage, when Kilborn may not know exactly who bears responsibility for

---

[4] The Court may consider the UIC Community Letter because Kilborn referred to it in his Amended Complaint and it is consistent with his allegations. *See Williamson*, 714 F.3d 432, 436 (7th Cir. 2013) (courts may consider "documents that are central to the complaint and are referred to in it" in ruling on a motion to dismiss).

every action. *See Koh v. Graf*, No. 11-cv-02605, 2013 WL 5348326, at *4 (N.D. Ill. Sept. 24, 2013) (Rule 8(a) does not require a plaintiff, "without the benefit of discovery, to connect every single alleged instance of misconduct in the complaint to every single specific [defendant]"); *See v. Strunk*, No. 06-2064, 2006 WL 2916819, at *11 (C.D. Ill. Oct. 10, 2006) ("It is of no significance to the adequacy of her legal claims that Plaintiff chose not to specifically name the individual defendant(s) in connection with any given claim.  She has adequately identified each individual defendant and alleged their personal involvement in the alleged violations.  Questions of who did what are properly left to the discovery stage.").

Accepting his allegations as true and construing all inferences in his favor, Kilborn has sufficiently stated a claim for compelled speech.  First, although Kilborn alleges that he must express his commitment to the goals of the program "*even if* he disagrees with the content and purpose" of the training, Doc. 9 ¶ 56, his response clarifies that he does, in fact, disagree with the themes of the program, *see* Doc. 23 at 5.  In any event, absent a compelling reason, the government may not force a person to speak regardless of the content of the speech.  *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634–35 (1943) (propriety of compelling speech does not "turn on one's possession of particular religious views or the sincerity with which they are held . . . . It is not necessary to inquire whether non-conformist beliefs will exempt from the duty to salute unless we first find power to make the salute a legal duty."); *see also Anderson Fed'n of Tchrs. v. Rokita*, 546 F. Supp. 3d 733, 749 (S.D. Ind. 2021) (acknowledging that "cases involving disputes over compelled speech are frequently brought by speakers who disagree with a mandated political or ideological message," but rejecting as a "narrow view" the state's argument that "speech can only be considered unconstitutional compelled speech if the speaker disagrees with it on political or ideological grounds" (citing *Barnette*, 319 U.S. at 634–35)).

Defendants also take issue with the fact that Kilborn has failed to identify the specific speech they allegedly compelled him to make. However, Defendants have not pointed the Court to authority that requires a plaintiff to identify the precise language of his speech, and the Court has no reason to believe that requiring Kilborn to express "commitment" to certain goals would not constitute compelled speech. *See Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019) (state could not "'coerce [plaintiffs] into betraying their convictions' and promoting 'ideas they find objectionable'" (citing *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018))). Although Kilborn may not ultimately prevail on his compelled speech claim, his allegations suffice at this stage.

## II.     Due Process Claims

The Fourteenth Amendment prevents a State from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Kilborn's Amended Complaint contains multiple allegations that arguably implicate due process, including that Defendants suspended him without sufficient process, that they denied him a 2% across-the-board merit raise, and that UIC's Nondiscrimination Policy suffers from unconstitutional vagueness. Defendants' motion challenges only the first allegation. In response, Kilborn focuses solely on the fact that Defendants denied him a merit raise, effectively conceding that he cannot pursue his due process claim based on his suspension. *See* Doc. 23 at 15–16 ("Defendants' sole challenge to the Due Process claim (FAC Count III) is that Kilborn's suspension with pay does not represent a cognizable injury to a property interest. However, Defendants ignore the fact that, as punishment for his purported policy violation, Kilborn was denied an across-the-board salary adjustment of 2%[.]"); *see also Bonte*, 624 F.3d at 466 ("Failure to respond to an argument . . . results in waiver.").

As for Kilborn's argument that Defendants deprived him of a cognizable property interest when they failed to raise his salary, the Court agrees with Defendants that Kilborn lacks a cognizable property interest in a merit raise. "An essential component of a procedural due process claim is a protected property or liberty interest." *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010) (quoting *Minch v. City of Chicago*, 486 F.3d 294, 302 (7th Cir. 2007)); *Citizens Health Corp. v. Sebelius*, 725 F.3d 687, 694 (7th Cir. 2013) ("The threshold question in any due process challenge is whether a protected property or liberty interest actually exists."). To qualify as a constitutionally protected property interest, the right must be created by "existing rules or understandings that stem from an independent source such as state law." *Kim Constr. Co. v. Bd. of Trs. of the Vill. of Mundelein*, 14 F.3d 1243, 1245–46 (7th Cir. 1994) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). A plaintiff "must have more than a unilateral expectation of" the claimed interest; he "must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. Kilborn bears the burden of demonstrating that he possesses a protected property interest. *Crull v. Sunderman*, 384 F.3d 453, 460 (7th Cir. 2004).

