**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Jason J. Kilborn, | |
| Plaintiff, | Case No.: 1:22-cv-00475 |
| v. | Judge Sara L. Ellis |
| Michael Amiridis, Caryn A. Bills, Julie M. Spanbauer, Donald Kamm, and Ashley Davidson, | Magistrate Judge Sheila M. Finnegan |
| Defendants. | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION**
**TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

Dated:  June 2, 2023

Respectfully submitted,

**MICHAEL AMIRIDIS, CARYN A. BILLS,**
**JULIE M. SPANBAUER, DONALD KAMM,**
**and ASHLEY DAVIDSON**

By:  */s/ John F. Kennedy*
         One of their Attorneys

John F. Kennedy
jkennedy@taftlaw.com
Elizabeth E. Babbitt
ebabbitt@taftlaw.com
Paul J. Coogan
pcoogan@taftlaw.com
Elizabeth A. Winkowski
ewinkowski@taftlaw.com
Andrew S. Murphy
amurphy@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Dr., Suite 2600
Chicago, IL 60601
Phone: (312) 527-4000
Fax:  (312) 527-4011

127439666v9

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. i

ARGUMENT ................................................................................................................ 1

    I.       Defendants' arguments are not precluded by Rule 12(g). .................................... 1

    II.     Defendants are entitled to qualified immunity and Kilborn waived any argument as to their immunity. ..................................................................... 2

    III.    Kilborn's retaliation claim fails under any framework............................................ 4

          A.     Kilborn's claim fails under *Garcetti* because he spoke pursuant to his official duties as a law professor. ....................................... 4

          B.     Kiborn's retaliation claim fails under any First Amendment framework because the speech at issue does not address a matter of public concern. .......................................................................... 6

    IV.    Kilborn fails to allege a claim for compelled speech.............................................. 9

    V.     Kilborn's renewed attempt to plead a procedural due process claim retreads arguments rejected by the court. .............................................................. 11

          A.     Kilborn's semantics do not save the procedural due process claim..................................................................................................... 11

          B.     Kilborn has no property interest where he never lost salary or benefits.................................................................................................. 12

    VI.    Kilborn fails to allege any plausible claim for prospective relief. ....................... 13

          A.     Kilborn's speculation about possible future enforcement of the nondiscrimination policy against him does not establish Article III standing.................................................................................. 14

          B.     The nondiscrimination policy is not unconstitutionally vague................................................................................................... 16

          C.     Kilborn's Second Amended Complaint does not include any request for injunctive relief to "expunge" his "conviction.".................... 18

    VII.   Kilborn has waived any allegation of prior restraint or defamation *per quod*. ......................................................................................................... 19

    VIII.  Kilborn fails to allege claims for defamation *per se* and false light. .................. 19

    CONCLUSION................................................................................................................ 20

127439666v9

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*About U.S. Real Estate, Inc. v. Burnley*,
14 C 04471, 2015 WL 3397025 (N.D. Ill. May 26, 2015) ......................................................2

*Adams v. Trs. of the Univ. of N.C.–Wilmington*,
640 F.3d 550 (4th Cir. 2011) ......................................................7

*Billups-Dryer v. City of Dolton*,
No. 20 C 1597, 2022 WL 1693486 (N.D. Ill. May 26, 2022) ......................................................2

*Bivens v. Trent*,
591 F.3d 555 (7th Cir. 2010) ......................................................7

*Brammer-Hoelter v. Twin Peaks Charter Acad.*,
492 F.3d 1192 (10th Cir. 2007) ......................................................7

*Brown v. Chi. Bd. of Educ.*,
824 F.3d 713 (7th Cir. 2016) ......................................................4

*Buchanan v. Alexander*,
919 F.3d 847 (5th Cir. 2019) ......................................................7

*Burton v. Bd. of Regents of Univ. of Wisc. Sys.*,
20-2910, 2022 WL 16948602 (7th Cir. Nov. 15, 2022) ...............................................1, 5, 17

*Callahan v. Fermon*,
526 F.3d 1040 (7th Cir. 2008) ......................................................5

*Capeheart v. Terrell*,
695 F.3d 681 (7th Cir. 2012) ...............................................1, 14

*Charleston v. Bd. of Tr. of Univ. of Ill. at Chicago*,
741 F.3d 769 (7th Cir. 2013) ...............................................1, 13

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)...............................................14, 15, 16

*Cooke v. Stefani Mgmt. Services, Inc.*,
250 F.3d 564 (7th Cir. 2001) ......................................................20

*Deen v. Darosa*,
414 F.3d 731 (7th Cir. 2005) ......................................................12

i

*Demers v. Austin*,
    746 F.3d 402 (9th Cir. 2014) ....................................................................7

*Doe v. Purdue Univ.*,
    4:18-CV-89-JEM, 2019 WL 1369348 (N.D. Ind. Mar. 25, 2019)...........18

*Doe v. Purdue Univ.*,
    4:18-CV-89-JEM, 2023 WL 2742103 (N.D. Ind. Mar. 31, 2023)...........18

*Doe v. Vill. of Arlington Heights*,
    782 F.3d 911 (7th Cir. 2015) ....................................................................3

*Elliott v. Hinds*,
    786 F.2d 298 (7th Cir. 1986) ..................................................................18

*Ennerga v. Sterns*,
    677 F.3d 766 (7th Cir. 2012) ....................................................................1

*Ewell v. Toney*,
    853 F.3d 911 (7th Cir. 2017) ....................................................................3

*Fei Wang v. Bd. of Tr. of Univ. of Ill.*,
    612 F. Supp. 3d 739 (N.D. Ill. 2020) .....................................................20

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006)....................................................................4, 8, 10

*Greer v. Amesqua*,
    212 F.3d 358 (7th Cir. 2000) ............................................................17, 18

*Hardy v. Jefferson Comm. College*,
    260 F.3d 671 (6th Cir. 2001) ................................................................3, 4

*Hatcher v. Bd. of Trs. of S. Ill. Univ.*,
    829 F.3d 531 (7th Cir. 2016) ..................................................................17

*Hill v. Colorado*,
    530 U.S. 703 (2000)..................................................................................15

*Holderman v. Walker*,
    No. 19 C 6324, 2021 WL 1192441 (N.D. Ill. Mar. 30, 2021) (Ellis, J.)....................3