Here, although Kilborn may have expected a raise, he has not established a legitimate claim of entitlement to one. *See Swartz v. Scruton*, 964 F.2d 607, 610 (7th Cir. 1992) (acknowledging that employee "may have an expectation of a merit pay increase," but explaining that "he has no property right, contractual or otherwise, to a specific amount of a merit pay increase"); *Altman v. Benigno*, No. 04-3074, 2006 WL 481655, at *7 (C.D. Ill. Feb. 28, 2006) (plaintiff had no property interest in a discretionary merit raise). Kilborn supports his claim by arguing only that Defendants provided the merit raise to all other faculty members and that it amounted to a significant sum. These facts do not suffice to establish a protected property interest. *See Sokn v. Fieldcrest Cmty. Unit Sch. Dist. No. 8*, No. 10-CV-1122, 2015 WL 183912,

18

at *13 (C.D. Ill. Jan. 13, 2015) (rejecting plaintiff's due process claim because she could not

"point to any source for a right to a raise . . . under her contract, under Illinois law or under

federal law"). Therefore, Kilborn cannot proceed with his due process claim on this basis.

However, Kilborn also raises a void for vagueness challenge to UIC's Nondiscrimination

Policy, the merits of which Defendants do not address. Defendants argue, in support of Eleventh

Amendment immunity, that Kilborn has not alleged the unconstitutionality of the

Nondiscrimination Policy. *See* Doc. 31 at 4 (asserting that Kilborn does not "allege that any

University policy is facially unconstitutional" and that he "did not ask this Court to scrutinize the

constitutionality of any University policy"). But Kilborn's Amended Complaint does contain

allegations relating to the vagueness and constitutionality of the policy. *See, e.g.*, Doc. 9 ¶ 73

("The conclusion that Plaintiff violated UIC's Nondiscrimination Policy Statement . . . is based

upon a single operative word, 'harassment,' which is not defined in any way, giving Plaintiff no

notice or guidance on the content of this policy or the kind(s) of conduct it purports to

proscribe."); *id.* ¶ 74 ("The due process principle of clarity is especially demanding, and a more

stringent vagueness test applies, when First Amendment freedoms are at stake, as in this case;

any claim that Plaintiff has violated any nondiscrimination policy violates due process and is

void for vagueness."); *id.* at 20 (requesting "a permanent injunction barring Defendants from

enforcing the antidiscrimination policy in a way that violates faculty and student rights under the

First, Fifth, and Fourteenth Amendments and the University of Illinois Statutes"). Although not

a model of clarity, Kilborn's Amended Complaint contains sufficient references to the vagueness

of UIC's Nondiscrimination Policy to put Defendants on notice of his claim. *See Bell Atl. Corp.*,

550 U.S. at 555 ("Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain

statement of the claim showing that the pleader is entitled to relief, in order to give the defendant

fair notice of what the . . . claim is and the grounds upon which it rests." (citation omitted) (internal quotation marks omitted)).

Moving to Defendants' challenges to all of Kilborn's constitutional claims—that the Eleventh Amendment bars them and Kilborn insufficiently alleged Defendants' personal involvement—the Court rejects Defendants' arguments with respect to Kilborn's due process claim. The claim falls under the *Ex parte Young* exception to the Eleventh Amendment because Kilborn seeks prospective relief—in the form of a declaratory judgment and permanent injunction—for an allegedly ongoing violation of federal law—the unconstitutionally vague Nondiscrimination Policy. *See Ind. Prot. & Advoc. Servs. v. Ind. Fam. & Soc. Servs. Admin.*, 603 F.3d 365, 371 (7th Cir. 2010) ("A court applying the *Ex parte Young* doctrine now 'need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" (alteration in original) (quoting *Verizon Md. Inc.*, 535 U.S. at 645)); *Littler v. Wallace*, No. 2:16-CV-175-WTL-DLP, 2019 WL 2416906, at *2 (S.D. Ind. June 10, 2019) ("[B]ecause the Plaintiff seeks to enjoin a policy that continues to be applied to him, his claims fall within the *Ex Parte Young* exception and may proceed."), *aff'd*, 803 F. App'x 15 (7th Cir. 2020). Moreover, Kilborn adequately addresses each Defendant's involvement by alleging throughout the Amended Complaint that all Defendants participated in enforcing the purportedly unconstitutional Nondiscrimination Policy. *See, e.g.*, Doc. 9 ¶¶ 69–73 (alleging that Defendants violated Kilborn's Fifth and Fourteenth Amendment rights by concluding that he violated UIC's Nondiscrimination Policy based on the undefined term "harassment"). Kilborn's allegations suffice to put Defendants on notice of the claims against them, all courts require at this stage. *See Koh*, 2013 WL 5348326, at *4 (a plaintiff need not "connect every single alleged instance of misconduct in the complaint to every

single specific [defendant]"); *Frazier v. U.S. Bank Nat. Ass'n*, No. 11 C 8775, 2013 WL
1337263, at *3 (N.D. Ill. Mar. 29, 2013) ("Although Plaintiff refers to 'Defendants' and their
'agents' collectively, Plaintiff has provided sufficient factual detail about the nature of his
allegations and about each Defendant to provide fair notice of his claims.").