*Huon v. Denton*,
    841 F.3d 733 (7th Cir. 2016) ..................................................................19

*Keen v. Penson*,
    970 F.2d 252 (7th Cir. 1992) ..............................................................1, 17

ii

*Kluge v. Brownsburg Cmty. Sch. Corp.*,
  432 F. Supp. 3d 823 (S.D. Ind. 2020), *aff'd*, 64 F.4th 861 (7th Cir. 2023) ..............................8

*Kramer v. Am. Bank & Tr., N.A.*,
  No. 11-cv-8758, 2014 WL 3638852 (N.D. Ill. July 23, 2014) ...................................................1

*Lane v. Franks*,
  573 U.S. 228 (2014)...................................................................................................................6

*Lott v. Levitt*,
  556 F.3d 564 (7th Cir. 2009) ...................................................................................................19

*Meade v. Moraine Valley Community College*,
  770 F.3d 680 (7th Cir. 2014) .....................................................................................................6

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) .....................................................................................................8

*Mills v. City of Evansville, Ind.*,
  452 F.3d 646 (7th Cir. 2006) .....................................................................................................5

*Osteen v. Henley*,
  13 F.3d 221 (7th Cir. 1993) .....................................................................................................13

*Pernell v. Florida Bd. of Gov. of the St. Univ. Sys.*,
  2022 WL 16985720 (N.D. Fla. Nov. 17, 2022)........................................................................17

*Piggee v. Carl Sandburg Coll.*,
  464 F.3d 667 (7th Cir. 2006) .........................................................................................1, 16, 17

*Puppala v. Will Cnty. Cmty. Health Ctr.*,
  No. 09 CV 6804, 2010 WL 3893847 (N.D. Ill. Sept. 30, 2010)............................................7, 8

*Riley v. Nat'l Fed. Of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988).................................................................................................................10

*Roldan v. Town of Cicero*,
  No. 17-CV-03707, 2021 WL 3674615 (N.D. Ill. Aug. 19, 2021), *aff'd and
  remanded sub nom. Roldan v. Stroud*, 52 F.4th 335 (7th Cir. 2022)........................................2

*Shebley v. United Cont'l Holdings, Inc.*,
  17-cv-01906, 2020 WL 2836796 (N.D. Ill. May 31, 2020)........................................................2

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014)................................................................................................................15

*Swartz v. Scruton*,
  964 F.2d 607 (7th Cir. 1992) .....................................................................................................1

iii

*Sweet v. Town of Bargersville*,
   18 F. 4th 273 (7th Cir. 2021) ...................................................................9

*Swick v. City of Chicago*,
   11 F.3d 85 (7th Cir. 1993) ....................................................................13

*Townsend v. Vallas*,
   256 F.3d 661 (7th Cir. 2001) ................................................................13

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ...............................................................................10

*Wooley v. Maynard*,
   430 U.S. 705 (1977) ...............................................................................10

*Wozniak v. Adesida*,
   932 F.3d 1008 (7th Cir. 2019) ........................................................1, 5, 17

*Yost v. Curran*,
   Case No. 14 C 3816, 2014 WL 6910666 (N.D. Ill. Dec. 9, 2014) (Ellis, J.) ...........................3

**Other Authorities**

University of Illinois Statutes, available at
   https://www.bot.uillinois.edu/userfiles/Servers/Server_694865/file/Statutes.pdf ..................12

iv

Perhaps the most telling feature of Kilborn's Response to Defendants' Motion to Dismiss (the "Response") is the significant extent to which he ignores binding precedents rejecting various positions he advances in this lawsuit. Kilborn fails to address the majority of the cases Defendants cited in the Motion to Dismiss (the "Motion to Dismiss" or the "Motion"). (Dkt. 56 ("Mot.")). These include a number of highly relevant precedential decisions that this Court must apply. By way of example, Kilborn does not address ***seven*** Seventh Circuit decisions that rejected free speech and/or procedural due process claims brought by college professors or students,[1] all of which were cited in the Motion. (*See* Mot. at 5, 12, 13, 16, 19, 22, 24.) Kilborn cannot ignore the circuit precedent that forecloses his claims. Nor should this Court.

## ARGUMENT

### I.      Defendants' arguments are not precluded by Rule 12(g).

In an effort to save his claims, Kilborn again argues that Federal Rule of Civil Procedure 12(g) precludes Defendants from articulating new arguments for dismissal not included in their First Motion to Dismiss, even though Kilborn chose to amend his pleadings. In doing so, Kilborn ignores *Ennerga v. Sterns*, 677 F.3d 766, 772-73 (7th Cir. 2012), which rejected the argument he advances throughout his Response. (*See* Dkt. 59 ("Resp.") at 14, 16, 17, 24, 28.) In *Ennerga*, the Seventh Circuit held that defendants are permitted to present new Rule 12(b)(6) arguments where, as here, the plaintiff chose to amend his complaint following the court's ruling on a Rule 12 motion. *See Ennenga*, 677 F.3d at 772-73. Kilborn instead relies on a single procedurally inapt district court decision: *Kramer v. Am. Bank & Tr., N.A.*, No. 11-cv-8758, 2014 WL 3638852 (N.D.

---

[1] *See Wozniak v. Adesida*, 932 F.3d 1008 (7th Cir. 2019); *Charleston v. Bd. of Tr. of Univ. of Ill. at Chicago*, 741 F.3d 769 (7th Cir. 2013); *Piggee v. Carl Sandburg Coll.*, 464 F.3d 667 (7th Cir. 2006); *Capeheart v. Terrell*, 695 F.3d 681 (7th Cir. 2012); *Swartz v. Scruton*, 964 F.2d 607 (7th Cir. 1992); *Keen v. Penson*, 970 F.2d 252 (7th Cir. 1992); *Burton v. Bd. of Regents of Univ. of Wisc. Sys.*, 20-2910, 2022 WL 16948602 (7th Cir. Nov. 15, 2022).