    Because Defendants have not moved to dismiss Kilborn's due process claim based on the
constitutionality of the policy, Kilborn may proceed with his claim on that basis against
Defendants in their individual and official capacities.

## III.    State Law Claims[5]

    Kilborn also brings state law claims for defamation, false light, and IIED.[6] Defendants
move to dismiss these claims on the merits and on sovereign immunity grounds, asserting that
the Illinois Court of Claims has exclusive jurisdiction over Kilborn's state law claims. The Court
addresses each of Defendants' arguments below.

### A.    Illinois Sovereign Immunity

    The Illinois State Lawsuit Immunity Act, 745 Ill. Comp. Stat. 5/1, protects the State of
Illinois from suit in any court except the Illinois Court of Claims. *Murphy v. Smith*, 844 F.3d
653, 658 (7th Cir. 2016), *aff'd*, 138 S. Ct. 784 (2018). A claim against a public employee
operates as a claim against the State when "there are (1) no allegations that an agent or employee
of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to
have been breached was not owed to the public generally independent of the fact of State
employment; and (3) where the complained-of actions involve matters ordinarily within that

---

[5] In his response brief, Kilborn clarifies that he brings his state law claims against Defendants only in
their individual capacities. The Court therefore need not address Defendants' argument that the Eleventh
Amendment bars Kilborn's state law claims against Defendants in their official capacities.

[6] Kilborn included "Violation of Illinois Statutes" as Count II of his Amended Complaint but indicates in
his response that he did not intend it as a standalone claim. For the sake of clarity, the Court dismisses
Count II.

employee's normal and official functions of the State."  *Id.* (quoting *Healy v. Vaupel*, 133 Ill. 2d 295, 309 (1990)).  But "[i]f the plaintiff alleges that state officials or employees violated statutory or constitutional law, sovereign immunity affords no protection."  *Id.* at 658–59 (citation omitted) (internal quotation marks omitted); *see also Leetaru v. Bd. of Trs. of Univ. of Ill.*, 2015 IL 117485, ¶ 45.  Because Kilborn alleges that Defendants violated state law and the Constitution, sovereign immunity does not protect them at this stage.  *See Murphy*, 844 F.3d at 658 (explaining that sovereign immunity affords no protection where a plaintiff alleges that state employees violated constitutional law even where "state-law claims [do] not depend on constitutional or statutory violations" (citing *Fritz v. Johnston*, 209 Ill. 2d 302 (2004))); *Wheeler v. Piazza*, 364 F. Supp. 3d 870, 885–86 (N.D. Ill. 2019) ("Taking the *Leetaru* majority at . . . its word, the Seventh Circuit in *Murphy* concluded that the exception discussed in *Leetaru* applies broadly to all cases in which state defendants allegedly violate statutory or constitutional law." (citation omitted) (internal quotation marks omitted)); *Hampton v. Kink*, No. 18-CV-550-NJR-MAB, 2021 WL 2580267, at *14 (S.D. Ill. June 23, 2021) (allowing IIED claim to proceed where "[e]ach of [plaintiff's] federal claims involve[d] Defendants' alleged violation of her constitutional rights"); *Danyus v. Derosa*, No. 19-1258, 2021 WL 76946, at *7 (C.D. Ill. Jan. 8, 2021) ("Because [defendant] is alleged to have acted in violation of statutory or constitutional law," specifically, substantive and procedural due process violations, "Plaintiffs' state law claims are not against the State, and therefore the Act does not apply" (citations omitted) (internal quotation marks omitted)).

### B.    Defamation

Kilborn alleges that Defendants defamed him with statements made in the OAE Findings Letter and the UIC Community Letter.  To state a claim for defamation, a plaintiff must allege

(1) that the defendant made a false statement concerning him and (2) that the defendant caused an unprivileged publication of that false statement to a third party, (3) which damaged the plaintiff. *Tuhey v. Ill. Tool Works, Inc.*, No. 17 C 3313, 2017 WL 3278941, at *5 (N.D. Ill. Aug. 2, 2017). Defamatory statements are actionable *per se* without allegations of damages when they involve the imputation of an inability to perform the duties of office or employment or when they prejudice a party or suggest a lack of ability in a plaintiff's trade, profession, or business. *Id.* Although a plaintiff need not lay out the allegedly defamatory statement verbatim, he must plead its substance with "sufficient precision and particularity so as to permit initial judicial review of its defamatory content." *Green v. Rogers*, 234 Ill. 2d 478, 492 (2009).