1

Ill. July 23, 2014). Defendants previously distinguished *Kramer* (*see* Dkt. 57 at 3-4), because the *Kramer* defendant "turned to a different ground under Rule 12 after its Rule 12 motion was denied, without an intervening change in the plaintiff's pleading." *About U.S. Real Estate, Inc. v. Burnley*, 14 C 04471, 2015 WL 3397025, at *7 (N.D. Ill. May 26, 2015). Here, Defendants moved to dismiss because of the intervening change Kilborn presented in his Second Amended Complaint (the "SAC"). *See also, e.g.*, *Billups-Dryer v. City of Dolton,* No. 20 C 1597, 2022 WL 1693486, at *5 (N.D. Ill. May 26, 2022) (relying on *Ennenga* and permitting new Rule 12 arguments); *Roldan v. Town of Cicero,* No. 17-CV-03707, 2021 WL 3674615, at *5 (N.D. Ill. Aug. 19, 2021) (recognizing that "*Ennenga* is the controlling law of this circuit," and "address[ing] Defendants' new failure-to-state-a-claim arguments, regardless of whether Defendants could have raised them earlier"), *aff'd and remanded sub nom. Roldan v. Stroud*, 52 F.4th 335 (7th Cir. 2022); *Shebley v. United Cont'l Holdings, Inc.*, 17-cv-01906, 2020 WL 2836796, at *4 (N.D. Ill. May 31, 2020). Kilborn does not acknowledge *Ennerga* or otherwise distinguish (or even acknowledge) *Shebley*, *About*, *Billups-Dryer*, or *Roldan*. Kilborn's effort to artificially constrain the scope of the issues before the Court should be rejected.

## II.    Defendants are entitled to qualified immunity and Kilborn waived any argument as to their immunity.

Defendants argued in their Motion to Dismiss that, to the extent Kilborn sufficiently alleged claims that his First Amendment and due process rights were violated, those claims should be dismissed against Defendants in their individual capacities because Defendants are entitled to qualified immunity. (Mot. at 15-17.) Rather than address the qualified immunity defense on the merits, Kilborn maintains that the defense should be: (1) disregarded because it was not raised in Defendants' First Motion to Dismiss; and/or (2) raised at a later stage of the proceedings. (Resp. at 16.) Defendants are not precluded from raising the qualified immunity defense in this motion.

2

(*See* Section I, *supra*.) And, "the Supreme Court repeatedly has stressed the importance of resolving immunity questions at the earliest possible stage in litigation," because it involves "an *immunity from suit* rather than a mere defense to liability." *Yost v. Curran*, Case No. 14 C 3816, 2014 WL 6910666, at *3 (N.D. Ill. Dec. 9, 2014) (Ellis, J.) (dismissing § 1983 claims where defendant established qualified immunity) (internal quotations and citations omitted).

Once, as here, the qualified immunity defense has been raised, even at the pleading stage, "[t]he plaintiff bears the burden of establishing that the constitutional right was clearly established." *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015). Kilborn does not meet this burden, and his argument that qualified immunity does not apply should be waived.

Moreover, Kilborn cannot demonstrate, through a closely analogous case or otherwise, that Defendants' alleged conduct violated clearly established constitutional rights which reasonable persons would have known. *See Ewell v. Toney*, 853 F.3d 911, 919-20 (7th Cir. 2017) (affirming Rule 12 dismissal of constitutional claim where officials were entitled to qualified immunity). "[I]t is not the simple existence of analogous case law that defeats the claim of qualified immunity; ***rather, these decisions must demonstrate that, at the time the defendants acted, it was certain that their conduct violated the law***." *Holderman v. Walker*, No. 19 C 6324, 2021 WL 1192441, at *16 (N.D. Ill. Mar. 30, 2021) (Ellis, J.) (dismissing a Fourth Amendment claim under Rule 12 on qualified immunity grounds and quoting *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 620 (7th Cir. 2002)) (emphasis added). Kilborn makes no argument and points to no authority which establishes that at the time Defendants acted, it was certain that their conduct violated the law.

Kilborn's reliance on a Sixth Circuit case does not defeat Defendants' qualified immunity. In *Hardy v. Jefferson Comm. College*, the court held that a community college president and dean were not entitled to qualified immunity at the pleading stage where they terminated an instructor

3

for using racial slurs in the classroom. 260 F.3d 671 (6th Cir. 2001). But this out-of-circuit case would not have provided notice to Defendants that their actions clearly violated Kilborn's rights because, among other reasons, *Hardy* pre-dated *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), and neither the Supreme Court nor the Seventh Circuit have ever recognized an exception to *Garcetti* for university professors. *See Brown v. Chi. Bd. of Educ.*, 824 F.3d 713, 715 (7th Cir. 2016). Further, Kilborn presents no argument or authority demonstrating that at the time Kilborn participated in training,[2] Defendants would be certain that this conduct would violate the First Amendment by "compelling speech." He also presents no basis to support the proposition that Defendants' conduct was an "obvious" violation of his procedural due process rights. For these reasons, Defendants are entitled to qualified immunity on the constitutional claims.

## III. Kilborn's retaliation claim fails under any framework.

*Garcetti* instructs that "when public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421. Kilborn's claim fails under *Garcetti* because, contrary to his argument, all of the speech at issue was made pursuant to his official duties. Further, as this Court has already concluded, even if *Garcetti* is inapplicable, "Kilborn's speech did not relate to matters of public concern, and so he cannot proceed with his First Amendment retaliation claim." (Dkt. 43 at 8.)

### A. Kilborn's claim fails under *Garcetti* because he spoke pursuant to his official duties as a law professor.

Kilborn argues that two of the four allegedly protected statements at issue—his

---

[2] The training in which Kilborn participated is detailed in the letter from University counsel dated December 16, 2021. (*See* Mot., Ex. 1.) Specifically, Kilborn participated in a five-week Cornell University online program entitled "Teaching and Learning in the Diverse Classroom." In addition to completing online coursework and preparing written assignments, Kilborn worked with an attorney-advisor experienced in employment law and diversity and inclusion consulting in the higher education context.

4

"homicidal" remark to a BLSA member and "hand of help" email to a former student (*see* SAC ¶¶ 57-59)—were made outside the scope of his official duties and not subject to *Garcetti*.[3] But, these comments arose from Kilborn's role as a law professor.