Plaintiffs may not base defamation claims on "substantially true" statements. Courts characterize a statement as substantially true "where the 'gist' or 'sting' of the allegedly defamatory material is true." *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 42. The question of substantial truth, while usually reserved for a jury, may be determined as a matter of law if "no reasonable jury could find that substantial truth had not been established." *Id.* (citation omitted) (internal quotation marks omitted). Similarly, an opinion—*i.e.*, a statement that is not objectively verifiable—cannot be the basis for a defamation claim. *See Wynne v. Loyola Univ. of Chi.*, 318 Ill. App. 3d 443, 251 (2000).

Kilborn identifies a variety of purportedly false statements in his Amended Complaint. Under the defamation count, he alleges that Defendants falsely stated that he (1) "was guilty of race-based 'harassment' of students;" (2) "'overtly intimidat[ed] and threaten[ed]' students (and similarly, 'threats did occur')" and (3) "'used' racial slurs and referred to minorities as 'cockroaches.'" Doc. 9 ¶ 84. In his response, Kilborn identifies other allegedly defamatory statements that he included elsewhere in his Amended Complaint: that his actions "interfered

with Black students' participation in the University's academic program and therefore constituted harassing conduct," that allegations made by students referring to "cockroaches" and other "inappropriate racially-charged comments" had been substantiated, that he "expressed anger and displeasure with students' objections in a manner that created retaliation concerns for Black students," and that he created "race related fears of physical safety and retaliation."  Doc. 23 at 16–17.  Kilborn also attempts to rely on entirely new facts by identifying allegedly defamatory comments in the UIC Community Letter, but because he omitted these allegations from his Amended Complaint, the Court will not consider them.  *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").  The only statement from the UIC Community Letter that Kilborn referenced in his Amended Complaint involves a generalization; Amiridis wrote that "[t]he use of words that disparage individuals based on identity or background is not necessary for academic freedom to flourish and is inconsistent with our commitment to create an inclusive and conducive learning environment.  These actions are not acceptable in our educational settings from any member of the campus community."  Doc. 9 ¶ 43.  Kilborn asserts that he did not disparage anyone based on identity or background.

Defendants contend that Kilborn failed to identify the substance, speaker, or publication of any "false" statement.  As to the speaker, reading the Amended Complaint with all reasonable inferences drawn in Kilborn's favor, it appears that most of the statements come from OAE's Findings Letter, attached as an exhibit to the Amended Complaint, *see, e.g.*, Doc. 9-1 at 3 ("[Y]our conduct . . . interfered with Black students' participation in the University's academic program and therefore constituted harassing conduct that violates the Policy."); *id.* ("[Y]ou made multiple, inappropriate, racially-charged comments over the course of one hour during the

24

January 23, 2020 class. This includes your making references to 'cockroaches.'"), or the UIC Community Letter, attached to Kilborn's response brief. *See* Doc. 23-1. Kamm signed the Findings Letter, copying Bills and Davidson. All three Defendants work with OAE and so plausibly helped draft the allegedly false statements. *See* Doc. 9 ¶ 33–39. Moreover, Kilborn alleges that "[a]ll Defendants participated in creating the findings letter." *Id.* ¶ 40. Amiridis signed the UIC Community Letter and copied Spanbauer. Although Kilborn may not ultimately be able to prove these allegations, Kilborn has sufficiently pleaded Defendants' involvement in making the allegedly defamatory statements.

With respect to Defendants' publication of the statements, they argue that Kilborn's allegation—that they published the Findings Letter "on information and belief"—does not suffice. Doc. 9 ¶ 39 (Defendants "published [the Findings Letter] by, on information and belief, sending it to members of the BLSA and others"). While Defendants correctly assert that a plaintiff bringing a defamation *per se* claim on information and belief "must at least plead the facts upon which the belief is founded," *Keen v. Bluestar Energy Servs., Inc.*, No. 11 C 7754, 2012 WL 1118215, at *5 (N.D. Ill. Mar. 30, 2012), here, Kilborn alleges that a third-party news source published the Findings Letter, which bore the mark "personal and confidential," *see* Doc. 9 ¶ 39; Doc. 9-1. Construing the Amended Complaint in Kilborn's favor, Kilborn has plausibly alleged that Defendants (as opposed to Kilborn himself) published the letter. *See Kallemeyn Collision Ctr., Inc. v. Standard Fire Ins. Co.*, No. 21 C 6004, 2022 WL 4234947, at *4 (N.D. Ill. Sept. 14, 2022) (plaintiffs sufficiently pleaded why they believed the defamation originated from defendants where defendants "[were] the only other parties besides Plaintiffs privy to the specific labor disputes at issue"); *see also Van Horne v. Muller*, 185 Ill. 2d 299, 308 (1998) ("In general, [a]ll persons who cause or participate in the publication of libelous or slanderous matters are

responsible for such publication." (citation omitted) (internal quotation marks omitted) (alteration in original)).  The Court will therefore turn to the allegedly defamatory statements contained in the Findings Letter.