Under *Garcetti*, the threshold inquiry in a First Amendment retaliation case is whether a public employee spoke as a citizen or pursuant to his official duties. *Mills v. City of Evansville, Ind.*, 452 F.3d 646, 647 (7th Cir. 2006). Then, the court considers whether the speech addressed a matter of public concern. *Id.* The Seventh Circuit continues to apply *Garcetti* to university professors. *See Wozniak v. Adesida*, 932 F.3d 1008, 1010 (7th Cir. 2019) (ignored by Kilborn); *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, No. 20-2910, 2022 WL 16948602, at *4 (7th Cir. Nov. 15, 2022) (same).

Kilborn told the BLSA member that he might "become homicidal" if the dean shared with him a petition criticizing the exam question, and told a former student who signed the petition that she made him feel as if his "extended hand of help has been bitten off." (SAC ¶¶ 20, 37, Ex. A.) Kilborn communicated with these two law students in his capacity as a law professor, responding to concerns regarding his exam question. How Kilborn chose to relate to law students and respond to concerns about his teaching methods was a part of his official job duties. *See Wozniak*, 932 F.3d at 1010 ("[H]ow faculty members relate to students *is* part of their jobs."). This remains true notwithstanding the new allegations in the SAC that Kilborn spoke with the BLSA member after hours from his home, not from the faculty lounge during the workday. *See Callahan v. Fermon*, 526 F.3d 1040, 1044 (7th Cir. 2008) (controlling factor is whether the speech "owes its existence to a public employee's professional responsibilities" (quoting *Garcetti*, 452 F.3d at 421)). That Kilborn spoke to the BLSA member at a law school colleague's urging, and sent the email to the

---

[3] There is no dispute that Kilborn made the other two types of statements—the exam question and in-class comments—pursuant to his official duties. (*See* SAC ¶ 57; Resp. at 10-11.)

student from his University email address (signed "Professor of Law") confirms that the speech at issue was made pursuant to Kilborn's official job duties. (*See* SAC ¶ 19; Ex. B.)

Kilborn's reliance on *Lane v. Franks*, 573 U.S. 228 (2014), is misplaced. There, the Supreme Court held that the director of a youth training program's sworn testimony during a criminal corruption trial was entitled to First Amendment protection because the employee's duties to his employer were "distinct and independent from the obligation, as a citizen, to speak the truth." *Id.* at 239. Here, in contrast, Kilborn's duties as a law professor—which include interacting with students and responding to their feedback—cannot be separated from the speech at issue. Kilborn's quotation from *Meade v. Moraine Valley Community College* is dicta (Resp. at 11), and, unlike here, those defendants conceded the "official duties" prong of the analysis, leaving the Court to only address whether the speech at issue involved a matter of public concern. 770 F.3d 680, 684-85 (7th Cir. 2014). All of the speech at issue here was made through Kilborn's official duties, and his retaliation claim must be dismissed under *Garcetti*.

### B. Kiborn's retaliation claim fails under any First Amendment framework because the speech at issue does not address a matter of public concern.

Kilborn next urges this Court to disregard *Garcetti*, claiming that it is inapplicable to university professors whose public duties involve speech to students—even though the Seventh Circuit has never recognized such an exception. Under any framework, Kilborn's retaliation claim fails because his speech did not address a matter of public concern. (*See* Dkt. 43 at 8.)

As an initial matter, Kilborn does not explain how his "homicidal" and "hand of help" comments addressed matters of public concern or respond to Defendants' argument that these matters merely expressed his personal reactions to student complaints about the exam question, waiving any argument to the contrary. Instead, Kilborn claims that his out-of-class speech is entitled to First Amendment protection "whether or not the conversations involved matters of

public concern." (Resp. at 3.) Kilborn is mistaken. Even if Kilborn made these remarks as a private citizen, he still must establish that his speech addressed a matter of public concern. *See Bivens v. Trent*, 591 F.3d 555, 560 (7th Cir. 2010); *see also Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1202 n.4 (10th Cir. 2007) ("District courts remain free, however, to skip the *Garcetti* analysis and dismiss . . . on the basis of the traditional *Pickering* analysis when a claim clearly fails because the matters discussed are not matters of public concern.").[4]

The individual remarks to students were expressions of Kilborn's personal reaction to the student criticism he faced in the wake of the exam question. Indeed, Kilborn repeatedly alleges that the "homicidal" remark was made in "jest." (SAC ¶¶ 20, 26, 38, 60.) The "hand of help" comment likewise reflects his reaction to student criticism. As such, Kilborn's speech is not protected because the "expression addresses only the personal effect upon the employee." *See Puppala v. Will Cnty. Cmty. Health Ctr.*, No. 09 CV 6804, 2010 WL 3893847, at *3 (N.D. Ill. Sept. 30, 2010); (*see also* Dkt. 43 at 11 (collecting cases)).

Kilborn's other speech fares no better. His new allegations focus exclusively on the exam question, attempting to retrofit it with a pedagogical purpose. But the Findings Letter confirms that the exam question alone did not cause the alleged retaliation. Instead, the focus of the Findings Letter was on Kilborn's *reaction* to student criticism of the exam question. (*See* SAC, Ex. B.) As

---

[4] Contrary to Kilborn's claim that Defendants ignore recent authority, Defendants expressly acknowledged that some courts outside this Circuit have declined to apply *Garcetti* to university professors under certain circumstances distinguishable from the facts at hand. (*See* Mot. at 15.) Kilborn cites several non-binding cases without analysis or explanation, some of which do not even hold the speech at issue is protected. *See Buchanan v. Alexander*, 919 F.3d 847, 854 (5th Cir. 2019) (holding, without addressing *Garcetti*, that a professor's use of profanity did not address a matter of public concern). Further, the "academic" speech that some appellate courts have concluded is entitled to First Amendment protection is distinguishable from the speech at issue here, which includes the use of an AAVE dialect to teach civil procedure. *See, e.g., Adams v. Trs. of the Univ. of N.C.–Wilmington*, 640 F.3d 550, 564 (4th Cir. 2011) (professor's columns, book, and media commentary, relating to his general duty to write and appear in his field, were excepted from *Garcetti*); *Demers v. Austin*, 746 F.3d 402, 415 (9th Cir. 2014) (professor's proposed plan to change mass communications school was excepted from *Garcetti*). In any event, "the Court need not decide this question today" because Kilborn's speech did not involve a matter of public concern. (Dkt. 43 at 8.)

to the exam question, Kilborn's retaliation claim should be rejected for this reason alone. *See Puppala* 2010 WL 3893847, at *2 (protected speech must be but-for cause of retaliation).