First, the Findings Letter states that the evidence OAE reviewed substantiated that Kilborn's conduct "interfered with Black students' participation in the University's academic program and therefore constituted harassing conduct."  Doc. 9-1 at 3.  Kilborn denies that his conduct interfered with Black students' participation in school, and Defendants have not addressed this particular statement.  Therefore, accepting Kilborn's allegation as true, Kilborn may proceed with a defamation claim predicated on this statement.

Kilborn may also proceed with his claim predicated on a second group of statements because, although Defendants argue that substantial truth protects them, the question should be left to a trier of fact, and Defendants do not raise any other defenses (*i.e.*, that they operate as opinions).  For example, the Findings Letter states that Kilborn expressed "overtly intimidating and threatening reactions to student-voiced criticism of [his] racially-charged comments and exam question."  Doc. 9-1 at 5.  Kilborn denies that he overtly intimidated or threatened students, explaining that he used the phrase "become homicidal" when speaking with a member of BLSA in jest and that the conversation continued with no indication that the student felt distressed or threatened.  Doc. 9 ¶ 20.  Defendants contend that the "gist" or "sting" of OAE's finding was substantially true based on evidence in the record—including that Kilborn does not deny telling a student he would "become homicidal" and that he "scolded" a White student who supported the BLSA Petition.  Doc. 20 at 12–13.  But Defendants' argument addresses the substantial truth of facts underlying OAE's statement, not the statement itself.  Defendants might have tried to defend OAE's statement as a non-actionable opinion, *see Black v. Wrigley*, No. 17 C 101, 2017

WL 8186996, at *7 (N.D. Ill. Dec. 8, 2017) ("[W]hen the facts underlying a statement of opinion are disclosed, readers will understand that they are getting the author's interpretation of those facts and are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts." (citation omitted) (internal quotation marks omitted) (alteration in original)), but the Court cannot conclude at this stage that "no reasonable jury could find that substantial truth has not been established," *Glob. Relief Found., Inc. v. N.Y. Times Co.*, 390 F.3d 973, 987 (7th Cir. 2004); *see also Levin v. Abramson*, No. 18-CV-1723, 2020 WL 2494649, at *7 (N.D. Ill. May 13, 2020) (substantial truth "is an affirmative defense better suited for a motion for summary judgment" (citation omitted) (internal quotation marks omitted)). The same reasoning and result apply to OAE's substantiation that Kilborn made "inappropriate, racially-charged comments" during his January 23, 2020 class and that his conduct after his exam created fear of physical safety or retaliation for Black students. In both cases, Kilborn denies the truth of the statements. Although the Amended Complaint supports the conclusion that Kilborn made "racially-charged comments," *see, e.g.*, Doc. 9 ¶ 36 (referring to "lynching" in class), a reasonable jury could find that their characterization as "inappropriate" was not substantially true. Similarly, although the Amended Complaint supports the conclusion that Kilborn expressed "anger and displeasure" in his January 4, 2021 email, *see, e.g.*, Doc. 9-1 at 10 (noting that it was "painful" to see a student's name on "BLSA's attack letter," that it was a "shame" to see his efforts "vilified," that his "extended hand of help has been bitten off," and that his "heart is absolutely broken by all of this"), whether Kilborn "created retaliation concerns for Black students" or "created race-related fear of physical safety or retaliation" is a question better left for a jury, *id.* at 4–5.