Moreover, Kilborn's post hoc justifications for the exam question cannot save his retaliation claim. What matters is the "content, form, and context" of the speech, with content being most important. *See Kluge v. Brownsburg Cmty. Sch. Corp.*, 432 F. Supp. 3d 823, 838 (S.D. Ind. 2020), *aff'd*, 64 F.4th 861 (7th Cir. 2023). Here, Kilborn's use of redacted racial epithets on a civil procedure exam did not reflect any of his particular views or add to the public discourse on "civil rights litigation or issues of race in the law." (*See* SAC ¶ 61); *see also Garcetti*, 547 U.S. at 419 (explaining that "public concern" inquiry "promot[es] the public's interest in receiving the well-informed views of government employees engaging in civic discussion"). The belabored allegations of the SAC only underscore that Kilborn did not communicate any clear message or opinion on racial issues to anyone.

Kilborn cites *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021), for the proposition that in-class speech about topics including race and gender addresses matters of public concern, but that non-binding case is inapposite. The speech at issue in *Meriwether* was a philosophy professor's refusal to call students by their preferred gender pronouns. The court concluded that the professor's mode of address was itself a message, reflecting the belief "that one's sex cannot be changed," which was a matter of public concern. *Meriwether*, 992 F.3d at 508. *Meriwether* is not binding in this Circuit, where at least one district court has concluded that a professor's mode of address, without explanation, added little to the public discourse on gender identity, and thus did not involve a matter of public concern. *See Kluge*, 432 F. Supp. 3d at 839. Likewise, peppering civil procedure exam questions with purported "real world, hot button examples of race discrimination," (SAC ¶ 66), delivers no substantive message on race or any other matter of public

8

concern. That the redacted racial epithets lacked content or context also dooms Kilborn's argument regarding media attention. Media interest in Kilborn's treatment is distinguishable from public interest in what he now claims he was trying to say through the exam question.

Kilborn's other speech—all made during the course of a single class session—also did not address a matter of public concern. Kilborn claims for the first time in his Response that his "cockroaches" and "lynching" remarks related to frivolous litigation and pressure on corporate executives to settle unmeritorious claims, while his use of an AAVE accent in quoting a song lyric was made to "to enliven and enlighten" a discussion about race-based pretextual stops. (Resp. at 8.) But none of these allegations regarding the context of the remarks are present in the SAC. (*See* SAC ¶¶ 35-36.) Further, Kilborn immediately retreated from the "lynching" remark as soon as he uttered it, demonstrating he was not using that word to speak on any matter of public concern. (*See id.* ¶ 36). In short, there is no plausible link between any of the statements and "civil rights litigation and issues of race in the law," the matters of public concern on which Kilborn was supposedly speaking. Accordingly, Kilborn's retaliation claim should be dismissed.

## IV.    Kilborn fails to allege a claim for compelled speech.

Kilborn cannot articulate a claim for a violation of his First and Fourteenth Amendment rights on the basis that Defendants compelled his speech through his participation in employee training, which included preparing written essays and engaging in a dialogue with a trainer.

First, and critically, Kilborn cannot articulate that his speech (or lack thereof) in this employee training was constitutionally protected. "'[S]peech that owes its existence to a public employee's professional responsibilities' does not implicate the employee's rights under the First Amendment." *Sweet v. Town of Bargersville*, 18 F. 4th 273, 278 (7th Cir. 2021) (quoting *Garcetti*, 547 U.S. at 421). In *Garcetti*, the Supreme Court concluded that the plaintiff's First Amendment rights were not implicated by plaintiff's writing of a memo because that activity was part of what

he "was employed to do." *Garcetti*, 547 U.S. at 421. Like the *Garcetti* plaintiff, Kilborn's participation in training arising directly and solely from his employment with the University "does not infringe on any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 422 (concluding that "[r]efusing to recognize First Amendment claims based on government employees' work product does not prevent them from participating in public debate.").

Furthermore, none of the cases Kilborn cites in support of his compelled speech claim involve speech made in the public employment context. *Wooley v. Maynard*, 430 U.S. 705 (1977) involved a challenge to a state statute requiring the use of a state motto on license plates. *Riley v. Nat'l Fed. Of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) addressed a state requirement that professional fundraisers disclose the percentage of charitable contributions turned over to a charity. In *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), the Supreme Court struck down a statute compelling school children to salute the American flag. These cases do not at all contemplate the situation presented by Kilborn's claim: that as a public employee, he participate in certain trainings. Under Kilborn's theory, any training program administered by a public employer requiring employee participation could be compelled speech. That is not the law.

Kilborn alleged in the SAC that he was compelled "to express his 'commitment to the goals of the program' in order to be released back to teaching." (SAC ¶ 56.) But, a reading of the complete letter from which he cherry-picks a single sentence demonstrates that Kilborn was not compelled to do any such thing—rather, he was expected to participate in a training program, which included dialogue with a trainer and writing assignments. (Mot. at 9-10, Ex. 1.) Absent from the SAC and Kilborn's Response is what speech, if any, he was "compelled" to make—and that is because he was not compelled to make any speech. Kilborn cannot and does not articulate any

10

message he was compelled to express with which he disagreed. He was not compelled to express his "commitment to the goals of the program," as the letter makes clear.

Kilborn is not entitled to First Amendment protection because he was expected to participate in a training program by his employer. And, Kilborn cannot articulate what speech, if any, he was compelled to make. His compelled speech claim should be dismissed with prejudice.

**V.     Kilborn's renewed attempt to plead a procedural due process claim retreads arguments rejected by the court.**

In its Opinion and Order, this Court concluded that because Defendants did not deprive Kilborn of a cognizable property interest when they failed to raise his salary, his procedural due process claim fails. (Dkt. 43 at 17-19.) Kilborn offers nothing in the SAC or the Response to warrant reviving that claim. Kilborn appears to concede the Court's ruling, stating that he was not amending his complaint for a purported property interest claim on the 2% raise. (SAC at 1 n.1.)