Kilborn may not, however, proceed with his claim based on comments that he "used" racial slurs, denounced racial minorities' participation in civil rights claims, or referred to minorities as "cockroaches." Defendants defend themselves against each of these allegedly defamatory statements based on substantial truth. First, the Court cannot identify a statement in the Amended Complaint wherein Defendants commented that Kilborn "used" racial slurs. As Defendants point out, the Findings Letter states that Kilborn used an "explicit (abbreviated) reference to a racial epithet," which is substantially true. *See* Doc. 9-1 at 4; *see also* Doc. 9 ¶ 15 (detailing Kilborn's final exam question). Second, Kilborn misrepresents Defendants' use of the term "cockroaches" and recitation that Kilborn "denounced racial minorities' participation in civil rights claims." *See* Doc. 9-1 at 2. The Findings Letter does not state that Kilborn referred to racial minorities as "cockroaches"; instead, it asserts that Kilborn "ma[de] references to 'cockroaches' during his January 23, 2020 class," as evidenced by the transcript excerpt Kilborn included in his Amended Complaint. *See* Doc 9-1 at 3; *see also* Doc. 9 ¶ 35 (transcript of class wherein Kilborn used the term "cockroaches"). As for denouncing racial minorities' participation in civil rights litigation, Defendants did not make this statement; they asserted that others reported that Kilborn engaged in race-based harassment in this way. *See* Doc 9-1 at 3 ("Six students and one faculty member reported that you engaged in race-based harassment of students between January 2020 and January 2021 as follows: . . . you allegedly . . . denounced racial minorities' participation in civil rights claims.").

Similarly, Kilborn cannot proceed with his defamation claim to the extent he seeks to predicate it on Amiridis' general statement that "[t]he use of words that disparage individuals based on identity or background is not necessary for academic freedom to flourish and is inconsistent with our commitment to create an inclusive and conducive learning environment.

28

These actions are not acceptable in our educational settings from any member of the campus." Doc. 9 ¶ 43. As pleaded, this statement does not defame Kilborn—it does not even reference him; it speaks to Amiridis' or UIC's opinion about inclusive learning generally.

In sum, Kilborn may proceed with his defamation claims based on only the following statements or group of statements: (1) his actions "interfered with Black students' participation in the University's academic program and therefore constituted harassing conduct"; (2) he expressed "overtly intimidating and threatening reactions" to students who criticized his in-class comments and exam question; (3) he made "inappropriate" comments in class; and (4) his reactions created intimidation and fears of physical safety and retaliation.

### C.    False Light

Kilborn also brings a claim alleging false light, a "similar tort[]" to defamation. *Black*, 2017 WL 8186996, at *4. A false light publicity claim requires Kilborn to plead that (1) he was "placed in a false light before the public as a result of the [D]efendants' actions," (2) that false light "would be highly offensive to a reasonable person," and (3) Defendants "acted with actual malice, that is, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false." *See Kirchner v. Greene*, 294 Ill. App. 3d 672, 682 (1998). Although a plaintiff may allege malice generally, "the bare conclusory claim of malice, unaccompanied by allegations from which the required subjective element of malice might be inferred, is insufficient to survive a motion to dismiss." *Osundairo v. Geragos*, 447 F. Supp. 3d 727, 742 (N.D. Ill. 2020) (quoting *Pippen v. NBC Universal Media, LLC*, No. 11-CV-8834, 2012 WL 12903167, at *2 (N.D. Ill. Aug. 2, 2012), *aff'd sub nom*. 734 F.3d 610 (7th Cir. 2013)); *see also Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) ("[I]n considering the plaintiff's factual

allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements.").

Here, Kilborn has sufficiently pleaded malice. Kilborn alleges that "Defendants acted with actual malice and reckless disregard for obvious evidence of the falsity of these statements in light of the facts above." Doc. 9 ¶ 87. Although this allegation alone would not suffice to show malice, *see Pippen*, 2012 WL 12903167, at *2 (plaintiff did not adequately allege malice where her complaint alleged only that defendants published the statements with actual malice, but contained no additional details), Kilborn's Amended Complaint contains other allegations that call OAE's investigation and findings into question. Kilborn alleges that he did not have the opportunity to respond to some of the allegations upon which OAE based the decisions in their Findings Letter, *see* Doc. 9 ¶¶ 33, 36, 37, 43, 70, 77, and that OAE ignored evidence and deliberately misrepresented some of Kilborn's statements, *see, e.g.*, *id.* ¶¶ 37, 79. Although Kilborn may not be able to prove this claim—particularly in light of language in the Findings Letter that describes OAE's "thorough" review of materials, including interviews with Kilborn and other relevant parties, and the fact that OAE did not substantiate discrimination allegations against Kilborn, *see* Doc. 9-1 at 3—his allegations suffice at this stage. *See Doe v. HarperCollins Publishers, LLC*, No. 17-CV-3688, 2018 WL 1174394, at *7 (N.D. Ill. Mar. 6, 2018) (plaintiff sufficiently pleaded malice where she alleged, among other things, that defendant deliberately omitted evidence and failed to check sources); *Gibson v. Philip Morris, Inc.*, 292 Ill. App. 3d 267, 276 (1997) (concluding that defendants conducted an "improper and incomplete investigation" based in part on the fact that defendant admitted that he failed to allow the plaintiff to explain himself). Kilborn may proceed with his false light claims based on the same statements that underlie his defamation claims. *See Gracia v. SigmaTron Int'l, Inc.*, 986

F.3d 1058, 1062 (7th Cir. 2021) ("[W]hen a false light invasion of privacy claim follows an unsuccessful defamation claim, the false light claim must also fail."); *Black*, 2017 WL 8186996, at *6 ("A statement cannot serve as the predicate for a defamation or false light claim if it is substantially true.").