**A.     Kilborn's semantics do not save the procedural due process claim.**

As the Court explained in its Opinion and Order, a plaintiff must have more than a unilateral expectation of a claimed interest; he must, instead, have a legitimate claim of entitlement to it. And, while "Kilborn may have expected a raise, he has not established a legitimate claim of entitlement to one." (Dkt. 43 at 18.) Kilborn tries to sidestep this conclusion by substituting the word "expectancy" with "denial" in his Response. He argues:

> Thus, the *expectancy* of this 2% raise was not the protected property interest that triggered due process protection; rather, the *denial* of this announced, across-the-board raise on the sole basis of a purported policy violation was the automatic, indirect economic effect of the discipline that included double–suspension.

(Resp. at 13, n.1.) From this flawed premise, Kilborn argues that the so-called "denial" of a 2% raise in 2021 creates an indirect economic impact sufficient to trigger the Due Process Clause. He argues that the intangible raise would somehow result in a tangible loss of future salary and benefits and then projects that fictitious loss into the future for a speculative "20 more years." (*Id.* at 13.)

Kilborn's replacement of the word "expectancy" with "denial" does not create a legitimate claim of entitlement to the merit raise. And, since Kilborn cannot establish a legitimate claim of entitlement to the raise as a matter of law (as this Court held), no indirect pecuniary loss can flow from the lack of that raise; nothing from nothing is nothing. Kilborn's "unilateral expectation" of a potential raise (or denial of same) does not create a property interest for due process purposes; nor does the purported incremental loss of that same raise over time. *See Deen v. Darosa*, 414 F.3d 731, 734 (7th Cir. 2005).

**B. Kilborn has no property interest where he never lost salary or benefits.**

It is undisputed that Kilborn was paid his salary and benefits during the relevant time period. Faced with that fact, Kilborn now maintains he had a "statutorily protected property interest in his employment," invoking the University of Illinois Statutes ("University Statutes") for the premise that Kilborn suffered a "severe sanction" by being "suspended with pay."[5] (Resp. at 10.) Kilborn is silent in his Response as to the fact that after a few weeks of administrative leave in early 2021, which resulted from the University's response to Kilborn remarking that he might be "homicidal" to a student, Kilborn admits he was "released to unrestricted duty." (SAC ¶ 28; *see also* Mot. Ex. 1 (providing that while Kilborn was not teaching, he was expected to continue his professorial duties, which included his scholarship work, substantive academic service work, and participation in certain committees)).

Kilborn claims that an alleged failure by the University to adhere to certain process elements set out in the University Statutes gives rise to an "entitlement." Not so. The Seventh Circuit has repeatedly rejected this argument:

---

[5] The University of Illinois Statutes are not "Statutes" enacted by the Illinois General Assembly. They are, rather, the progeny of the internal bylaws approved by the University of Illinois for its governance in 1901 and revised from time to time under the current label "statutes." *See* University of Illinois Statutes, available at https://www.bot.uillinois.edu/userfiles/Servers/Server_694865/file/Statutes.pdf.

> We have rejected similar claims of an 'interest in contractually-guaranteed university process' many times, but we will be clear once more: a plaintiff does not have a federal constitutional right to state-mandated process. Like other student-plaintiffs before him, all that Charleston alleges is that the medical school conferred on him certain procedural rights. It may have been unfair for the university not to follow its own procedures in Charleston's case, but it was not unconstitutional.

*Charleston v. Bd. of Trustees of the Univ. of Ill. at Chi.*, 741 F.3d 769, 773-774 (7th Cir. 2013) (collecting cases) (internal citation omitted); *see also Osteen v. Henley*, 13 F.3d 221, 225 (7th Cir. 1993) ("As we tirelessly but unavailingly remind counsel in this court, a violation of state law . . . is not a denial of due process, even if the state law confers a procedural right").

Kilborn points to no precedent or authority disagreeing with the Seventh Circuit's black letter law on these types of due process claims, and the cases he offers in support of his theory further foreclose this claim. *See Swick v. City of Chicago*, 11 F.3d 85, 86 (7th Cir. 1993) (even if the plaintiff was on a suspension with leave, his due process claim failed where he had no "measurable economic value"); *Townsend v. Vallas*, 256 F.3d 661, 675-76 (7th Cir. 2001) (holding same and noting that even if the plaintiff's reassignment to a different teaching position was "tantamount to a suspension, under the existing case law, a suspension with pay would not constitute the deprivation of a property right subject to federal constitutional protections"). As such, Kilborn's due process claim should be dismissed with prejudice.

## VI.    Kilborn fails to allege any plausible claim for prospective relief.

Kilborn fares no better with his various requests for prospective relief related to Defendants' past and (hypothetical) future enforcement of the nondiscrimination policy. Here, Kilborn continues his pattern of ignoring or minimizing any precedents with which he disagrees. And, more fundamentally, Kilborn still has not provided any satisfactory explanation for how he suffers a "concrete and particularized injury" merely because the University requires its tenured

law professors to abide by a nondiscrimination policy that is the functional equivalent of countless similar policies issued by most public and private employers across the country.

A. **Kilborn's speculation about possible future enforcement of the nondiscrimination policy against him does not establish Article III standing.**

Kilborn's contention that he has Article III standing to seek an injunction against future enforcement of the nondiscrimination policy rests entirely on his professed fear that because he was previously "punished under the policy for his exam question and other speech . . . he now faces a credible threat of future enforcement." (Resp. at 19.) Two cases Defendants cited in their Motion to Dismiss (and ignored by Kilborn)—*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), and *Capeheart v. Terrell*, 695 F.3d 681, 685 (7th Cir. 2012)—reject his expansive standing theory.

The Seventh Circuit's decision in *Capeheart* is indistinguishable from this case. There, a tenured university professor cited two prior incidents of retaliation in support of her request for an injunction enjoining future retaliation against her on the basis of her future speech. 695 F.3d 681, 685 (7th Cir. 2012). Though acknowledging that the plaintiff's retaliation claims were "serious," the Seventh Circuit declined to "stretch [its] jurisdiction based on a guess that Capeheart will improperly be [punished] as retaliation for her speech, as she believe[d] she once was." *Id.* at 686. The Seventh Circuit added that, "[i]f Capeheart's guess is right and she is targeted for her speech, she can again seek a federal forum for her claims." *Id.* The same is true here. If in the future University officials enforce the nondiscrimination policy against Kilborn in a way that unlawfully punishes his protected speech, then Kilborn may be able to seek a judicial remedy. Until then, Kilborn's fears of future punishment are speculative and thus insufficient under Article III.