    **D.**    **IIED**

        To recover for IIED, Kilborn must allege that "(1) defendants' conduct was extreme and outrageous; (2) defendants either intended to inflict severe emotional distress or knew that there was a high probability that their conduct would do so; and (3) defendants' conduct actually caused severe emotional distress." *Lifton v. Bd. of Educ. of City of Chi.*, 416 F.3d 571, 579 (7th Cir. 2005) (citation omitted) (internal quotation marks omitted). To be considered extreme and outrageous, defendants' conduct "must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 438 (7th Cir. 2009) (quoting *Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1 (1992)). In the employment context, '[l]iability for emotional distress . . . is even more constrained" because "personality conflicts and questioning of job performance are unavoidable aspects of employment and . . . frequently, they produce concern and distress." *Richards v. U.S. Steel*, 869 F.3d 557, 567 (7th Cir. 2017) (citation omitted) (internal quotation marks omitted); *see also Naeem v. McKesson Drug Co.*, 444 F.3d 593, 605 (7th Cir. 2006) ("Illinois courts have been hesitant to find intentional infliction of emotional distress in the workplace because, 'if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action.'" (citing *Graham v. Commonwealth Edison Co.*, 318 Ill. App. 3d 736 (2000))).

Kilborn alleges that Defendants caused him extreme emotional distress when they (1) cancelled his courses, prohibited him from contacting students or colleagues, and forced him to come to campus (potentially exposing himself to COVID-19) and submit to drug testing and medical exams; and (2) attributed inflammatory and false race-based comments to him. Defendants contend that Kilborn fails to sufficiently allege any of the elements of an IIED claim.

The Court need not address all of the elements because Kilborn has failed to adequately allege that Defendants engaged in extreme and outrageous conduct. The Court agrees with Defendants that cancelling Kilborn's courses and requiring him to come to campus do not amount to extreme or outrageous conduct, particularly in the employment context. *See Bannon v. Univ. of Chi.*, 503 F.3d 623, 630 (7th Cir. 2007) (no "extreme and outrageous" conduct where plaintiff complained of "being excluded from some meetings, being denied the responsibility of organizing meetings, being forced to attend a few unpleasant sessions with . . . [the] general counsel that led to no disciplinary action, and having a mean boss who sometimes told her she was stupid"); *Loizon v. Evans*, No. 18 C 2759, 2020 WL 5253852, at *9 (N.D. Ill. Sept. 3, 2020) (plaintiff failed to allege that defendant engaged in "extreme and outrageous conduct" even where defendant "publicly subject[ed] [him] to potentially embarrassing discipline[] and eventual termination" and placed him on desk duty, which "is an extremely embarrassing form of discipline"); *Welsh v. Commonwealth Edison Co.*, 306 Ill. App. 3d 148, 154 (1999) (finding plaintiff's allegations that "they were demoted, transferred, forced to perform 'demeaning' and 'humiliating' tasks, harassed, intimidated, and threatened with termination" insufficient to establish an IIED claim because "in the absence of conduct calculated to coerce an employee to do something illegal, courts have generally declined to find an employer's retaliatory conduct

sufficiently extreme and outrageous as to give rise to an action for intentional infliction of emotional distress").

Although a closer call, Defendants' publication of the Findings Letter and investigation report containing allegedly defamatory statements also does not constitute extreme and outrageous conduct. Kilborn points to cases that have held that "sham" investigations can form the predicate for an IIED claim in the employment context. *See* Doc. 23 at 22–24. However, even crediting Kilborn's allegations that Defendants did not allow Kilborn to respond to every allegation against him and misrepresented or misconstrued some of Kilborn's statements, Kilborn's allegations do not amount to a "sham" investigation as contemplated by the cases he cites. In those cases, the plaintiffs alleged that defendants engaged in the investigations for no reason other than to harm the plaintiff, among other allegations not present here. *See Jackson v. City of Joliet*, No. 19 C 7284, 2020 WL 5800733, at \*5 (N.D. Ill. Sept. 29, 2020) (holding that plaintiff, a Black police officer, sufficiently alleged that defendant arrested him as a result of racial discrimination and retaliation where he alleged that video footage would contradict defendants' theory, that defendants refused to look at the footage, that defendants requested a bond far greater than the normal bond for the charges, and his mistreatment by other officers on the basis of his race); *Graham*, 318 Ill. App. 3d at 746 (allowing plaintiff to proceed with IIED claim where he alleged that defendants retaliated against him for reporting nuclear safety violations, forced statements from employees who denied having any knowledge of his alleged misconduct, and knew throughout their investigation that he had no involvement in incidents defendants attributed to him). Here, in contrast, Kilborn admits to writing the exam question that sparked controversy, telling a student he might "become homicidal" (even if in jest), and writing an email to a former student in response to the student signing the BLSA Petition. Kilborn may