The Supreme Court's decision in *Clapper* is also instructive. There the Court held that plaintiffs who regularly exchanged sensitive communications with foreign individuals likely to be surveilled by United States intelligence agencies lacked standing to seek an injunction against

14

collection of their communications, even though there was an "objectively reasonable likelihood" that their communications would, in fact, be collected at some point in the future. 568 U.S. 398, 401. In so doing, the Supreme Court explained that the plaintiffs' alleged fear of possible future injury, premised on purported fears about how independent actors in the government would exercise their discretion, did not satisfy Article III's requirement that the "threatened injury must be ***certainly impending***." *Id.* at 410-414 (emphasis added). The *Clapper* Court also rejected the plaintiffs' attempt to establish standing by pointing to "costly and burdensome measures" they undertook to maintain the confidentiality of their communications, reasoning that plaintiffs could not "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id*. at 415-16.

Here, Kilborn's professed fear of possible future punishment is even more speculative than the fears of the *Clapper* plaintiffs. Whereas the plaintiffs in *Clapper* objected to having any of their private communications surveilled by the government, Kilborn apparently agrees that professors should not harass their students.[6] Kilborn's claim is reduced to the notion that he will face future punishment under the nondiscrimination policy only if University officials conclude that some hypothetical future speech that Kilborn considers totally appropriate constitutes "harassment." This Court should reject Kilborn's standing theory because it rests entirely "on speculation about the decisions of independent actors" in hypothetical scenarios not before the court. *Id.* at 414; *see Hill v. Colorado*, 530 U.S. 703, 733 (2000).[7]

---

[6] For example, Kilborn insists that he "has never interfered with Black students' participation in the university's academic program," that he has "never disparaged anybody based on identity or background," and that "attributing race-based discrimination and harassment to a public university professor is among the very worst things that one might say to destroy that person's reputation." (SAC ¶¶ 33, 43, 97, 100, 104.)
[7] Kilborn's reliance on *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), is therefore misplaced. The statute at issue there purported to criminalize making "false statements" during the course of a political campaign, and it had previously been used to target a self-described "pro-life advocacy organization" for criticizing political candidates, something the plaintiff fully intended to continue doing. *Id.* at 151–64.

Kilborn's request for injunctive relief is all the more speculative considering that three of the five University officials he sued no longer hold the positions they held during the events described in the SAC. Though Kilborn contends that this Court should simply substitute the individuals who currently occupy those positions for Defendants for purposes of Kilborn's official capacity claims (Resp. at 24-25), the undisputed change in personnel at the University adds another layer of speculation on top of Kilborn's already speculative fear that the nondiscrimination policy will be used in the future to punish him for engaging in protected speech.

Finally, Kilborn's suggestion the he has engaged in "self-censorship" by avoiding in-class discussion of two cases does not amount to a concrete and particular injury either. Nowhere in the SAC or any of its supporting exhibits is there any allegation or suggestion that Kilborn was punished because of the cases he chose to discuss in class. To the contrary, the Findings Letter and Kilborn's own allegations make clear that what University officials and multiple students objected to was the manner in which he chose to communicate with students—including by using the term "lynching" and adopting an AAVE accent in the same class, telling a student he might become "homicidal," and chastising a different student for biting off his "hand of help." And, again, Kilborn cannot manufacture his own standing by claiming to engage in self-censorship in response to hypothetical concerns not before the Court. *Clapper*, 568 U.S. at 416.

### B.     The nondiscrimination policy is not unconstitutionally vague.

Alternatively, even if Kilborn does have standing to bring a facial challenge to the nondiscrimination policy, this Court should reject the challenge on its merits. As noted above and in the Motion to Dismiss (*see* Mot. at 20-23), Seventh Circuit decisions squarely foreclose Kilborn's argument that the University's nondiscrimination policy is unconstitutionally vague. *See Piggee v. Carl Sandburg Coll.*, 464 F.3d 667, 674 (7th Cir. 2006) (rejecting college professor's challenge to university's anti-harassment policy and explaining that "[t]he doctrines of vagueness

16

and overbreadth do not apply here, as no one was threatening to proceed criminally against [her]");

*Greer v. Amesqua,* 212 F.3d 358, 369 (7th Cir. 2000) (rejecting vagueness challenge to workplace policies prohibiting "discrimination" and "harassment" and explaining that, "[a]lthough written in general language, these rules in the employment setting sufficiently define a range of inappropriate conduct which a reasonable employee would understand.").[8] Kilborn does not address *Piggee* at all, and his effort to distinguish *Greer* (Resp. at 23) consists of a single sentence in which he merely asserts that *Greer* "did not involve a university policy and used the word 'harass' in an ordinary context, which confined its application." But nothing in *Greer* or any other Seventh Circuit case supports Kilborn's assumption that tenured university professors are somehow less capable than the general public of comprehending workplace policies written in general language.

Rather than address binding precedent that forecloses his facial challenge to the nondiscrimination policy, Kilborn instead focuses primarily on a single out-of-circuit district court decision: *Pernell v. Florida Bd. of Gov. of the St. Univ. Sys.*, 2022 WL 16985720 (N.D. Fla. Nov. 17, 2022). But Kilborn's characterization of that case as addressing an "antidiscrimination statute" is wildly misleading. The plaintiffs in *Pernell* were university professors who challenged Florida's "Stop W.O.K.E. Act," a law the district court characterized as "positively dystopian" and which purported to provide the State "unfettered authority to limit what professors may say in class, even at the university level." *Id.* at *1, 3. The plaintiffs risked being disciplined or fired if they espoused

---

[8] *See also, e.g. Burton*, 2022 WL 16948602, at *4 (7th Cir. Nov. 15, 2022) (relying on *Hatcher v. Bd. of Trs. of S. Ill. Univ.*, 829 F.3d 531, 539 (7th Cir. 2016), and rejecting argument that plaintiff's "tenured professorship endowed her with expectations of academic freedom not present for most public employees"); *Wozniak*, 932 F.3d at 1010 ("[H]ow faculty members relate to students *is* part of their jobs. . . . Professors who harass and humiliate students cannot successfully teach them."); *Keen v. Penson*, 970 F.2d 252 (7th Cir. 1992) (recognizing "University's interest in ensuring that its students . . . are not subject to demeaning, insulting, and inappropriate comments.)