disagree with the way Defendants carried out the investigation or interpreted Kilborn's statements, but the Amended Complaint does not sufficiently allege that Defendants' investigation served "no legitimate objective" such that their behavior amounted to extreme and outrageous conduct. *See Jackson*, 2020 WL 5800733, at *5 (N.D. Ill. Sept. 29, 2020) (acknowledging that in the employment context, "conduct can be extreme and outrageous when the employer or supervisor knows that there is no legitimate objective for the disciplinary investigation"); *Graham*, 318 Ill. App. 3d at 746 (explaining that "many courts have found abusive conduct not to be extreme and outrageous in employment situations where the employer had a legitimate purpose" and collecting cases). Therefore, the Court dismisses Kilborn's IIED claim without prejudice.

## IV. Rule 11 Sanctions

In addition to their motion to dismiss, Defendants have filed a motion for sanctions pursuant to Rule 11. Rule 11 sanctions serve "to deter baseless filings in the district court." *Cooney v. Casady*, 735 F.3d 514, 523 (7th Cir. 2013). Under Rule 11, an attorney certifies that, "to the best of [her] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the contentions she makes in a filing are "not being presented for any improper purpose," "are warranted by existing law or by a nonfrivolous argument" for changing the law, and have evidentiary support. Fed. R. Civ. P. 11(b). The Seventh Circuit has cautioned district courts to impose sanctions sparingly, *Hartmarx Corp. v. Abboud*, 326 F.3d 862, 867 (7th Cir. 2003), with the decision left to the Court's discretion, *Cooney*, 735 F.3d at 523. Defendants have a "high burden" to establish that the Court should impose sanctions. *See Lundeen v. Minemyer*, No. 09 C 3820, 2010 WL 5418896, at *3 (N.D. Ill. Dec. 17, 2010).

Defendants specifically argue that Kilborn and his attorneys violated Rule 11(b)(3), which requires that evidentiary support exist for factual contentions. They base their argument on the fact that Kilborn and his attorneys erroneously assert that Kilborn does not know whether he has sufficiently completed his training program or will return to teaching, in light of the fact that Defendants informed Kilborn and UIC students that Kilborn had completed the program and "[was] scheduled" to teach two courses in the Fall of 2022. Doc. 30-2 at 2. Defendants included this information in emails sent to Kilborn and UIC students on March 2 and March 4, respectively, *see* Doc. 30-1, 30-2, months before Kilborn filed his response brief but after he filed his Amended Complaint. Defendants contend that these contrary statements carry significance because they underlie the basis of Kilborn's official capacity claims.

Although the Court finds that the Eleventh Amendment bars Kilborn's compelled speech claim against Defendants in their official capacities, the Court does not find that Kilborn's conduct warrants the imposition of sanctions. This is especially so given the early stage of litigation. *See B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 857 F. Supp. 1241, 1244 n.4 (N.D. Ill. 1994) ("The proper moment for determining the adequacy of B. Sanfield's factual basis for filing the amended complaint will be the summary judgment stage[.]"); *see also United States ex rel. Ivanich v. Bhatt*, No. 13 C 4241, 2015 WL 249413, at *3 (N.D. Ill. Jan. 20, 2015) (granting motion to dismiss claim, but denying motion for sanctions based in part on "early stage of proceedings"). The Court notes that several documents appended to the parties' sanction briefs appear to indicate that Kilborn may have included arguments in his response brief that do not sound in fact; however, the Court still finds sanctions inappropriate at this early stage and denies Defendants' motion for sanctions. If Kilborn elects to file a Second Amended Complaint and

persists in presenting potentially spurious allegations, the Court will entertain a renewed motion for sanctions at that time and may hold an evidentiary hearing.

## CONCLUSION

For the forgoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss [20]. The Court grants, without prejudice, Defendants' motion to dismiss Kilborn's First Amendment retaliation claim against all Defendants and his compelled speech claims against Defendants in their official capacities. The Court also grants Defendants' motion to dismiss Kilborn's claim for IIED without prejudice. Kilborn may proceed in part with all other claims, as discussed thoroughly above. The Court denies Defendants' motion for sanctions [29].

Dated: February 15, 2023

_____
SARA L. ELLIS
United States District Judge