17

certain views the Florida legislature had deemed too "woke." By contrast, the nondiscrimination policy here is indistinguishable from policies that apply in workplaces across the United States.

Likewise, Kilborn's selective quotation of the Findings Letter for the proposition that the nondiscrimination policy is "broader than applicable law" does not render the policy inscrutable to a person of ordinary intelligence, despite Kilborn's protestations to the contrary. (SAC ¶ 86.) As the complete sentence Kilborn partially cites makes clear, the policy is "broader than applicable law" in the sense that "discriminatory or harassing conduct may violate the Policy even where the conduct does not rise to the level of a violation of law." (SAC, Ex. A at 2.) A reasonable person, including a tenured law professor like Kilborn, is deemed capable of understanding the prohibited discriminatory and harassing conduct set forth in the policy, and it is reasonable for a university to expect its employees to comply with such a policy. *See, e.g.*, *Greer*, 212 F.3d at 369.

### C. Kilborn's Second Amended Complaint does not include any request for injunctive relief to "expunge" his "conviction."

Kilborn also alleges for the first time in his Response that he seeks "expungement of the 'conviction' from his employment record." (Resp. at 15.) Clearly, the SAC does not deal with a "conviction." Also, nowhere in the SAC does Kilborn actually request this relief. This Court should not entertain a claim or theory of relief Kilborn failed to include in his pleadings. In any event, the two cases Kilborn cites—one involving a request for reinstatement by a former employee and one involving a request for a modified transcript by a former student—do not support his "expungement" request.[9]

---

[9] *See Elliott v. Hinds*, 786 F.2d 298, 300 (7th Cir. 1986) (involving primarily a request for reinstatement to a position from which the plaintiff had been fired); *Doe v. Purdue Univ.*, 4:18-CV-89-JEM, 2023 WL 2742103, at *1 (N.D. Ind. Mar. 31, 2023) (involving a request by a student for clean transcript that did not reference discipline a jury had found to be discriminatory*); Doe v. Purdue Univ.*, 4:18-CV-89-JEM, 2019 WL 1369348, at *3 (N.D. Ind. Mar. 25, 2019) (preliminary ruling in same case).

## VII.   Kilborn has waived any allegation of prior restraint or defamation *per quod*.

Kilborn does not articulate any argument for how Defendants' actions supposedly amount to a "prior restraint." Instead, he simply declares that no analysis of this theory is required. (Resp. at 23-24.) Likewise, Kilborn's Response does not mention defamation *per quod*. Accordingly, Kilborn has effectively waived any argument regarding either theory by failing to articulate those arguments in response to Defendants' arguments for dismissal.

## VIII.   Kilborn fails to allege claims for defamation *per se* and false light.

Kilborn also has not alleged any claims for defamation *per se* or false light. Kilborn first contends that this Court was wrong to conclude that the Findings Letter's description of his "cockroaches" comment can be innocently construed as not referring to racial minorities. (Resp. at 25.) In support of this argument, Kilborn relies almost entirely on his allegation that the *ABA Journal* misreported the Findings Letter as having "substantiated" the allegation that Kilborn referred to racial minorities as cockroaches. (*Id.* at 26.) But any potentially defamatory statements by the ***ABA Journal*** cannot give rise to a defamation claim against **Defendants**. Further, as the Seventh Circuit explained in yet another case Kilborn ignores, in determining whether an allegedly defamatory statement is capable of innocent construction Illinois courts "need not weigh the relative value of competing constructions; instead, any reasonable, nondefamatory interpretation is the one that sticks." *Lott v. Levitt*, 556 F.3d 564, 568 (7th Cir. 2009) (citing *Tuite v. Corbitt*, 866 N.E.2d 114, 122-23 (Ill. 2006)); *see also Huon v. Denton*, 841 F.3d 733, 738 (7th Cir. 2016) (also ignored by Kilborn and explaining that "if a statement is capable of two reasonable constructions, one defamatory and one innocent, the innocent one will prevail").

Finally, Kilborn's defamation and false light claims should be dismissed to the extent they are based on statements of opinion. Despite Kilborn's suggestion to the contrary, there is nothing contradictory between (1) Defendants' expectation that university professors have an

19

understanding about the range of behaviors that can constitute harassment, and (2) the reality that each person perceives harassment differently. *See Cooke v. Stefani Mgmt. Services, Inc*., 250 F.3d 564, 566-67 (7th Cir. 2001) (recognizing that harassment claims have objective and subjective elements). Indeed, Kilborn's own emails acknowledge the obvious fact that there is sometimes a disconnect between how speech is intended and how it is received.[10] Kilborn's disagreement with the opinion of his students and University officials about the propriety of his speech and conduct does not give rise to a viable defamation claim. *See Fei Wang v. Bd. of Tr. of Univ. of Ill.*, 612 F. Supp. 3d 739, 753 (N.D. Ill. 2020).

## **CONCLUSION**

WHEREFORE, Defendants respectfully request that this Court dismiss the SAC in its entirety, and grant any other and further relief that it deems equitable and just.

Dated: June 2, 2023

Respectfully submitted,

**MICHAEL AMIRIDIS, CARYN A. BILLS, JULIE M. SPANBAUER, DONALD KAMM, and ASHLEY DAVIDSON**

By: <u>    */s/ John F. Kennedy*         </u>
      One of their Attorneys

John F. Kennedy
jkennedy@taftlaw.com
Elizabeth E. Babbitt
ebabbitt@taftlaw.com
Paul J. Coogan
pcoogan@taftlaw.com
Elizabeth A. Winkowski
ewinkowski@taftlaw.com
Andrew S. Murphy
amurphy@taftlaw.com

---

[10] *See* SAC, Ex. C at 1 (Kilborn telling a student that he is "sometimes a bit fragile" and that "reminding [him] that [dissent is] not personal, and you're not attacking me or my view, just expressing an opposing viewpoint, is nice"); *id.*, Ex. D at 1 (Kilborn telling a student that he "acknowledged and expressed regret for the pain" his actions caused even though he "certainly did not intend to cause anyone distress").

20

127439666v9

TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Dr., Suite 2600
Chicago, IL 60601
Phone: (312) 527-4000
Fax:  (312) 527-4011

127439666v9